**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

PHILIP FRYMAN and ARAM HOVASAPYAN, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

ATLAS FINANCIAL HOLDINGS, INC., SCOTT D. WOLLNEY, and PAUL A. ROMANO,

Defendants.

Case No.: 1:18-cv-01640

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Lead Plaintiffs Philip Fryman and Aram Hovasapyan ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things: (a) review and analysis of regulatory filings made by Atlas Financial Holdings, Inc. ("Atlas Financial," or "AFH," or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Atlas Financial; and (c) review of other publicly available information concerning Atlas Financial.

## I. NATURE OF THE ACTION

1. This is a securities fraud class action on behalf of persons and entities that purchased or acquired Atlas Financial securities between February 22, 2017, and June 15, 2018, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. AFH holds itself out as a "***specialty***"[2] insurance company, which claims to have "extensive experience and ***expertise with respect to underwriting and claims management*** of in [its] specialty area of insurance."[3] Specifically, the Company provides specialty commercial transportation insurance for taxi, limousine, paratransit and other transport businesses around the United States. AFH's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "AFH." Atlas Financial's business is conducted through insurance subsidiaries, which during the relevant period included: (1) American Country Insurance Company; (2) American Service Insurance Company, Inc.; (3) Gateway Insurance Company ("Gateway"); and (4) Global Liberty Insurance Company of New York ("Global Liberty").

---

[1] "Defendants" refers to Atlas Financial, Scott D. Wollney ("Wollney"), and Paul A. Romano ("Romano") collectively.

[2] Unless otherwise noted, all emphasis in this Complaint is added.

[3] *See* Annual Report on Form 10-K for the 2016 fiscal year, filed with the SEC on March 13, 2017.

3. During the relevant period, AFH similarly touted to investors that the executives of the Company possessed substantial sophistication and experience in its niche market. For example, the Company's 2016 Annual Report claimed:

> ***Experienced management team***. We have a talented and experienced management team who ***have decades of experience in the property and casualty insurance industry***. Our senior management team has worked in the property and casualty industry for an average of more than 25 years ***and with the [AFH's subsidiaries], directly or indirectly, for an average of 15 years.***

4. Loss reserves are everything to an insurance company because every dollar added to loss reserves comes at the expense of net income. Insurance companies are required to hold reserves that are sufficient to cover losses owing to both: (1) known claims on insurance policies that they have provided to customers ("case reserves"); and (2) presently unknown claims on those policies – "incurred but not reported" losses ("IBNR"). Loss reserves should properly reflect the cost of claims that the carrier will be responsible for, whether known or unknown. The value of an insurance company is largely determined by the amount of its "surplus" – the capital it holds in excess of its loss reserves. As such, Defendants were highly motivated to understate loss reserves in order to inflate AFH's reported income and overall value.

5. On March 11, 2015, Atlas Financial announced the closing of its acquisition of Global Liberty. Defendant Wollney touted the benefits of the acquisition, stating: "The addition of Global Liberty to the Atlas group of companies provides key infrastructure which we believe will allow us to pursue proportionate market share on the East Coast, accelerating our ability to grow premium during the current favorable market cycle."

6. On February 22, 2017, AFH shocked investors when it reported its preliminary financial results for the 2016 fiscal year ended December 31, 2016, and announcing a massive increase to its loss reserves. The Company cited as reasons for the reserve strengthening the "significantly increased severity in light commercial auto within the Michigan market and pre-acquisition claims at Global Liberty."

7. In a February 22, 2017, press release, Defendant Wollney stated:

> "While ***Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving***, we did not anticipate the level of loss development in

> Michigan increasing dramatically over the past year. Our team is confident that we have addressed the issues at the heart of this problem, have taken appropriate steps, and will learn from it as part of our ongoing commitment to continuous improvement, which has always been a priority at Atlas. With respect to pre-acquisition related claims at Global Liberty, the transaction was structured to mitigate potential development. We have isolated any remaining exposure with a clear plan in place for remaining claims, and continue to feel very good about the strategic benefits and expected future profitability of this business. While the impact of our reserve strengthening is significant, we believe it is isolated and that our overall book of business is sound, as will be demonstrated going forward."

8. Despite increasing the reserves, in the February 22, 2017 press release, Defendant Wollney cited the Company's increased use of technology, including predictive analytics, and sought to re-assure the investor by stating that " the changes made in our claim process will yield an overall better result in our ultimate loss costs going forward."

9. During the Class Period, Defendants led investors to believe that the 2017 increase in the loss reserves was a one-time-only event and that additional increases were not anticipated. Moreover, as 2017 progressed, Defendants led investors to believe that the substantial reserve increase at the end of 2016 had been sufficient to address the issue and that the issue was progressing in line with the Company's expectations when increasing the reserves at the end of 2016.

10. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Defendants falsely assured investors that the situation was not deteriorating further. Specifically, Defendants failed to disclose, among others: (1) AFH's reserving was not "conservative;" (2) that AFH's loss reserves were still severely understated; (3) that, as a result, AFH's reported net income was severely overstated; (4) that AFH was continuing to see claims payments in excess of case reserves for older claims; (5) that Defendants were disregarding this negative trends with respect to older claims payments based on the unreliable assumption that the reserve deficiencies on these older claims would be offset by favorable loss reserve trends for claims from more recent years (resulting from AFH's recent implementation of predictive analytic tools); and (6) that, as a result of the foregoing, Defendants' statements about AFH's business, operations, and prospects, were false and

misleading and/or lacked a reasonable basis.

11. On March 1, 2018, the Company again shocked investors by announcing a massive increase to its reserves. Atlas Financial reported in relevant part:

> ***Atlas performed a comprehensive review of its reserves and based on year-end actuarial work coupled with a detailed internal file audit for claims with reserves not established by the Company's predictive analytics tools, overall reserves were strengthened.***
>
> **Facts Surrounding Reserve Changes**
>
> • Atlas previously identified that claim expenses in Michigan were significantly outpacing other states and took a significant charge. Although exposure in Michigan was reduced to approximately 1% of the Company's business by year end 2017, ***payments for claims in this state continued to be disproportionate to historic premiums earned.***
>
> • In addition, ***remaining liability for non-New York Global Liberty business written prior to 2016 is expected to settle for greater amounts than previously expected.***
>
> • Overall remaining actuarially determined liability for ***remaining claims related to accident year 2015 and prior in general was indicated to be significantly higher than carried reserves***.
>
> * * *
>
> • Based on year end 2017 actuarial work Atlas determined that this significant reserve increase is necessary to ensure sufficient IBNR levels to extinguish the remaining claims especially for older accident years.
>
> Scott D. Wollney, Chief Executive Officer stated, "While we are disappointed that book value was reduced by reserve strengthening related to prior periods, we are reassured that results for more recent accident years are coming in as expected. The significant commitment we've made to analytics and technology are amplifying the expertise, data and heritage we've always identified as valuable assets of our insurance subsidiaries. The majority of our case reserves are now based on predictive modeling, and thus far this model has proved to be working, helping us to bring claims to ultimate faster and with greater accuracy. We believe the file by file review conducted by our experienced team will also serve as a reliable benchmark against which future payments for older claims can be measured. Going forward, we plan to share quarterly actual loss development experience for both the audited claim files for older accident years as well as paid to case reserve outcomes for predictive model based case reserves."

12. On this news, the Company's stock price fell $7.70 per share, over 40%, to close

at $11.10 per share on March 2, 2018, on unusually heavy trading volume.

13. On March 2, 2018, Defendants held a public conference call with investors, analysts, and other market participants. Therein Defendants admitted that they "obviously pay close attention to [AFH's] claim activity." However, Defendants further conceded that throughout 2017 the runoff of the older claims for years prior to 2016 were being paid for more than the AFH's factor based case reserves.

14. Thereafter, on June 15, 2018, insurance rating company A.M. Best announced that it was downgrading the credit rating of Atlas Financial and the Company's insurance subsidiaries. According to A.M. Best, these actions were taken because, among other reasons, the balance sheet strength of certain of Atlas Financial subsidiaries were "very weak." According to A.M. Best, the "rating downgrades reflect the significant reserve strengthening charge taken in the fourth quarter of 2017," which caused "significant operating losses."

15. On this news, the Company's stock price fell another $1.00 per share, more than 9%, to close at $9.95 per share on June 18, 2018, on heavy trading volume.

16. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

20. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

21. Lead Plaintiff Philip Fryman, as set forth in the certification previously filed with the Court (Dkt. No. 18-3), incorporated by reference herein, purchased Atlas Financial securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22. Lead Plaintiff Aram Hovasapyan, as set forth in the certification previously filed with the Court (Dkt. No. 18-3), incorporated by reference herein, purchased Atlas Financial securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23. Defendant Atlas Financial is incorporated in the Cayman Islands and the Company's corporate headquarters are located in Schaumburg, Illinois. Atlas Financial's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "AFH."

24. Defendant Scott D. Wollney ("Wollney") was the Chief Executive officer ("CEO") of Atlas Financial at all relevant times.

25. Defendant Paul A. Romano ("Romano") was the Chief Financial officer ("CFO") of Atlas Financial at all relevant times.

26. Defendants Wollney and Romano, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Atlas Financial's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew

that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV. BACKGROUND

27. AFH is a financial services holding company. According to the Company's 2016 Annual Report, AFH's "***core business*** is the underwriting of commercial automobile insurance policies, focusing on the 'light' commercial automobile sector." This sector includes taxi cabs, non-emergency para-transit, limousine, livery and business auto.

28. In AFH's 2016 Annual Report, the Company held itself out as a "***specialty***" insurance company, which claims to have "extensive experience and ***expertise with respect to underwriting and claims management*** of in [its] specialty area of insurance."

29. Similarly, AFH touted to investors that the executives of the Company possessed substantial sophistication and experience in its niche market. For example, the Company's 2016 Annual Report claimed:

> ***Experienced management team***. We have a talented and experienced management team who ***have decades of experience in the property and casualty insurance industry***. Our senior management team has worked in the property and casualty industry for an average of more than 25 years and with the [AFH's subsidiaries], directly or indirectly, for an average of 15 years.

### A. Overview Of AFH And Its Subsidiaries

30. AFH's business is conducted through insurance subsidiaries, which during the relevant period included: (1) American Country Insurance Company ("American Country"); (2) American Service Insurance Company, Inc. ("American Service"); (3) Gateway; and (4) Global Liberty.

31. AFH acquired American Country and American Service at the end of 2010. In connection with the acquisition, AFH streamlined the operations of these insurance subsidiaries to focus on the "light" commercial automobile lines of business. During 2011 and 2012, AFH disposed of non-core assets and placed into run-off certain non-core lines of business previously

written by these insurance subsidiaries. Since disposing of these non-core assets and lines of business, AFH's sole focus has been the underwriting of specialty commercial insurance for users of "light" vehicles in the United States.

32. AFH acquired Gateway in January 2013 from an unaffiliated third party. Gateway provides specialized commercial insurance products, including commercial automobile insurance to niche markets such as taxi, black car and sedan service owners and operators. The total purchase price for Gateway was approximately $14.3 million, consisting of a combination of cash and $2 million of AFH preferred shares (consisting of 2 million preferred shares). The Gateway purchase was subject to certain pre and post-closing adjustments, including, among others, the future development of Gateway's actual claims reserves for certain lines of business and the utilization of certain deferred tax assets over time. Pursuant to the terms of the stock purchase agreement, the Company issued an additional 940,500 preferred shares due to the favorable development of Gateway's actual claims reserves for certain lines of business during the first quarter of 2015. During the first quarter of 2016, the Company canceled 401,940 preferred shares pursuant to the Gateway stock purchase agreement due to the unfavorable development of Gateway's actual claims reserves for certain lines of business. During the third quarter of 2016, the Company and the former owner of Gateway's parent company agreed to settle the additional consideration related to future claims development and utilization of certain tax assets. In connection therewith, Atlas redeemed all 2,538,560 of the remaining preferred shares issued to the former owner of Gateway.

33. In March 2015, AFH acquired Global Liberty in a transaction that was structured similar to the acquisition of Gateway. AFH acquired Global Liberty for a total purchase price of $23.2 million, consisting of a combination of cash and Atlas preferred shares, and was estimated at approximately 1.3 times combined U.S. GAAP book value. The consideration consisted of approximately $19.2 million in cash and $4.0 million of Atlas preferred shares (consisting of a total of 4,000,000 preferred shares at $1.00 per preferred share). Global Liberty provides specialized commercial insurance products, including commercial automobile insurance to niche markets such as taxi, black car and sedan service owners and operators primarily in the New

York market. During the fourth quarter of 2016, the Company canceled 4,000,000 preferred shares pursuant to the stock purchase agreement due to unfavorable development of Global Liberty's pre-acquisition claims reserves.

34. According to AFH's 2016 Annual Report, "Gross premium written from commercial automobile was $223.8 million, $207.8 million, and $119.5 million for the years ended December 31, 2016, 2015, and 2014, respectively." Additionally, "As a percentage of [AFH's subsidiaries'] overall book of business, commercial auto gross premium written represented 99.4%, 99.3%, and 97.6% of gross premium written for the years ended December 31, 2016, 2015, and 2014, respectively."

**B. Overview Of The Commercial Auto Insurance Industry**

35. The "light" commercial automobile policies AFH underwrites provide coverage for light weight commercial vehicles typically with the minimum limits prescribed by statute, municipal or other regulatory requirements. The majority of AFH's policyholders are individual owners or small fleet operators.

36. AFH's 2016 Annual Report further indicated that "the 'light' commercial automobile sector is a subset of the historically profitable commercial automobile insurance industry segment" but "in more recent years the commercial automobile insurance industry has seen profitability pressure within certain segments, underperforming the broader property & casualty ("P&C") industry." According to AFH, "for 2015 the total market for commercial automobile liability insurance was approximately $31.3 billion."

**C. Overview Of Insurance Reserves And AFH's Reserving Process**

37. AFH, like all insurance companies, establishes loss reserves to ensure that the Company has sufficient liquid capital to pay claims that are submitted from its insured customers. For insurance companies, reserves are a critical, if not the most important, measure of financial health as they represent expected future losses that the company will be required to pay out for claims on the insurance policies it has issued and underwritten.

38. The establishment of reserves is meant to ensure that a sufficient portion of the premiums received in connection with a business line will be available to cover the claims filed

that relate to that business line. Loss reserves established by an insurer or reinsurer reflect the estimated cost of claims that the carrier will be required to pay in the future on insurance that has been written as of the date of the financial statement. Loss reserves are for the losses, known or unknown, which have been incurred as of the financial reporting date on all policies active or expired. They include an examination of reported but unpaid claims (called case reserves), estimates of claims not yet reported, estimates of closed claims which may be reopened, and estimates of the shortfall expected in case reserves, based on history, to reflect that even on reported claims, information is never complete until the claim is settled. In order for the level of reserves established in connection with a given group of policies to be adequate, the reserves must be based upon actuarial analysis of accurate underlying data concerning the nature of the claims filed (and expected to be filed) and the business lines (i.e., workers' compensation, commercial multi-peril, *etc.*) associated with the claims.

39. Loss reserves fall into two distinct categories. The first category consists of individual case reserves for reported losses and loss expenses associated with a specific reported insured claim. Once AFH receives an insurance claim, a case reserve should be established based upon known facts about the claim at that time, and is modified on an ongoing basis based upon the development of additional facts.

40. The second category of loss reserves consists of the IBNR losses, which include expected losses and claims adjustment expense ("CAE") amounts for claims incurred but not yet reported and the expected loss development of reported claims. CAE reflects the costs associated with the payment of losses and settlement of claims other than the amount of the loss itself, such as the expense of investigating claims and providing payment to attorneys. There are both case reserves and IBNR reserves for CAE. For example, according to AFH's 2016 Annual Report: "The provision for unpaid claims represent the estimated liabilities for reported claims, plus those incurred but not yet reported and the related estimated claims adjustment expenses, such as legal fees." AFH's 2016 Annual Report further indicated that "Unpaid claims adjustment expenses are determined using case-basis evaluations and statistical analyses, including insurance industry claims data, and represent estimates of the ultimate cost of all claims incurred.

41. As AFH explained in its 2016 Annual Report, the Company's net claims incurred expenses is a critical metric to the Company's financial performance. AFH explained:

> Net claims incurred expenses are a function of the amount and type of insurance contracts we write and of the claims experience of the underlying risks. We record net claims incurred based on an actuarial analysis of the estimated claims we expect to be reported on contracts written. We seek to establish case reserves at the maximum probable exposure based on our historical claims experience. Our ability to estimate net claims incurred accurately at the time of pricing our contracts is a critical factor in determining our profitability. The amount reported under net claims incurred in any period includes payments in the period net of the change in the value of the reserves for net claims incurred between the beginning and the end of the period.

42. During the Class Period, AFH claimed that it had conservatively established reserves to cover its estimated liability for the payment of claims and expenses related to the administration of claims incurred on the insurance policies the Company had written. Moreover, AFH claimed that it maintained adequate internal controls over financial reporting.

43. For example, at the start of the Class Period, on February 22, 2017, Defendant Wollney indicated that "… Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving …."

44. Moreover, during the Class Period Defendants claimed to be closely monitoring AFH's loss development. For example, during a public conference call on May 9, 2017, Defendant Wollney reassured investors that Defendants were "monitoring loss development closely and are pleased to confirm that the results in the first quarter were consistent with the loss ratio range provided in our last [conference] call." Similarly, during a public conference call on August 8, 2017, Defendant Wollney reassured investors that "we're monitoring trends by segment and geography closely."

### D. <u>Atlas Financial Touts The Implementation Of Predictive Analytics And AFH's Modeled Versus Non-Modeled Claims</u>

45. In 2015, Atlas Financial implemented plans to incorporate predictive analytics into its business model, and entered into an relationship with EagleEye Analytics in support of those plans.

46. An AFH press release from February of 2015 touted the benefits of incorporating

analytics into the Company's modeling, stating: "We are excited to utilize EagleEye's sophisticated analytics platform to leverage the information and expertise within our organization with the objective of always outperforming the industry across market cycles."

47. AFH's use of predictive analytics was relevant to both its underwriting/pricing determinations, but also to be used in connection with respect to AFH's claims processes.

48. In 2016, AFH directly integrated predictive analytics into AFH's point of sale system and rolled it out to agents during the year.

49. On June 1, 2016, AFH's predictive analytics were integrated into AFH's claims processes with the objective of identifying potentially large claims earlier than previously possible with the goal of: (1) meritorious claims being settled more quickly with less indemnity "leakage" and allocated loss adjustment expense; and (2) non-meritorious claims being engaged earlier in the process to effectuate better outcomes through defense and/or mitigation.

50. Importantly, the timing of AFH's implementation of predictive analytics had a significant undisclosed impact on AFH's claims and reserves. Specifically, claims after June 1, 2016 had "modeled" case reserves that took into account predictive analytics, whereas claims prior to that date were so-called "non-modeled" claims where the case reserves were not set using predictive analytics.

51. While traditionally commercial auto underwriters using traditional methods are not able to establish ultimate case reserves for a year, under AFH's predictive modeling, AFH would set the expected ultimate claim as predicted by its machine learning based modeling tools at only 45 days.

52. During the Class Period, Defendants touted the expected benefits that would come from the use of predictive analytics, including, greater/earlier insight into crucial trends negatively impacting claims. For example, during an August 8, 2017 conference call, Defendant Wollney stated, "The fact that we are now using the machine-learning based predictive analytics in our pricing models as well as our claims reserving process, it's going to help us monitor those changes in severity and frequencies much more closely than we could have without those tools."

## V. OVERVIEW OF DEFENDANTS' FRAUD

53. Throughout the Class Period, Defendants were engaged in a course of fraudulent activity with the goal of concealing AFH's need to increase its loss reserves, in large part due to the claims in Michigan.

54. As alleged herein, Defendants ignored and omitted material information about the worsening condition of AFH's non-modeled claims relating to years 2015 and earlier. In doing so, Defendants knowingly and/or recklessly disregarded that AFH's reserves were severely deficient and drastically understated with respect to the non-modeled claims for the 2015 year and prior years.

55. As a result of the fraudulent conduct alleged herein and AFH's understated loss reserves, AFH reported materially false and misleading net income for Q4 2016 through Q3 2017. Moreover, Defendants made numerous false and misleading statements and omissions regarding the worsening performance of the non-modeled claims for years 2015 and prior.

### A. At The Start Of The Class Period, When Announcing The Company's 2016 Financial Results On February 22, 2017, Defendants Announce A Massive Increase To Atlas Financial's Reserves

56. On February 22, 2017, AFH shocked investors when it issued a press release announcing a substantial increase in its loss reserves. The press release stated:

> Chicago, Illinois (February 22, 2017) -Atlas FinancialHoldings, Inc. (NASDAQ: AFH) ("Atlas" or the "Company") today announced selected preliminary financial results for its fourth quarter and year ended December 31, 2016, which included ***reserve strengthening on higher than expected losses related primarily to significantly increased severity in light commercial auto within the Michigan market and pre-acquisition claims at Global Liberty. To a lesser extent, the overall severity trend on smaller losses in other markets was also a consideration.*** After the impact of taxes and of preferred share adjustments related to acquisition agreements, the impact on net income will be approximately $17 million for the fourth quarter and year ended December 31, 2016. ***The Company performed a comprehensive review of its reserves as a result of changing loss payment trends identified through year-end actuarial work, and ultimately decided that it was appropriate to strengthen reserves at this time.***
>
> Scott D. Wollney, Chief Executive Officer stated, "***While Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving, we did not anticipate the level of loss development in Michigan increasing dramatically over the past year. Our team is confident that we have addressed***

***the issues at the heart of this problem, have taken appropriate steps, and will learn from it as part of our ongoing commitment to continuous improvement, which has always been a priority at Atlas. With respect to pre-acquisition related claims at Global Liberty, the transaction was structured to mitigate potential development. We have isolated any remaining exposure with a clear plan in place for remaining claims, and continue to feel very good about the strategic benefits and expected future profitability of this business. While the impact of our reserve strengthening is significant, we believe it is isolated and that our overall book of business is sound, as will be demonstrated going forward.***"

As a percentage of the Company's policy count, business written in the state of Michigan was reduced significantly on a year-over-year basis beginning in 2013 as a result of relative underperformance. In 2012, Michigan business represented 18.5% of total policy count; in the past year, policies in that state represented 4.5% of the total. Despite the reduction in relative exposure, losses paid in connection with Michigan claims have been disproportionate, representing 21% of all loss amounts paid in 2016 for commercial auto liability claims. Claims paid under $25,000 represented 43% of the total paid in the state with average severity in this cohort increasing 24% on a year over year basis in 2016. In particular, average severity for personal injury protection ("PIP") coverage, which is mandatory in Michigan, paid in 2016 increased by 115% as compared to 2015, litigated PIP claim settlements increased by 25% year over year and PIP claims closing without payment decreased from 50% to 32%. Severity trends for large claims were more stable. In total, based on claim payment made through year-end 2016, Michigan claims for policy years 2010 through 2015 exceeded the amount that would have been proportionate by approximately $23 million.

Atlas will only write business in states and segments where it believes the Company can generate an above average underwriting profit. Having taken actions to eliminate this exposure, the Company anticipates business in Michigan to be less than 1% of Atlas' in-force business by the end of 2017.

Mr. Wollney continued, "***As a specialist, we put a priority on addressing changes in our market in a nimble way. To this end, in recent years Atlas enhanced and initiated numerous underwriting and claim related processes designed to leverage our expertise in the specialty light commercial auto sector, including the elevated use of predictive analytics.*** We have proactively compressed settlement time, particularly with respect to larger claims, providing earlier visibility into potentially changing claim trends. It is important to acknowledge our entire claims team's excellent work, including our Michigan adjusters who are diligently addressing the challenges in that market. ***Observations from the year-end 2016 reserve analysis that led to the conclusion that reserve strengthening for older years appears appropriate also confirm our belief that the changes made in our claim process will yield an overall better result in our ultimate loss costs going forward. The Company is committed to learn from the factors surrounding our reserve strengthening to ensure we can react to changes in our industry and niche as quickly as possible in the future.***"

> Gross Written Premium generated by the Company for the full year ended December 31, 2016 grew year over year by 7.6% to $225.1 million, of which Michigan business represented $9 million of the full year premium. Despite a further anticipated reduction of business in Michigan, overall market conditions in the other states in which Atlas writes business are anticipated to support continued profitable growth. As always, Atlas' focus is optimizing underwriting profit and ultimately return on equity as opposed to top-line growth on an absolute basis, and the Company believes that this reserve strengthening for past periods coupled with the use of advanced risk modeling has Atlas positioned correctly in 2017.
>
> After considering the potential residual effect of reserve strengthening, the Company anticipates its reported Loss & LAE ratio for the most current accident year to be in the range of 59% to 61%. While this is encouraging, Atlas will be diligent in its efforts to deliver potentially improved loss ratios, especially related to more recent accident years through appropriate underwriting and pricing, disciplined claims handling as well as further leveraging the investments it has made in predictive analytics. ***However, credit for such improvement will not be recognized until it is reflected in future loss settlements. Overall reserves will be consistently re-evaluated and Atlas anticipates seeing the positive impact of severity mitigation activities will become apparent in losses settled during 2017 and forward.***
>
> Based on preliminary unaudited financial results, the Company anticipates book value to be in the range of $10.35 to $10.55 per common share diluted as at December 31, 2016, as compared to $10.15 at December 31, 2015, which includes modest income for the year after this reserve adjustment. While reserve strengthening will bring book value to a level only 2% to 4% higher than it was at year-end 2015, Atlas remains committed to the Company's previously stated goal of exceeding P&C industry return on equity ("ROE") by 500 to 1,000 bps going forward based on more recent accident years.

57. During a public conference call on March 14, 2017, with investors and analysts to discuss the Company's Q4 2016 financial results, Defendants provided further information about the events leading to the substantial increase to the Company's loss reserves. Specifically, Defendant Wollney stated:

> For the next few minutes, I'll briefly address the recent reserve strengthening that we've preannounced last month and about which I've spoken with many of you subsequent to that release. ***We feel very strongly that we've isolated the issue and that we were open with investors as to both the cause and the short-term impact it had on our operating results.***
>
> ***As a result of the proactive measures we took and are taking, we believe that Atlas is well positioned going forward.*** I certainly encourage everyone to review

the materials we made available on our website in advance of the AIFA Conference last week and the press release we issued last month.

***For the 2016 fourth quarter and year-end, Atlas performed a comprehensive review of its reserves. As a result of changing loss payment trends identified through year-end actuarial work, we ultimately decided that it was appropriate to strengthen reserves at this time.*** The impact on net income after tax and preferred share adjustments related to acquisitions was approximately $17 million. ***The primary cause of the reserve strengthening was related to increased severity in light commercial auto within the Michigan market for business written in prior accident years.***

***Certain unrelated pre-acquisition claims at Global Liberty were also identified as requiring reserve strengthening. The bulk of the net impact on our balance sheet related to Michigan, so I'll provide more detail in that regard. On slide 3, we outline a few of the causal elements at the heart of the issue. On slide 4, we further explain the analysis around our book, the origination of the challenge, how we proactively address the issue and, ultimately, how Atlas is positioned going forward. As we've referenced before, Michigan had been underperforming for a number of years relative to the rest of our book. As a result, our exposure to the Michigan market was reduced significantly through a combination of rate increases, reduced policy count and, most recently, by refocusing claim efforts based on developments in the past year in particular.***

While some of the macro level causal issues such as high unemployment in Detroit back in 2012 and 2013 have improved, we do not believe these changes are sufficient to achieve our underwriting profit expectations based on market rates in the state at this time. As illustrated in great detail in the materials we presented at the AIFA Conference, litigation percentages and paid severities in Michigan essentially doubled in 2016 as compared to the prior year.

***While the relative underperformance was not a surprise as evidenced by our significant actuarially supported rate increases in the past three years, the dramatic increase in paid severity in one year was a reason we felt it was important to strengthen reserves based on our 2016 year-end actuarial work.***

***By the end of 2017, we expect Michigan to be less than 1% of our overall book of business. This doesn't necessarily mean that we're exiting the state [ph] to net worth return. We just understand that, as a nimble operator, we must focus on properly deploying our capital in states where we can achieve our underwriting goals.***

There are a number of states where we currently don't write due to environments that we believe will not support underwriting profit at this time for various reasons. There are also other states that were historically challenged, but has improved. ***In both cases, our expertise coupled with an ability and willingness to adjust our exposure based on these changes is something that distinguishes us from a larger generalist.***

> There are no other states or segments in our book of business that showed the kind of great need or severity challenges I just described. ***And the predictive analytics we've implemented in the claims area last year will help ensure that any such trends can be identified even earlier in the future.***

58. Further, during the March 14, 2017 conference call, Defendant Wollney assured investors that the reserve increases were "appropriately conservative." Specifically, Defendant Wollney stated:

> ***And so, we do believe that the reserve strengthening is appropriately conservative, reflecting both the disproportionate amount of reserves that claims in Michigan used up through the end of 2016 as well as the expected future payment for the run-off of remaining claims, again, with the expectation that what we saw in 2016 would not improve from a reserve standpoint.*** But operationally we're doing everything we can do to achieve the best possible outcome. So, we are optimistic that those things will have a positive impact and that would ultimately be a good factor for us.

**B. During The Class Period, Defendants Mislead Investors By Suggesting That Atlas Financial's Reserves Continue To Be Sufficient**

59. Throughout the Class Period, Defendants were engaged in a course of fraudulent activity with the goal of concealing AFH's need to increase its loss reserves, in large part due to the claims in Michigan.

60. When announcing substantial increases to loss reserves on February 22, 2017, falsely represented that additional increases in loss reserves were not anticipated, and that the existing loss reserves were expected to be sufficient. In doing so, Defendant Wollney highlighted AFH's "conservative reserves." Further, Defendant Wollney indicated that AFH and the Defendants were "***confident that we have addressed the issues at the heart of this problem, [and] have taken appropriate steps*** …."

61. For example, on May 8, 2017, Defendant Wollney claimed "the reserve charges that Atlas took surrounding our Michigan book of business is ***something that we believe has been isolated***."

62. On August 8, 2017, Defendant Wollney told investors that

> ***I can tell you that the reserve levels that we established at year-end 2016 for Michigan do appear to be holding up consistent with the expectations we had.***

> Paid severity in Michigan seems to be flattening out, again just based on the sort of early information we have in the first half of this year.
>
> As I touched on, the inventory claim count has dropped 16% since the end of 2016. We currently have about 450 claims open for Michigan in terms of the third-party bodily injury and PIP claims, and we are seeing that inventory declining. So claim closure rate is definitely exceeding the rate of inbound claims, which is slowing dramatically.
>
> Last year, I think, we saw the biggest amount of claims settlement that we've seen historically and probably will see based on the fact that there was a three-year statute related to Michigan PIP and a lot of the exposure in that state for us was created in 2013, in terms of claims made against 2012 and 2013 accident years. And so now that that three-year statute has run on the years where we had the biggest in-force exposure, that is also going to result in fewer claims coming in, especially bigger, older claims. ***So, we do have a team of people who are focused specifically on running off those older Michigan claims and we feel confident that they're doing the right job***.

63. Importantly, Defendants knew and/or had ready access to information showing that the loss reserves were insufficient. Because the setting of loss reserves is part of the Company's core operations, knowledge of their insufficiency is imputed to the Individual Defendants. Further, Defendants had instant access to real-time information regarding the Michigan claims, and in fact touted their facility with sophisticated data analysis, which they claimed gave the Company competitive advantage. During the Class Period, however, Defendants repeatedly re-assured investors that additional increases in loss reserves were not anticipated and that the situation, including in Michigan, was under control.

### C. The Truth Begins To Emerge When Atlas Financial Reports Its Preliminary Results For the 2017 Fiscal Year And Subsequently Results In The Company's Credit Rating Being Downgraded

64. The truth regarding AFH's deficient reserves and the Company's true financial condition began to partially be disclosed and/or materialize beginning on March 1, 2018 and on June 15, 2018.

#### 1. The March 1, 2018, Disclosure Of Massive Increases To The Company's Reserves

65. On March 1, 2018, after market closed, AFH issued a press release announcing its preliminary financial results for the 2017 fiscal year ending December 31, 2017, and shocked investors by disclosing that the Company expected to report a net loss of approximately $3.20 for the 2017 fiscal year.

66. AFH's March 1, 2018, press release disclosed that the massive net loss for 2017 had resulted from the need to massively increase its reserves for claims relating to accident years prior to 2016. The March 1, 2018 press release, in relevant part, stated:

> Atlas performed a comprehensive review of its reserves and based on year-end actuarial work coupled with a detailed internal file audit for claims with reserves not established by the Company's predictive analytics tools, overall reserves were strengthened.
>
> **Facts Surrounding Reserve Changes**
>
> • Atlas previously identified that claim expenses in Michigan were significantly outpacing other states and took a significant charge. Although exposure in Michigan was reduced to approximately 1% of the Company's business by year end 2017, payments for claims in this state continued to be disproportionate to historic premiums earned.
>
> • In addition, remaining liability for non-New York Global Liberty business written prior to 2016 is expected to settle for greater amounts than previously expected.
>
> • Overall remaining actuarially determined liability for remaining claims related to accident year 2015 and prior in general was indicated to be significantly higher than carried reserves.
>
> • Risk selection and pricing precision supported by modelling in underwriting beginning in 2015 appears to have contributed improvement in expected loss ratio for premiums earned in 2016 and 2017.
>
> • Payment activity in calendar year 2017 attributed to the use of predictive modelling in claims was accelerated as expected. The Company believes that this represents an ultimate reduction in future expected losses, but it appears to be too early for credit to be given to this potential outcome from an actuarial perspective.
>
> • While the Company did see positive trends relating to more recent accident years in which predictive modelling had an impact, based on year-end work, it is clear that the challenges from the past outpaced more recent benefits.
>
> • Based on year end 2017 actuarial work Atlas determined that this significant reserve increase is necessary to ensure sufficient IBNR levels to extinguish the remaining claims especially for older accident years.
>
> Scott D. Wollney, Chief Executive Officer stated, "While we are disappointed that book value was reduced by reserve strengthening related to prior periods, we are reassured that results for more recent accident years are coming in as expected. The significant commitment we've made to analytics and technology are amplifying the expertise, data and heritage we've always identified as

> valuable assets of our insurance subsidiaries. The majority of our case reserves are now based on predictive modeling, and thus far this model has proved to be working, helping us to bring claims to ultimate faster and with greater accuracy. We believe the file by file review conducted by our experienced team will also serve as a reliable benchmark against which future payments for older claims can be measured. Going forward, we plan to share quarterly actual loss development experience for both the audited claim files for older accident years as well as paid to case reserve outcomes for predictive model based case reserves."

67. On this news, the Company's stock price fell $7.70 per share, over 40%, to close at $11.10 per share on March 2, 2018, on unusually heavy trading volume.

### 2. <u>The June 15, 2018, Credit Rating Downgrades</u>

68. Thereafter, on June 15, 2018, insurance rating company A.M. Best announced that it was downgrading the credit rating of Atlas Financial and certain subsidiaries. A.M. Best issued a press release announcing, among others:

> A.M. Best has removed from under review with negative implications and downgraded the Long-Term Issuer Credit Rating (Long-Term ICR) to "c" from "b-" of Atlas Financial Holdings, Inc. (Atlas) [NASDAQ: AFH], the Financial Strength Rating (FSR) to C (Weak) from B (Fair) and the Long-Term ICRs to "ccc" from "bb" of American Service Insurance Company Inc. (Schaumburg, IL), American Country Insurance Company (Elk Grove Village, IL) and Gateway Insurance Company (St. Louis, MO), collectively referred to as the American Service Pool. A.M. Best also has removed from under review with negative implications and downgraded the FSR to C++ (Marginal) from B+ (Good) and the Long-Term ICR to "b" from "bbb-" of Global Liberty Insurance Company of New York (Global Liberty) (Melville, NY), another wholly owned subsidiary of Atlas. The outlook assigned to these Credit Ratings (ratings) is negative.
>
> ***The ratings of American Service Pool reflect its balance sheet strength, which A.M. Best categorizes as very weak, as well as its marginal operating performance, neutral business profile and marginal enterprise risk management (ERM).***
>
> The ratings of Global Liberty reflect its balance sheet strength, which A.M. Best categorizes as adequate, as well as its marginal operating performance, limited business profile and marginal ERM. The ratings also consider significant drag from the lead rating unit, American Service Pool.
>
> ***The rating downgrades reflect the significant reserve strengthening charge taken in the fourth quarter of 2017, primarily due to Michigan-related claims and non-New York Global Liberty business written prior to 2016. This reserve strengthening caused significant operating losses at both companies, year-over-year decreases in policyholder surplus of 35% at American Service Pool and 27% at Global Liberty, as well as significantly reduced risk-adjusted***

> ***capitalization levels that no longer support the current ratings.*** American Service Pool has increased its quota share reinsurance cession effective April 1, 2018, to mitigate operating leverage on a going-forward basis.

69. On this news, the Company's stock price fell another $1.00 per share, more than 9%, to close at $9.95 per share on June 18, 2018, on heavy trading volume.

### D. Defendants Admissions That They Were Aware Of And Recklessly Disregarded Undisclosed Negative Trends During The Class Period With Respect To Claims Payments In Excess Of Case Reserves For Non-Modeled Claims

70. On March 1, 2018, Defendants held a public conference call with investors and analysts to discuss the Company's preliminary financial results announced that day. Therein, Defendant Wollney began by addressing the reserve increases:

> Here are the facts. Last year we identified that claims expense in Michigan were significantly outpacing other states and took a significant charge. ***To-date the disproportional amount of claims we've paid in Michigan exceeds $38 million. We also recognize that claims of Global Liberty related to prior years' business continued being settled for more than case reserves, while New York business at Global is moving in the right direction, particularly non-New York business from 2016 and earlier years developed worse than expected.***
>
> In addition to these two specific issues, while we have reasons to believe that our niche is less exposed to volatility than other areas of commercial auto insurance, ***based on year-end actuarial work, there appears to be an overall increase in both paid severity and future expected unpaid amounts across our book of business primarily for accident years 2015 and prior.***
>
> While we did see positive trends relating to more recent accident years and our predictive model driven business, based on year-end work, we are again moving to our outside independent actuary select point resulting in a significant reserve increase for remaining claims, ***especially those older accident years prior to our use of predictive analytics.*** The end result is that after the effective reserve strengthening, as well as an approximate $0.55 per share DTA write down resulting from the Tax Cut and Jobs Act (sic) [Tax Cuts and Jobs Act], book value per share as of December 31, 2017 is expected to be between $7.25 and $8, and statutory surplus across Atlas's four insurance company subsidiaries will be between $85 million and $90 million.

71. During the March 1, 2018 conference call, Defendant Wollney indicated: "At year-end 2017, ***experienced members of our claims team also conducted a file by file claim review of non-modeled claims, as well as all remaining Michigan claims to reinforce our***

***decision-making. The results of that review will serve as a benchmark against which sufficiency can be measured as these older claims run off***." Further, Defendant Wollney indicated that "Joe Shugrue[4] and his team of experienced adjusters with 10 years to 20 years or more years of experience at the end of the year looked at each and every one of those claims and evaluated their expected outcomes."

72. During the March 2, 2018 conference call, Defendant Wollney indicated that predictive analytics had a seemingly positive impact on so-called "modeled claims" resulting in expected "compression of claim settlement times" as these changes led to claims payments being sped up. Moreover, Defendant Wollney indicated that AFH was confident that the payment of modeled claims was occurring for less than the case reserve.

73. The announcement of the enormous reserve increases obviously blindsided investors and analysts. In response to an analysts question about how the Company's quarterly reserve process unfolded throughout the year, Defendant Wollney attempted to claim that the reserve increase caught Defendants off-guard but simultaneously admitted that Defendants had been aware that older non-modeled claims were paying out in excess of the case reserves throughout 2017:

> <Q - Matthew J. Carletti>: Couple of questions. I guess first, Scott, could you walk us through a bit of how the – even it sounds like this year that was a little bit of a more in-depth process, but on a more regular basis, how did the quarterly reserve processes take place as compared to, say, what I presume is a more in-depth Q4 process? Because it seems like this definitely came out, caught you guys by surprise that I'm just [indiscernible] (00:21:19) that by kind of the interactions that we've had on prior calls and things like that. Just really with the idea of how it seems like this is rather pervasive in the older years, and how it kind of went under the radar for presumably at least three quarters?
>
> <A - Scott D. Wollney>: Yeah. No, it did catch us by surprise candidly. ***I mean, we obviously pay close attention to our claim activity as the analytics that we provided in the deck I think illustrate, we are looking very closely at claim settlement times, at claim settlement amounts. And really in calendar year 2017 there were two things going on simultaneously. There was the runoff of the older claims where we were paying above that factor based case reserves and that's what the IBNR we put up at the end of last year should have been there to***

[4] As noted below, Joe Shugrue was one of several key AFH executives who engaged in highly unusual and suspicious sales of AFH stock between November and December 2017.

> ***cover.***
>
> And at the same time, we were intentionally paying bigger claims faster as they were identified by our predictive modeling. ***And so, when you look at those things in aggregate, the payments for the older claims were using up IBNR, the claims being paid against the predictive model based case. We're releasing redundancy into IBNR and on a quarterly basis, it – as the older claims became the minority and the newer claims became the majority, it looked like those things would essentially offset one another.*** And then, so we knew that the claim payments were accelerating that was by design for the claims predicted to be larger and again we've got the specifics in terms of those closure rates on page 9.
>
> We were not paying more to close those claims earlier, which is what we illustrate on page 10. So again, it wasn't an issue where we saw average paid severity is going up significantly on a calendar year basis. And because those older claims really relied pretty heavily on the IBNR being correct, until we did the full year actuarial work, we weren't comfortable coming to a conclusion that on an overall net basis, there was a significant need, but we did do a couple of things differently this year obviously than we've done in the past. We did this intensive file review that was possible because at this point claims from 2015 and prior are now at least a year old because almost all the claims for a given accident year get reported within a year.

74. In other words, Defendant Wollney indicated that AFH was seeing the older non-modeled claims being paid for higher than case reserves. AFH, however, disregarded this negative trend based on the assumption that payments one newer modeled claims were paying less than case reserves and would offset the adverse trends with respect to the older claims. As Defendant Wollney more specifically stated:

> <Q - Cliff Gallant>: The one thing – one of the things you were talking about in the Q&A was in terms of looking at the paids year, it sounded like what you said, and I just want to clarify that the total paid losses were coming in as you expected, what you didn't appreciate was that a high percentage of it was going – was coming from the old accident years. Is that correct?
>
> <A - Scott D. Wollney>: ***Well, I think in terms of the – how much of the older accident years using up IBNR exceeded what the newer claims were doing to help IBNR***, because if you think about what was happening at 45 days, we are putting up case reserves for claims that for those claims – under the model of the environment, those claims that had been paid were being paid for less than case, so on a incurred basis, the reserving process itself significantly replaced IBNR with case, and then the older claims that were being paid that had the lower factor reserves were actually legitimately using up IBNR on a paid basis.
>
> ***And in aggregate, there was sort of an offsetting effect and our expectation was as the run-off piece of that non-modeled claims got less and less, it's***

> ***deterioration on IBNR would be more than offset by the benefit from what was going on the modeled claims, but based on the year end work, the conclusion was, there was not enough benefit in the new stuff. In fact, there may even be a reserving review that there it may have suggested the LDF need to be bigger than we think they are.***
>
> And at the same time, the assessment of what's left in that old inventory actuarially is just bigger than our own team has assessed when they have looked at those individual cases file by file. So, it is a different of opinion, but it's also a different approach. It's a file-by-file review versus an actuarial assessment of 2015 and prior in the aggregate.
>
> And again, the only thing that will resolve that difference of opinion is time and we will be communicating how those claims are working through the system on a quarter-by-quarter basis, because really it's the only way that we can ultimately demonstrate what the final outcome is going to be. You've got one – essentially one estimate that's based on math, and you've got another estimate that's based on a granular look at every single file. But as with any claim in the end, the final outcome is the thing that matters.
>
> And so we want to just make sure we both have a very strong control environment internally, particularly for those older claims, which is where the problem seems to be. ***And then be able to articulate that with great transparency to our stakeholders, shareholders and others, as we go forward. And again, make sure we've got the support to get more benefit from – or more credit for the benefits that we are actually seeing emerging in those newer accident years, but don't really think are reflected in the reserving decision.***

75. However, on the March 1, 2018 conference call, Defendant Wollney also effectively conceded that AFH's view that the benefits of predictive analytics (*i.e.*, payments on modeled claims) would offset the negative trends from older claims (*i.e.*, payments on non-modeled claims) was unreasonable based on any traditional understanding of insurance reserves:

> <Q - Robert Farnam>: Did you ever consider getting maybe a second opinion as well? I mean, given that this charge is going to be so big, did you reach out to maybe another third-party to maybe get an analysis done?
>
> <A - Scott D. Wollney>: So, we did do work with other outside experts, many of whom are actuaries, not necessarily reserving actuaries, to help us support what we believe was happening in the business. ***But I think anybody using a traditional actuarial approach to assess reserves would probably see similar things in the sense that you do have old claims that are coming in and being paid for more than the reserves contemplated a year ago.***
>
> ***And we do have these moving parts where big claims are being paid earlier, an early evidence that the claims that are remaining are going to cost less than***

> ***they used to. But I don't think that somebody coming and using a traditional reserving method is necessarily going to come in with a materially different number. But again, I think one of the things we want to do is, think about the fact that as we go forward not only do we want to continue to reaffirm the things that we believe are correct and share those with investors and other stakeholders, but we are going to bring in incremental opinions.***

## VI. ADDITIONAL ALLEGATIONS REGARD DEFENDANTS' SCIENTER

76. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Atlas Financial, their control over, and/or receipt and/or modification of Atlas Financial's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Atlas Financial, participated in the fraudulent scheme alleged herein.

77. Additionally, the Defendants' knowledge and/or recklessness regarding the materially false and/or misleading statements and omissions described herein, is further established by the following facts which establish a strong inference that Defendants acted with scienter.

### A. The Individual Defendants And Other Key Atlas Financial Executives And Directors Began Dumping Atlas Financial Stock In A Highly Unusual And Coordinated Fashion Between November 8, 2017 and December 21, 2017

78. During the Class Period Defendants Wollney and Ramano, as well as three other high ranking AFH executives (including Joseph Shugrue, Giles Bruce Wayne, and Leslie Dimagio) took advantage of AFH's artificially inflated stock price and sold shares while AFH's stock price was near its Class Period high and shortly before AFH disclosed substantial increases to its loss reserves.

79. Each of these individuals' sales of AFH was highly unusual and suspicious

because: (1) each individual deviated from their prior trading in AFH's stock since 2015; (2) occurred between November 8 and December 21, 2017, while AFH's stock was near its Class Period high; (3) occurred near the end of 2017 around the time AFH was conducting a claim-by-claim review of its non-modeled claims, which was being conducted by Joseph Shugrue; (4) each individuals' transaction occurred in a synchronized and coordinated fashion with their transactions occurring over the same period of time and on similar dates; and (5) resulted in each individual obtaining substantially higher proceeds than had each individual waited until after the March 1, 2018, announcement that AFH was drastically increasing its reserves or thereafter.

80. During the Class Period, Defendant Wollney sold 36,668 shares of AFH stock and realized $721,880 from these sales. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

81. During the Class Period, Defendant Romano sold 26,668 shares of AFH stock and realized $525,675 from these sales. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

82. Joseph Raymond Shugrue is AFH's Vice President for Claims. During the Class Period, Shugrue sold 23.334 shares of AFH stock and realized $456,173 from these sales. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

83. Bruce Wayne Giles is AFH's Vice President for Product Development and Underwriting. During the Class Period, Giles sold 23.334 shares of AFH stock and realized $459,172 from these sales. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

84. Leslie Dimaggio is AFH's Vice President for Operations and IT. During the Class Period, Defendant Wollney sold 23,334 shares of AFH stock and realized $459,172 from these sales. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

85. The Individual Defendants and Leslie Dimaggio were further motivated to inflate the price of AFH stock because, as of March 27, 2017, Scott Wollney had 58,098 Ordinary Shares, Paul Romano had 14,488 Ordinary Shares and Leslie DiMaggio had 14,488 Ordinary

Shares pledged as security for personal loans.

### B. Defendants' Manipulation Of AFH's Reserves Involved The Company's Core Operations

86. Setting of loss reserves are indisputably part of Atlas Financial's core operations. Atlas Financial is in the business of providing specialized auto insurance. Setting of loss reserves is an essential part of an insurance business. Without a knowledgeable setting of loss reserves, an insurance company cannot properly function in a business environment in that setting an appropriate loss reserve is essential in the underwriting of insurance policies.

87. Setting of loss reserves in, among other states, Michigan represented a crucial part of Atlas Financial's operations. Company executives, including the Individual Defendants, repeatedly emphasized the loss reserves in Michigan as representing an important aspect of the Company operations, and stated that they played an important role in Atlas Financial's profitability and income.

88. As alleged herein, Atlas Financial carefully tracked the status of its loss reserves. The data concerning actual or possible claims was maintained by Defendants and was easily available to them. Defendants further had (and promoted having) extensive experience in the commercial auto insurance industry and were aware of the importance of setting appropriate loss reserves. Indeed, Defendants understood that, as part of Atlas Financial's core operations, the setting of appropriate loss reserves were necessary for the company's status as a going concern, let alone as a profitable enterprise.

89. Moreover, in certifications that the Individual Defendants signed and submitted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 with 2016 10K, Q1 2017 10Q, Q2 2017 10Q, and Q3 2017 10Q forms, they attested that they have reviewed these forms and that these reports do not contain any false statements of material fact of material omissions, and that they fairly present in all material respects the financial condition of the Company.

### C. Defendants Were Experienced Executives At A "Specialty" Insurance Company

90. Each of the Individual Defendants is a highly experienced corporate executive with particular experience in the specialty insurance industry.

91. Defendant Wollney. 49, is President, Chief Executive Officer & Director at Atlas Financial Holdings, Inc. and President & Chief Executive Officer at American Service Insurance Co., Inc. He is on the Board of Directors at 1347 Property Insurance Holdings, Inc. Mr. Wollney was previously employed as President & Chief Executive Officer by Kingsway America, Inc. and Lincoln General Insurance Co., and President by Avalon Risk Management, Inc. Mr. Wollney was a Co-Founder of Avalon subsidiary over 10 years ago and has over 18 years' experience in transportation related and surety insurance. He has been a Director of Atlas Financial Holdings, Inc. since December 31, 2010 and 1347 Property Insurance Holdings, Inc. since March 30, 2015. He is a sub-committee member in the U.S. Customs and Border Protection Trade Support Network and received the Transportation Intermediaries Industry Advancement Award. Mr. Wollney holds an MBA with a dual concentration in Finance and Strategy from Northwestern University's, Kellogg School of Management in 2000 and a Bachelor of Arts degree from the University of Illinois in 1991.

92. Defendant Romano, 56, has served as Vice President and Chief Financial Officer of Atlas Financial since December 2010. From March 2010 until that time, he served as Vice President and Treasurer of Kingsway America Inc., prior to which he was the Vice President, Data Management of Lincoln General Insurance Company from October 2008 to March 2009. From 2002 through 2008, he held various Vice President and Director positions with American Country Insurance Company and its affiliates. Mr. Romano holds a Certified Public Accountant designation in the State of Illinois. He received a Master of Business Administration degree from the Northwestern University Kellogg Graduate School of Management in 1996 and a Bachelor of Science, Accounting, from the University of Illinois in 1984.

93. The Individual Defendants' educational and professional experience demonstrate that they are well-versed in the business of specialized auto insurance. By virtue of this experience, the Individual Defendants understood the importance of setting appropriate levels of loss reserves in the insurance industry. They also understood the importance of setting appropriate levels of loss reserves to Atlas Financial's business, as well as to the Company's stock price.

### D. Defendants Were Admittedly Aware Of Negative Undisclosed Trends And Claim To Have Been Closely Monitoring The Negative Information That Was Withheld From Investors

94. The Individual Defendants repeatedly highlighted their real-time access to key data regarding the trends in their insurance risk pool, including data necessary to properly set loss reserves. Indeed, the Individual Defendants not only had access to, but in fact actively monitored this information.

95. For example, during a May 8, 2017 earnings call, Defendant Wollney stated:

> In the case of the evolution of our target niche, we believe that Atlas has the most comprehensive perspective on the market risk and has been moving incrementally to translate that knowledge into underwriting profit by leveraging both our heritage as well as our commitment to technology and analytics.

96. Wollney emphasized Defendants' proficiency with data analysis and touted it as on of the Company's strengths:

> ***We have a high level of visibility to evaluate and implement rate changes*** where appropriate and have been doing so. Data from The Council of Insurance Agents and Brokers as shown on slide 7 illustrates the broader commercial auto rate retrenchment, which supports rate increases in general and particularly in the smaller account and light commercial auto markets, in which Atlas specializes. . . .
>
> *We are continuing to closely monitor* loss development throughout our book of business and feel that many of the investments made in recent years in the areas of predictive analytics and increased use of advanced telematics will continue to refine our ability to identify potential loss scenarios more rapidly and also optimize pricing.

97. Similarly, during an August 8, 2017 earnings call, Defendant Wollney touted the Company's focus on data analytics:

> [W]e are expecting to write to the same target loss ratio, despite the fact that you're going to see changes in frequency and severity. ***So it's definitely something we're watching very closely.*** The fact that we are now using the machine-learning based predictive analytics in our pricing models as well as our claims reserving process, ***it's going to help us monitor those changes in severity and frequencies much more closely than we could have without those tools***. And it's definitely something that will be part of our regular pricing analysis as well. But it's a great question and those are definitely changes that that ***we have to keep an eye on*** and make sure we're pricing to. . . .

98. Likewise, on a November 7, 2017, earnings call, Defendant Wollney

emphasized the Company's agility with real-time data analysis:

> Atlas was built through a series of acquisitions which allowed us to assemble a unique combination of data, brand strength and expertise. We utilize machine learning-based predictive analytics to amplify the value of these assets which our team ***continuously refreshes*** increasingly with the additional benefit of in-vehicle and other emerging technologies.
>
> ***The usage of data and analytics to innovate has been at the core of Atlas's business model since our formation.*** When we initially conducted the analysis of the two subsidiaries that initially made up the Atlas platform, we found that through decades of data, like commercial auto and our target niche has historically outperformed both commercial auto and property and casualty at large and that the data that was inside of these companies was of immense value as it could be further leveraged through analytics. . . .
>
> Our strategy is to exploit this situation by incorporating sophisticated technologies, to leverage specific data which is not readily available, to create a differentiated comparative advantage relative to the smaller insurers against which we generally compete, it should also widen the value of the competitive modes I mentioned.

99. Under these circumstances, Defendants were aware or were reckless in not being aware that the trends, especially in Michigan, would require an increase in loss reserves for the policies in that state.

## E. <u>Defendants Were Motivated To Understate Atlas Financial's Reserves Because Of Non-Compliance With Atlas Financial's Covenants With Its Lenders</u>

100. The Individual Defendants had the motive and opportunity to commit fraud. With respect to opportunity, because of their positions with Atlas Financial, the Individual Defendants controlled the contents of the Company's public statements during the Class Period. Each of the Individual Defendants was provided with, had access to or was in control of the statements alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Given their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations that were being made were false and misleading. As a result, the Individual Defendants were responsible for the accuracy of Atlas Fianncial's

corporate statements and are therefore responsible and liable for the representations contained therein.

101. Atlas Financial's 2016 10-K form stated:

> In February 2017, American Acquisition filed its statutorily required financial statements for the year ended December 31, 2016, which are used to determine on-going compliance with the covenants contained in the Loan Agreement. As a result of the reserve strengthening described in this annual report on Form 10-K and its effect on American Acquisition's December 31, 2016 financial statements, American Acquisition is not in compliance with the Loan Agreements' EBITDA Ratio covenant as of March 13, 2017. American Acquisition has a thirty day period to cure this covenant non-compliance and the Company and American Acquisition have been in discussions with the lender regarding a modification to the loan covenants to more specifically address the effects of reserve modifications and/or obtaining a waiver with respect to the existing non-compliance.

102. Defendants. therefore, knew that any additional increase in loss reserves, including with respect to Michigan claims, would lead to additional breaches of the covenants in the Loan Agreement. Defendants were motivated to not disclose to the market and its lender(s) additional increases in loss reserves as that would endanger the Company's credit. Accordingly, Defendants had both motive and opportunity to withhold key information regarding the Company, including the need to increase loss reserves.

### F. <u>Defendants Were Motivated To Understate Atlas Financial's Reserves To Issue Securities (Senior Unsecured Notes Issued on April 26, 2017) To Raise Funds To Repay The Amount Outstanding Under Its Loan Agreement With Fifth Third Bank</u>

103. On or around April 21, 2017, AFH issued approximately $25 million worth of senior unsecured notes. According to the offering materials for the issuance, AFH "intends to use the net proceeds of this offering, together with cash on hand, for the repayment of $19.4 million in outstanding debt drawn from Atlas' secured credit facilities (which will then be terminated), repurchases of common stock, supporting organic growth, and potential acquisitions, as well as for general corporate purposes."

104. Atlas Financial's 10-Q form for the period ending March 31, 2017 stated:

> As of December 31, 2016, American Acquisition was in compliance with the covenants of the Loan Agreement. In February 2017, American Acquisition filed

> its statutorily required financial statements for the year ended December 31, 2016, which are used to determine ongoing compliance with the covenants contained in the Loan Agreement. As a result of the reserve strengthening described in Atlas' 2016 Annual Report on Form 10-K and its effect on American Acquisition's December 31, 2016 financial statements, American Acquisition was not in compliance with the Loan Agreements' EBITDA Ratio covenant as of March 13, 2017. ***On April 26, 2017, Atlas issued senior unsecured notes and used a portion of the net proceeds of this offering, together with cash on hand, to repay the entire amount outstanding under the Loan Agreement, which was then terminated.***

105. In other words, in order to cure the above-referenced non-compliance under the Loan Agreement, due to the strengthening of the loss reserves, AFH issued unsecured notes to terminate that agreement.

106. Defendants, therefore, had the motive and opportunity to conceal negative information regarding the need for additional strengthening of the loss reserves in order to secure the funds necessary to terminate the Loan Agreement. If Defendants had disclosed this information, it would have been far more difficult for them, if not impossible, to raise the funds needed to repay the indebtedness under the Loan Agreement or would have resulted in AFH having to offer the notes on substantially less favorable terms than AFH was ultimately able to issue the notes.

### G. <u>Atlas Financial Acted With Corporate Scienter</u>

107. Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Atlas Financial, including each high-ranking officer or director, is imputable to Atlas Financial. The knowledge of each of these individuals should therefore be imputed to Atlas Financial for the purposes of assessing corporate scienter.

108. Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Atlas Financial as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's operations, finances, business practices and loss reserves—all important topics that

would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## VII. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

109. Throughout the Class Period, Defendants failed to disclose, among others: (1) AFH's reserving was not "conservative;" (2) that AFH's loss reserves were still severely understated; (3) that, as a result, AFH's reported net income was severely overstated; (4) that AFH was continuing to see claims payments in excess of case reserves for older claims; (5) that Defendants were disregarding this negative trends with respect to older claims payments based on the unreliable assumption that the reserve deficiencies on these older claims would be offset by favorable loss reserve trends for claims from more recent years (resulting from AFH's recent implementation of predictive analytic tools); and (6) that, as a result of the foregoing, Defendants' statements about AFH's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

110. On February 22, 2017, Defendants issued a 8-K form informing the public that the Company has strengthened its loss reserves. Specifically, the exhibit to the form stated: "The Company performed a comprehensive review of its reserves as a result of changing loss payment trends identified through year-end actuarial work, and ultimately decided to strengthen reserves at this time." Defendant Wollney was quoted as follows:

> While ***Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving***, we did not anticipate the level of loss development in Michigan increasing dramatically over the past year. ***Our team is confident that we have addressed the issues at the heart of this problem, have taken appropriate steps***, and will learn from it as part of our ongoing commitment to continuous improvement, which has always been a priority at Atlas. ***With respect to pre-acquisition related claims at Global Liberty, the transaction was structured to mitigate potential development. We have isolated any remaining exposure with a clear plan in place for remaining claims, and continue to feel very good about the strategic benefits and expected future profitability of this business. While the impact of our reserve strengthening is significant, we believe it is isolated and that our overall book of business is sound, as will be demonstrated going forward.***

* * *

> Mr. Wollney continued, "As a specialist, we put a priority on addressing changes in our market in a nimble way. To this end, in recent years Atlas enhanced and initiated numerous underwriting and claim related processes designed to leverage our expertise in the specialty light commercial auto sector, including the elevated use of predictive analytics. We have proactively compressed settlement time, particularly with respect to larger claims, providing earlier visibility into potentially changing claim trends. It is important to acknowledge our entire claims team's excellent work, including our Michigan adjusters who are diligently addressing the challenges in that market. Observations from the year-end 2016 reserve analysis that led to the conclusion that reserve strengthening for older years appears appropriate also confirm our belief that the changes made in our claim process will yield an overall better result in our ultimate loss costs going forward. The Company is committed to learn from the factors surrounding our reserve strengthening to ensure we can react to changes in our industry and niche as quickly as possible in the future."

111. This statement was materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be further raised substantially driven in a large part by the claims in Michigan. Moreover, the statement was materially false and misleading because AFH's reserves were not "conservative" and because the Company had not addressed deficiencies with its reserving processes. Moreover, AFH was continuing to see non-modeled claims for years 2015 and earlier result in payments that exceeded case reserves.

112. On March 13, 2017, the Company filed its annual report on Form 10-K for the period ending on December 31, 2016. The Company noted Claims Liabilities of $139,004,000 for the period ending on December 31, 2016. The Company stated that based on an evaluation of internal controls over financial reporting, "the Company's internal control over financial reporting is effective as of December 31, 2016." The Company further stated: "During the year ended December 31, 2016, case reserves increased by 5.4% compared to December 31, 2015, while IBNR reserves increased by 12.0%. The increase in case reserves resulted from management's review of outstanding unpaid personal injury protection claims, particularly in the state of Michigan."

113. This statement was materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business,

operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be further raised substantially driven in a large part by the claims in Michigan.

114. On March 13, 2017, the Company issued a press release entitled "Atlas Financial Holdings Announces 2016 Fourth Quarter Financial Results." In this press release, Defendant Wollney was quoted as stating:

> As outlined in our preliminary announcement, we identified a level of loss development in Michigan that led to an increase in reserves at the end of 2016 for older accident years. This impacted our financial performance for the quarter and the year, but ***we are confident that the proactive actions we took to address this exposure were appropriate and sufficient*** to position Atlas for future profitability at our expected levels in the coming year and beyond.

115. This statement was materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be further raised substantially driven in a large part by the claims in Michigan.

116. On May 8, 2017, Atlas issued a press release announcing its financial results for Q1 2017 and filed its Q1 2017 Quarterly Report on Form 10-Q with the SEC, which was signed by Defendant Romano. Therein, AFH reported that the Company's net income for the quarter was $4.9 million.

117. Additionally, the Company's May 8, 2017 press release contained a quote from Defendant Wollney, in which he stated:

> We once again grew in a meaningful way with incremental price by leveraging our expertise and strong value proposition. As anticipated, the Company continued to see marginally lesser reduction in traditional taxi business while still experiencing strong growth in the limousine/livery and para-transit markets. We are cautiously optimistic about our niche and incremental opportunities in the light commercial auto segment generally. The competitive environment remains favorable and early indicators of increased profitable growth continue in our niche.

118. The above statements from May 8, 2017, were materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the

Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and needed to be further raised substantially driven in a large part by the claims in Michigan. Increase in loss reserves would be a substantial expense and would substantially reduce the Company's net income.

119. On May 9, 2017, during a public conference call with investors and analysts to discuss the Company's Q1 2017 financial results, Defendant Wollney stated:

> We clearly take responsibility for the challenges faced in Michigan and are on track to see the percentage of our overall book of business in Michigan drop to below 1% this year. ***While Michigan claims will continue to runoff over time; as of March 31, 2017, open claim inventory related to the state has been reduced by 8.5% compared to year-end 2016 with 575 pending claims open at this time***. . . .
>
> We are continuing to closely monitor loss development throughout our book of business and feel that many of the investments made in recent years in the areas of predictive analytics and increased use of advanced telematics will continue to refine our ability to identify potential loss scenarios more rapidly and also optimize pricing.

120. This statement was materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be raised substantially driven in a large part by the claims in Michigan.

121. On the same conference call, Defendant Wollney had the following exchange with an analyst:

> **<Q - Tom Shimp>**: Okay. Great. Thank you. I had one more question if I may, in regards to the Michigan market and the issues we saw in the last quarter, how confident are you that we're not going to see that throughout the remainder of the year?
> **<A - Scott D. Wollney>**: Well as we stated on the prior call, we focused on that issue, ***we strengthen reserves with the expectation that the remaining runoff of claims related to the periods the prior year periods where we had a significant amount of exposure in that state would trend similar to kind of the higher paid severity results we saw in 2016***. And so, we are expecting that to be a challenging environment for the totality of the runoff of those claims. So, it is something we're going to be monitoring very closely. I don't think we were surprised by anything

in the first quarter, although obviously not a lot of time has passed since our last call.

***So, I think the good news is we haven't seen anything different than we would have expected*** and obviously, it's something that we're keeping a very close eye on. It's encouraging that the overall inventory is coming down. As I mentioned, total Michigan related claims were down about 8.5% in just 90 days following the end of the year. And so, we do have a dedicated team of people who are focusing specifically on that book of business and obviously, we want to learn everything we can from what we sort of described as the new normal in that environment to get the best possible result going forward, but we are going to be very careful and manage that book very closely. . . .

122. This statement was materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be raised substantially driven in a large part by the claims in Michigan.

123. On August 7, 2017, Atlas issued a press release announcing its financial results for Q2 2017 and filed its Q2 2017 Quarterly Report on Form 10-Q with the SEC, which was signed by Defendant Romano. Therein, AFH reported that the Company's net income for the quarter was $5.5 million.

124. Additionally, the Company's August 7, 2017 press release contained a quote from Defendant Wollney, in which he stated:

We were pleased to deliver solid operating results in the second quarter highlighted by a strong combined ratio of 86.2%, improved underwriting income, and annualized return-onequity of 16.2%. These bottom-line improvements were driven by our specialty strategic focus on distinct niche markets within commercial auto insurance where the combination of Atlas' expertise and strong value proposition allow us to generate better than industry results. We continue to leverage the use of analytics to amplify the value of the unique data our organization historically acquired and continuously refreshes, increasingly with the additional benefit of in-vehicle and other emerging technologies. Through this approach, our team is able to specifically target the right markets, evaluate and price risk appropriately, best manage claims and other expenses and ultimately adapt quickly to turn potential long-term challenges into opportunities as conditions evolve. During the second quarter, we achieved solid growth of 18.6% in gross written premiums, as market share and market size expansion in our limousine/livery and para-transit markets continued to overtake lesser reductions in the traditional taxi business. On a macro basis, we continue to see pricing increase across commercial auto increase. Last year, Atlas exhibited both price leadership in our niche market and discipline in terms of growth with our consistent priority on return on equity in mind. The most recent quarter

> exemplifies Atlas' ability to grow our business with expanding operating margins through our commitment to this discipline. While we continue to encourage a long-term view, we are certainly proud of the results in the most recent quarter.

125. The above statements from August 7, 2017, were materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be further raised substantially driven in a large part by the claims in Michigan. Increase in loss reserves would be a substantial expense and would substantially reduce the Company's net income.

126. On August 8, 2017, Defendants held a public conference call with investors and analysts to discuss the Company's financial results for Q2 2017. During the conference call, Defendant Wollney stated:

> Yes, so we don't typically provide specific reserve levels on a state-by-state basis in dollar terms. ***But I can tell you that the reserve levels that we established at year-end 2016 for Michigan do appear to be holding up consistent with the expectations we had***. Paid severity in Michigan seems to be flattening out, again just based on the sort of early information we have in the first half of this year.
>
> As I touched on, the inventory claim count has dropped 16% since the end of 2016. We currently have about 450 claims open for Michigan in terms of the third-party bodily injury and PIP claims, and we are seeing that inventory declining. ***So claim closure rate is definitely exceeding the rate of inbound claims, which is slowing dramatically***.
>
> Last year, I think, we saw the biggest amount of claims settlement that we've seen historically and probably will see based on the fact that there was a three-year statute related to Michigan PIP and a lot of the exposure in that state for us was created in 2013, in terms of claims made against 2012 and 2013 accident years. And so now that that three-year statute has run on the years where we had the biggest in-force exposure, ***that is also going to result in fewer claims coming in, especially bigger, older claims. So, we do have a team of people who are focused specifically on running off those older Michigan claims and we feel confident that they're doing the right job***…..

127. This statement was materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be raised substantially driven in a large part by

the claims in Michigan.

128. Additionally, during the August 8, 2017 conference call, analyst further asked about Michigan and Defendant Wollney falsely indicated that in the past six months AFH was not seeing anything different than the Defendants had expected:

> <Q - Matthew J. Carletti>: Hi. Thanks. Good morning. Scott, I just had a quick one. I wanted to circle back on Michigan and maybe a little more qualitative, just versus kind of your expectations at year-end, fast forward to six months where we are today, I think it's safe to say things aren't worse than you expected, because we haven't seen anything adverse, but whether it's claim counts or just the underlying loss trends, are they kind of in line with what you had hoped for or are they better, but because things are still so green, you're not going to reflect that in the numbers yet, you're just kind of wait and see?
>
> <A - Scott D. Wollney>: Yes. I think it's – I mean, it's definitely the latter where six months while it's encouraging that we are not seeing anything different than we expected, which is a good fact. I think it's – it would be premature for us to do something positive as a result of that. So we are encouraged based on what we're seeing. When we look at settlement – average settlements amounts in all the different severity band, so claims that are between zero and [ph] $25,000 between $25,000 and $50,000 and greater than $50,000 (01:02:41).
>
> In 2017, we are seeing paid severities go down in all three segments by a little bit. And so again it's encouraging, because the actuarial analysis within year-end, the assumptions we made was that we did not build any optimistic assumption that will go down. So, again, it is encouraging, but it's really too early, I think, to come to any conclusion on that. Obviously, if we saw something negative, we might have been more proactive in doing something about that. But – so other than being encouraged by the limited amount of additional information we have, I'd probably wouldn't go beyond that in terms of coming to any conclusions about Michigan.

129. This statement was materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be raised substantially driven in a large part by the claims in Michigan.

130. On November 6, 2017, Atlas issued a press release announcing its financial results for Q3 2017 and filed its Q3 2017 Quarterly Report on Form 10-Q with the SEC, which was signed by Defendant Romano. Therein, AFH reported that the Company's net income for

the quarter was $5.1 million.

131. Additionally, the Company's November 6, 2017 press release contained a quote from Defendant Wollney, in which he stated:

> Atlas reported solid third quarter results driven by underwriting performance and continued expansion of market share in limo/livery and paratransit. We are encouraged by consistent positive pricing action across our niche markets. Our expectation is that ongoing hardening commercial market conditions will enable our team to further leverage our analytics capability to optimize return on deployed capital, with the objective of building on our 14.5% annualized return-on-equity. We feel that Atlas' focus on bottom line execution and expertise in our niche differentiates our business in the face of a challenging environment across broader commercial auto. Our hyper-focus, coupled with underwriting and claim handling discipline, led to a strong combined ratio of 87.9% in the third quarter, which we achieved despite expected quarterly fluctuations in deferred acquisition costs. With the infrastructure and capital planning tools we have in place, we believe we can continue to grow nationwide, increasing our operating leverage in a responsible and managed way to continue to increase ROE. In parallel, we continue to building on our foundational heritage to develop technology-based solutions for the expanding universe of 'gig economy' drivers utilizing light vehicles to move people and things with the objective of launching select products in 2018, subject to continuing successful market testing and regulatory approval.

132. The above statements from November 6, 2017, were materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be further raised substantially driven in a large part by the claims in Michigan. Increase in loss reserves would be a substantial expense and would substantially reduce the Company's net income.

133. On November 7, 2017, Defendants held a public conference call with investors and analysts to discuss the Company's financial results for Q3 2017. During the conference call, Defendant Wollney stated in his introductory remarks:

> As an update on Michigan, *claims continue to run off over time*. As of September 30, 2017, open claim inventory related to the state had been reduced by approximately 35% compared to year-end 2016 with approximately 390 pending claims. This is down from 450 pending claims at the end of Q2 and a much larger number at the end of 2016. . . .

134. This statement was materially false and/or misleading and/or lacked a reasonable

basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be raised substantially driven in a large part by the claims in Michigan.

135. The market for Atlas Financial's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Atlas Financial's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Atlas Financial's securities relying upon the integrity of the market price of the Company's securities and market information relating to Atlas Financial, and have been damaged thereby.

136. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Atlas Financial's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about AFH's business, operations, and prospects as alleged herein.

137. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Atlas Financial's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was

revealed.

## VIII. LOSS CAUSATION

138. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

139. During the Class Period, Plaintiffs and the Class purchased Atlas Financial's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

140. The truth regarding Atlas Financial's financial condition was partially revealed, and/or the concealed risks materialized, on or about, March 1, 2018 and June 15, 2018. As alleged above in Section V.G, *supra*, as direct result of these partial disclosures, the price of Atlas Financial's stock declined precipitously, often on heavy trading volume.

## IX. CLASS ACTION ALLEGATIONS

141. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Atlas Financial's securities between February 22, 2017, and June 15, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

142. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Atlas Financial's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Atlas Financial shares were traded publicly during the Class Period on the NASDAQ. As of November 3, 2017, Atlas Financial had 12,030,703 shares of common stock outstanding. Record owners and other

members of the Class may be identified from records maintained by Atlas Financial or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

143. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

144. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

145. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Atlas Financial; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

146. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

147. The market for Atlas Financial's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements

and/or failures to disclose, Atlas Financial's securities traded at artificially inflated prices during the Class Period. On January 5, 2018, the Company's stock price closed at a Class Period high of $21.35 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Atlas Financial's securities and market information relating to Atlas Financial, and have been damaged thereby.

148. During the Class Period, the artificial inflation of Atlas Financial's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Atlas Financial's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Atlas Financial and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

149. At all relevant times, the market for Atlas Financial's securities was an efficient market for the following reasons, among others:

(a) Atlas Financial stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Atlas Financial filed periodic public reports with the SEC and/or the NASDAQ;

(c) Atlas Financial regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Atlas Financial was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

150. As a result of the foregoing, the market for Atlas Financial's securities promptly digested current information regarding Atlas Financial from all publicly available sources and reflected such information in Atlas Financial's stock price. Under these circumstances, all purchasers of Atlas Financial's securities during the Class Period suffered similar injury through their purchase of Atlas Financial's securities at artificially inflated prices and a presumption of reliance applies.

151. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

152. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Atlas Financial who knew that the statement was false when made.

## XII. CLAIMS

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

153. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

154. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Atlas Financial's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

155. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Atlas Financial's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

156. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Atlas Financial's financial well-being and prospects, as specified herein.

157. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Atlas Financial's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Atlas Financial and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

158. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

159. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing Atlas Financial's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

160. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Atlas Financial's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Atlas Financial's securities during the Class Period at artificially high prices and were damaged thereby.

161. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Atlas Financial was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Atlas Financial securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

162. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

163. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

164. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

165. Individual Defendants acted as controlling persons of Atlas Financial within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

166. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

167. As set forth above, Atlas Financial and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 30, 2018

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Robert V. Prongay
Stan Karas
Charles H. Linehan
Robert Gruber
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
skaras@glancylaw.com
clinehan@glancylaw.com
rgruber@glancylaw.com

*Lead Counsel for Lead Plaintiffs and the Putative Class*

**LAWRENCE, KAMIN, SAUNDERS & UHLENHOP LLC**
Mitchell B. Goldberg
Peter E. Cooper
Marielise Fraioli
300 S. Wacker Drive, Suite 500
Chicago, IL 60606
Telephone: (312) 372-1947
Email: mgoldberg@lksu.com
pcooper@lksu.com
mfraioli@lksu.com

*Liaison Counsel for Plaintiffs*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Plaintiffs*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On July 30, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Illinois, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 30, 2018.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 1:18-cv-01640 Fryman v. Atlas Financial Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John J Clarke , Jr**
  john.clarke@dlapiper.com
- **Peter E. Cooper**
  pcooper@lksu.com,shennessey@lksu.com,aterry@lksu.com
- **Marielise Fraioli**
  mfraioli@lksu.com,jjones@lksu.com,aterry@lksu.com
- **Mitchell Benjamin Goldberg**
  mgoldberg@lksu.com,jjones@lksu.com
- **Yan Grinblat**
  yan.grinblat@dlapiper.com
- **Charles H Linehan**
  CLinehan@glancylaw.com
- **John Scott Monical**
  jmonical@lksu.com,jjones@lksu.com,aterry@lksu.com
- **Lesley F. Portnoy**
  LPortnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com
- **Kenneth L. Schmetterer**
  kenneth.schmetterer@dlapiper.com,chicago-docketing-7916@ecf.pacerpro.com,docketingchicago@dlapiper.com,kenneth-schmetterer-8814@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`