## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PHILLIP FRYMAN and ARAM HOVASAPYAN, Individually and On Behalf of All Others Similarly Situated, | Case No. 18-cv-01640 |
| Plaintiffs, | Judge Mary M. Rowland |
| v. | |
| ATLAS FINANCIAL HOLDINGS, INC., SCOTT D. WOLLNEY, and PAUL A. ROMANO, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Philip Fryman and Aram Hovasapyan, individually and on behalf of a proposed class of Atlas Financial Holdings, Inc. shareholders, bring suit against Defendants Atlas Financial Holdings, Inc., Scott D. Wollney, and Paul A. Romano, alleging securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5. Before the Court is Defendants' motion to dismiss Plaintiffs' Third Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) [Dkt. 63]. Defendants' motion is granted. Defendants have also filed a motion to strike [Dkt. 73], which is granted in part and denied in part.

## BACKGROUND

### I. Facts

The following facts are alleged in Plaintiffs' Third Amended Complaint ("TAC") and are presumed true for the purpose of resolving the present motion.

The Parties

Defendant, Atlas Financial Holdings, Inc. ("AFH") is a holding company that owns four insurance subsidiaries that provide "light"[1] commercial transportation insurance. (Dkt. 61 at ¶¶ 2; 35.) Defendant Scott Wollney is AFH's chief executive officer and Defendant Paul Romano is AFH's chief financial officer. (*Id.* at ¶¶32-33.) Plaintiffs are purchasers of AFH common stock between February 22, 2017 and April 30, 2019 ("the Class Period"). (*Id.* at ¶¶29-30; 179.)

Loss Reserves and Predictive Analytics

Insurance companies, like AFH, must maintain sufficient reserves of liquid capital to pay for customer claims. (*Id.* at ¶45.) This allocation of funds is called a "loss reserve". (*Id.*) Loss reserves reflect the estimated cost of claims that the insurance company expects to pay in the future based on both known and unknown ("incurred but not reported"—"IBNR") claims. (*Id.* at ¶4.) An insurance company's financial value is largely determined by the amount of capital it holds in excess of its loss reserves. (*Id.*) The amount of loss reserves is calculated based on actuarial and statistical analyses of underlying claims, historical claims, and insurance industry claims data. (*Id.* at ¶¶46; 48.) AFH holds itself out as an expert in underwriting and

---

[1] "Light" refers to light weight commercial transportation vehicles, such as taxis and limousines.

claims management in the light commercial auto industry. (*Id.* at ¶36.) In June 2016, AFH also began to integrate predictive analytics into its business model to better determine adequate loss reserve amounts for its claims. (*Id.* at ¶57-60.) Reserves for claims prior to June 2016 were not modeled with predictive analytics. (*Id.* at ¶58.) [2]

<u>2017 Reserve Increase</u>

On February 22, 2017, AFH announced an increase in its loss reserves due to "higher than expected losses related primarily to significantly increased severity in light commercial auto within the Michigan market and pre-acquisition claims at Global Liberty," one of AFH's insurance subsidiaries acquired in 2015. (*Id.* at ¶¶ 41; 64.) AFH based the decision on "a comprehensive review of its reserves as a result of changing loss payment trends through year-end actuarial work." (*Id.* at ¶64.) Defendant Wollney reassured the public that while AFH had not anticipated the increase, it planned to take steps to ensure that the reserve increase would be an "isolated" event:

> While Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving, we did not anticipate the level of loss development in Michigan increasing dramatically over the past year. Our team is confident that we have addressed the issues at the heart of this problem, have taken appropriate steps, and will learn from it as a part of our ongoing commitment to continuous improvement, which has always been a priority at Atlas. With respect to pre-acquisition related claims at Global Liberty … [w]e have isolated any remaining exposure with a clear plan in place for remaining claims, and continue to feel very good about the strategic benefits and expected future profitability of this business. While the impact of our reserve strengthening is significant, we believe it is isolated and that our overall book of business is sound, as will be demonstrated going forward.

(*Id.*)

---

[2] These pre-June 2016 claims are herein referred to as "non-modeled" claims, while post-June 2016 claims subject to predictive analytics are referred to as "modeled" claims.

3

Throughout 2017, Defendants continued to reassure investors "that the reserve strengthening [wa]s appropriately conservative" and that "the reserve levels [ ] established at year-end 2016 for Michigan [ ] appear to be holding up consistent with [ ] expectations..." (*Id.* at ¶¶68; 154.) Defendants conveyed that they were "closely monitor[ing] loss development" and touted the benefits of predictive analytics in addressing the issue. (*Id.* at ¶147.) Furthermore, Defendants reported a positive net income throughout the year—$4.9 million for Q1, $5.5 million for Q2, and $5.1 million for Q3. (*Id.* at ¶¶144; 151; 158.)

Between November 8 and December 21, 2017, while AFH's stock price was near its Class Period high, Defendants Wollney and Romano, as well as three other AFH executives, sold several of their AFH shares. (*Id.* at ¶¶106-107.) During this time, Joseph Shugrue, one of the executives that sold stock along with the Defendants, had been conducting a claim-by-claim review of AFH's older, non-modeled claims, including those from Michigan. (*Id.*) Defendants and the other corporate executives had not sold AFH stock prior to this time. (*Id.* at ¶¶108-112.)

2018 Reserve Increase

On March 1, 2018, AFH announced another increase to its loss reserves based on "a comprehensive review of its reserves and based on year-end actuarial work coupled with a detailed internal file audit for claims with reserves not established by the Company's predictive analytics tools …." (*Id.* at ¶11.) AFH explained that (1) "payments for claims in [Michigan] continued to be disproportionate to historic premiums earned," (2) "remaining liability for non-New York Global Liberty business

written prior to 2016 is expected to settle for greater amounts than previously expected," and (3) "liability for remaining claims related to accident year 2015 and prior in general was indicated to be significantly higher than carried reserves." (*Id.*) AFH maintained the position that the necessity for a reserve increase "caught [them] by surprise." (*Id.* at ¶85.) Despite their knowledge that older non-modeled claims were "deteriorati[ng] [ ] IBNR" case reserves throughout 2017, Defendants thought this trend would be offset by the newer modeled claims that were paying out less than case reserve amounts. (*Id.* at ¶86.) Wollney reassured investors of the adequacy of the new reserve amount, adding "that results for more recent accident years are coming in as expected" and that their use of predictive analytics for newer claims and "file by file review" of older claims would help address the issue. (*Id.* at ¶11.)

On March 2, 2018, AFH's stock price fell $7.70 per share to close at $11.10 per share. (*Id.* at ¶13.) On June 15, 2018, insurance rating company A.M. Best downgraded AFH's credit rating due to "the significant reserve strengthening charge taken in the fourth quarter of 2017," and consequential "significant operating losses." (*Id.* at ¶15.) Three days later, on June 18, 2018, AFH disclosed in its SEC Form 8-K signed by Defendant Romano that it had dismissed its independent public accountant, BDO USA, LLP. (*Id.* at ¶16.) That day, AFH's stock price fell $1.00 to close at $9.95 per share. (*Id.* at ¶17.)

AFH continued to reassure shareholders of the adequacy of the previous reserve increase. (*Id.* at ¶92.) Wollney stated that AFH had "been focusing much more on the underlying data and the changes in the business to make sure that as we go

into the year-end actuarial review, we avoid surprises," which had been "an issue at year-end [20]17." (*Id.* at ¶95.) Wollney maintained that AFH's use of predictive analytics and the close monitoring of older claims would help eliminate the need for another reserve increase. (*Id.* at ¶¶92; 94-95.)

<u>2019 Reserve Increase</u>

On March 4, 2019, AFH announced a third loss reserve increase stating that "[a]ctuarial work conducted in connection with year-end indicated a need to increase reserve estimates for unpaid losses due primarily to bodily injury claims from accident years 2016 and prior" and that "[t]hese claims are showing higher severity and have been open for longer periods than we had estimated." (*Id.* at ¶19.) Defendants maintained that they had again been caught off guard by the "actuarial estimation of ultimate claim severity" which exceeded the estimates provided by their predictive analytics. (*Id.* at ¶98.)

On March 4, 2019, AFH's stock price fell by $2.21 per share to close at $6.80 per share and fell again the next day to close at $2.66 per share. (*Id.* at ¶20.) On March 20, 2019, A. M. Best further downgraded AFH's credit rating. (*Id.* at ¶101.) On April 30, 2019, AFH disclosed in its Form 8-K, signed by Defendant Romano, that it dismissed its new independent public accountant, RSM US, LLP. (*Id.* at ¶22.) The filing explained that:

> [O]n April 26, 2019, RSM informed the Corporation in writing that, based on its audit work to such date, it had concluded that the December 31, 2018 insurance reserves in certain of the Corporation's insurance subsidiaries were understated, and that such understatement constituted a material misstatement of the Corporation's financial condition as reflected in the statutory financial statements of such insurance subsidiaries for the fiscal year

ended December 31, 2018. … [The Company] disagrees with the conclusion of RSM based on the Corporation's assessment of reserve estimates and the related work of the Corporation's independent third-party actuaries.

(*Id.*) AFH's stock price fell again to close at $1.28 per share on April 30, 2019. (*Id.* at ¶23.)

Plaintiffs filed the current iteration of this lawsuit on June 11, 2019, alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, 15 U.S.C. §78j(b), 17 C.F.R. §240.10b-5, arising from Defendants' allegedly false and misleading statements and omissions regarding the adequacy of AFH's loss reserves.

## II. Exhibits

The parties ask this Court to consider several exhibits not attached to the TAC in arriving at its conclusion. Courts ordinarily may not consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018). Nevertheless, when a document is referenced in the complaint and central to plaintiff's claims, the Court may consider it in ruling on a motion to dismiss. *Id.* ("This rule is a liberal one—especially where…the plaintiff does not contest the validity or authenticity of the extraneous materials."). In addition, the Court may "take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned." *Parungao v. Cmty. Health Sys.*, 858 F.3d 452, 457 (7th Cir. 2017).

Plaintiffs do not contest this Court's consideration of Defendants' exhibits. Given this, the Court considers Defense Exhibits D, E, F, G, H, I J, L, N, O, U, V, Y, BB, CC, DD, EE, FF, and GG, which consist of SEC filings, press releases, and conference call transcripts published by AFH. (Dkt. 65, Defs' Exs.) These documents are referenced in the TAC and are central to Plaintiffs' claims as they include the purportedly materially false statements, misrepresentations, omissions, and/or corrective disclosures that are the basis for Plaintiffs' securities claims and alleged losses. *See, e.g.*, *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp.2d 1152, 1155 n.1 (N.D. Ill. 2004) (considering "SEC filings, press releases, and conference calls" in connection with motion to dismiss section 10(b) and 20(a) claims because the "materials" were "referred to" in the complaint and "central to plaintiffs' claims").[3] Defendants also submit Form 4 Statements of Changes in Beneficial Ownership filed by the Individual Defendants and other corporate executives within the Class Period. The Court will consider the Form 4s as relevant to Plaintiffs' allegations in paragraphs 108 through 113 of the TAC alleging that the Individual Defendants and other AFH executives sold specified amounts of their AFH shares during the Class Period. The TAC does not disclose the source of this information, but "[b]ecause … the information in the Forms 4 from within the class period is identical" to the

---

[3] Defendants correctly assert that their remaining exhibits, AFH's Forms 10-Q from various years and AFH's Form 10-K from April 3, 2018, (Exhibits A, B, C, K, M, W, X, Z, and AA), are also subject to judicial notice because they are publicly filed with the SEC. *See e.g., Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *12 (N.D. Ill. Mar. 31, 2011) ("judicial notice may be taken of the contents of public record disclosure documents filed with the SEC if the facts sought to be noticed are not subject to dispute.") However, the Court does not rely on these documents because they contain the same cautionary language as AFH uses in Defense Exhibits D, E, F, G, H, I J, L, N, O, U, V, Y, BB, CC, DD, EE, FF, and GG. Therefore, the Court declines to take judicial notice of them.

allegations in the TAC, "and because the only source of insider trading data available to plaintiffs when drafting complaints is the Forms 3, 4, and 5 filed with the SEC, the Court can safely assume that the Forms 4 filed by the Individual Defendants during the class period were the source of the entries in … paragraph[s] [108-113] of the complaint". *Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *10 (N.D. Ill. Mar. 31, 2011). Thus, the Form 4s (Exhibits P, Q, R, S, and T) are incorporated by reference in the TAC and the Court will consider them in determining the merits of Defendants' motion to dismiss. *Id.*

Turning next to Plaintiffs' exhibits, Plaintiffs ask this Court to take judicial notice of five documents, which Defendants move to strike. (Dkt. 73). Plaintiffs' Exhibit A is an order and report by the State of Missouri Department of Insurance, Financial Institutions and Professional Registration, dated May 11, 2017, examining one of AFH's subsidiaries. The order determined that as of December 31, 2015, the reserve amounts for this subsidiary were deficient by $6 million dollars in part because the subsidiary set its reserve amounts below the actuarially recommended amount. (Dkt. 68 Ex. A at 2.) A court may generally take judicial notice of another court or agency's decision, but only for the limited purpose of establishing the fact of such a decision, not for the truth of the statements asserted in the decision. *See e.g.*, *Opoka v. I.N.S.*, 94 F.3d 392, 394-95 (7th Cir. 1996). Defendants argue that Plaintiffs impermissibly offer Exhibit A for the truth of the statements regarding reserve amounts. Plaintiffs respond that they offer the Exhibit to show AFH's knowledge of the statements within it, rather than for the truth. The Court will take judicial notice

of Exhibit A to the extent Plaintiffs limit their use of it to arguments regarding knowledge and notice, rather than the factual adequacy/inadequacy of reserve amounts. While Plaintiffs' remaining exhibits are likely proper subjects for judicial notice, the Court declines to take judicial notice of them because Plaintiffs do not rely on them in support of their arguments against Defendants' motion to dismiss. (*See* Dkt. 67 at 11-35.)[4]

## LEGAL STANDARDS

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014).

A fraud allegation is subject to the heightened pleading requirements of Rule 9(b), which requires that allegations of fraud be stated "with particularity," Fed. R. Civ. P. 9(b), meaning "the who, what, when, where, and how: the first paragraph of

---

[4] Plaintiffs refer to Exhibits B-E in the facts section of their opposition brief but do not present any legal arguments for why these documents support the sufficiency of their pleadings.

any newspaper story."[5] *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Claims of securities fraud must additionally comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), under which Plaintiffs must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quotation marks omitted).

## ANALYSIS

### I.  Count I: Section 10(b) and Rule 10b-5

To state a claim of securities fraud under § 10(b) of the Exchange Act and Rule 10b-5(b), Plaintiffs must allege: "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997)). Defendants argue that Plaintiffs fail to allege facts demonstrating the first, third, and sixth elements of securities fraud.

### A.    False Statement or Omission

---

[5] Plaintiffs do not acknowledge this heightened pleading requirement. (Dkt. 67 at 10, citing only the standard for Rule 12(b)(6) analysis).

Plaintiffs allege that Defendants made several false or misleading statements and omissions between 2017 and 2019. Specifically, Plaintiffs allege (1) AFH's assurances of the adequacy of its reserves were false or misleading, (2) AFH's financial statements were rendered materially false or misleading due to AFH's inadequate loss reserves, (3) AFH's statements regarding its use of predictive analytics, its experience and expertise, and its close monitoring of older, non-modeled claims were false or misleading; and (4) AFH failed to disclose the known trends of increasing non-modeled claim severity and the ongoing insufficiency of its reserves.[6]

## 1. Assurances of the Adequacy of Reserves

While the failure to provide for adequate reserves is "a form of mismanagement that generally is not considered fraudulent," "[r]epresentations by management about the adequacy of reserves … may be fraudulent if they are knowingly false or misleadingly incomplete." *United States v. Morris*, 80 F.3d 1151, 1164 (7th Cir. 1996). Because such statements are generally a matter of opinion or belief, however, to make this showing Plaintiffs must demonstrate that Defendants "did not truly believe in the adequacy of [AFH's] loss reserves and that [their] statement[s] to the contrary w[ere] not supported by the available facts." *Id*. at 1164-65. The Supreme Court recently reaffirmed this standard in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, holding that statements of opinion are actionable as fraud if

---

[6] The TAC repeatedly asserts that statements were "false and misleading in that it represented that (i) further increases in reserves would not be necessary, (ii) Atlas Financial's business model was viable, and (iii) Atlas Financial's status as a specialty insurance company gave it a market advantage. The statement further failed to disclose that additional strengthening of reserves would be required." (Dkt. 61 at ¶¶ 65, 67-68, 70, 73, 88, 91, 93 and 96.)

either "the speaker did not hold the belief she professed" or if "the supporting fact[s] she supplied were untrue." 575 U.S. 175, 186 (2015). Defendants argue that Plaintiffs fail to allege that Defendants did not believe that their reserve estimates were adequate.

The TAC states generally that "Defendants knew and/or had access to information showing that the loss reserves were insufficient" (Dkt. 61 at ¶74), but such a conclusory allegation cannot pass muster under the heightened pleading requirements of the PSLRA. Plaintiffs seem to argue that this Court should *infer* knowledge of the inadequacy of reserve amounts because Defendants' use of predictive analytics and their close monitoring of claims, conducted by their highly experienced staff, gave them "access to real-time [claim] information." (Dkt. 67 at 17.) But Plaintiffs do not allege what specific information these processes revealed indicating that reserve amounts were in fact inadequate or that further increases would be necessary. *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 995-96 (9th Cir. 1999) ("When one of the circumstances indicating falseness is the alleged existence of contemporaneous information inconsistent with a particular statement that was allegedly known only to the defendants, some detail about the alleged information, other than that its substance contradicted the substance of the identified statement, must be provided.") (citing *Arazie v. Mullane*, 2 F.3d 1456, 1466-67 (7th Cir. 1993).

A similar argument was recently rejected by this Court in *Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164 (N.D. Ill. 2019). Plaintiffs sued Gogo, Inc., a provider of in-flight internet connectivity services, under the Exchange Act and Rule 10b-5

challenging Gogo's public statements about the performance of its new 2Ku system in the face of a system defect caused by de-icing fluid used on aircrafts. *Id.* Dismissing the plaintiffs' complaint, the Court observed:

> [Plaintiffs'] [m]ere[] alleg[ations] that (a) Gogo could and did track service outages, (b) defendants had access to outage reports, and (c) at some time prior to May 4, 2018, during or after the 'winter,' the 2Ku system's 'availability plunged down to the mid-80s', without other details, does not provide sufficient specific and particularized information about *when* the data revealed that the de-icing problem had caused a precipitous drop in availability, or when it became clear that costly remediation efforts were necessary.

*Id.* at 1174 (italics in original). While the Court acknowledged that at this pre-discovery stage plaintiffs could not "yet obtain documents or data that only defendants possess," it found that "plaintiffs must still plead sufficient factual matter to make the alleged fraud plausible" and that "[p]laintiffs d[id] not carry this burden by pleading that defendants merely had access to data that may have shown that their statements to investors were misleading when made, without describing specific documents containing that data or otherwise alleging that the data was available to the defendants in some specific form." *Id.* at 1174-75.

Like in *Pierrelouis*, merely alleging that Plaintiffs had access to information through predictive analytics and claim review allegedly revealing that AFH's reserve amounts were inadequate, is insufficient to allege plausible fraud. The TAC does not allege (1) what specific information and data the predictive analytics or claim review uncovered to establish that reserve amounts were inadequate (2) whether such information was available to the Individual Defendants, or (3) when the fact that reserve amounts were inadequate was learned and therefore should have been

14

revealed to the public. Put another way, Plaintiffs' allegations are equally consistent with the possibility that AFH's predictive analytics and close monitoring of claims, conducted by its experienced professionals, revealed information indicating that reserve amounts would be adequate, as Defendants themselves stated in the challenged statements. And then, as further data became available and further analysis took place, the need for an increase in reserves again became apparent and Defendants revealed this news to the market. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 75 (S.D.N.Y. 2015) ("While it is true that on a motion to dismiss a court draws all reasonable inferences in the plaintiff's favor, a claim for relief must be more than merely possible. It must be plausible. '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' or where there are 'obvious alternate explanations,' that standard is not met.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679; 682 (2009)). While such a scenario might reflect bad business judgment or even mismanagement, it does not imply fraud. *See In re First Chicago Corp. Sec. Litig.*, 769 F. Supp. 1444, 1449 (N.D. Ill. 1991) ("Although mismanagement may in some circumstances contribute to—or even account for—poor performance and depressed earnings, '[s]ecurities laws do not guarantee sound business practices and do not protect investors against reverses.'") (quoting *DiLeo*, 901 F.2d at 627 (7th Cir. 1990)).

This case stands in strong contrast to *Jones v. Corus Bankshares, Inc.*, in which Plaintiffs, who challenged representations of loan reserve adequacy under the Exchange Act and Rule 10b-5, "set forth in very clear and specific terms the

information available to Corus [defendant] and why, given its possession of this information, Corus's statements about the adequacy of its reserves were misleading." 701 F. Supp. 2d 1014, 1020-21 (N.D. Ill. 2010). For example, the *Jones* plaintiffs alleged that Defendant had access to information indicating that "Corus's construction loan portfolio—which makes up 85% of Corus's loans—was already showing signs of problems by mid–2006" and that "by the end of 2007, construction costs had become astronomically high and construction on many Corus funded projects had fallen behind schedule." *Id.* at 1020. Moreover, the information indicated that despite the company's noncurrent construction loans nearly quadrupling in the next year, Corus cut its percentage of loss reserves for these loans by 17%. *Id.*

Plaintiffs argue that by March 1, 2018 Defendants knew that older non-modeled claims were paying out in excess of case reserves throughout 2017. (Dkt. 61 at ¶86.) Knowledge of this trend, however, does not plausibly allege that Defendants did not *believe* that the reserve amounts they set in 2018 and 2019 based on actuarial analysis were adequate. In fact, Defendants explained that although they knew this information, they expected that payments on newer modeled claims, which were paying out less than case reserve amounts, would offset the negative trend with respect to old claims. (*Id.* at ¶¶85-86.); *see Neca-Ibew Pension Fund v. N. Tr. Corp.*, No. 10-CV-5339, 2013 WL 1290202, at *6 (N.D. Ill. Mar. 28, 2013) (rejecting plaintiffs' attempt to cite to information that should have alerted defendant to reserve inadequacy because "plaintiffs … alleged no facts that [defendant] ignored those developments or failed to account for them."). Plaintiffs attempt to rebut this

16

explanation arguing that Defendants "conceded that AFH's view that the benefits of predictive analytics … would offset the negative trends from older claims … was unreasonable based on any traditional understanding of insurance reserves" (Dkt. 61 at ¶87). But the cited quote by Defendant Wollney confirms Woolney's *opinion* that a traditional approach would reach the same result as AGH's use of predictive analytics and that old claims are costing more than previously anticipated. (*See id.*) ("I think anybody using a traditional actuarial approach to assess reserves would probably see similar things in the sense that you do have old claims that are coming in and being paid for more than the reserves contemplated a year ago… I don't think that somebody coming in and using a traditional reserving method is necessarily going to come in with a materially different number.").

In a variation of the above argument, Plaintiffs argue that the reserve increases in 2018 and 2019 were attributed by Defendants to older non-modeled claims from Michigan—the same cause behind the initial reserve increase in 2017— implying that although they claimed to be surprised at the need to increase reserves, Defendants must have known all along that reserve increases in 2018 and 2019 would be required. Such an inference, however, is a classic example of impermissible fraud by hindsight. *DiLeo,* 901 F.2d at 628 (7th Cir. 1990) ("There is no fraud by hindsight …') (internal quotations omitted); *see also Neca-Ibew*, 2013 WL 1290202, at *5 (N.D. Ill. Mar. 28, 2013) (rejecting plaintiffs' "'fraud by hindsight' theory under which a plaintiff attempts to show that because huge reserves were required at the end of the class period, the defendant must have known that its reserves were inadequate all

along."). That reserve amounts were increased on March 1, 2018 and March 4, 2019 for the same reason they were increased in the preceding year(s) is not, by itself, sufficient to show that Defendants' representations about reserve adequacy prior to these dates were knowingly fraudulent. What is lacking in the TAC is any information that Defendants knew and hid the fact that reserves were underfunded from the market.

Finally, Plaintiffs point to an order and report issued by the State of Missouri Department of Insurance, Financial Institutions and Professional Registration, in which the agency investigated Gateway Insurance, one of AFH's subsidiaries, and concluded that its "combined reserves were deficient by approximately $6.0 million" in part because the subsidiary set its reserves below the actuarially recommended amount by approximately $6.0 million. (Dkt. 68 Ex. A at 15). The order was issued on May 17, 2017 but covers the financial period January 1, 2012 through December 31, 2015. (*Id.*) Plaintiffs offer this exhibit, not to establish that Gateway's reserves were in fact deficient by $6 million, but to show that as of May 2017, AFH was on notice of reserve deficiencies. But an agency's conclusion that reserves amounts for *one* of AFH's four subsidiaries were deficient during a period predating the Class Period by over a year, does not establish that Defendants knew or believed that its reserves levels were insufficient during the Class Period—in fact Defendants were attempting to cure previous insufficiencies by increasing reserves.

Plaintiffs thus fail to adequately allege that Defendants did not believe in the adequacy of the reserve amounts they set.[7] Consequently, their claims of fraud based on AFH's assurances of reserve adequacy fail.

### (2) AFH's Financial Statements

Plaintiffs' allegation as to the fraudulent financial statements flows directly from the understated reserve argument. Plaintiffs argue that AFH's reported profits and capital surplus on every quarterly report submitted between the first quarter of 2017 and the third quarter of 2018 would have been lower if the reserve estimates had been properly reported. Therefore, according to the Plaintiffs "the financial results during the Class Period were false and misleading." (Dkt. 67 at 21.) This fails to state an action for the same reason that Plaintiffs' inadequate reserves argument fails to state a cause of action: Plaintiffs do not adequately allege that Defendants did not believe in the adequacy of the reserve amounts reported in AFH's financial statements.

### 3. Statements Regarding Predictive Analytics, Experience, and Monitoring

As the *Omnicare* court acknowledged, statements of opinion often contain embedded statements of fact, which may also be actionable as fraud. 575 U.S. at 186. Plaintiffs argue that Defendants' statements touting their use of predictive analytics, extensive experience/specialization in underwriting and claim management, and close monitoring of older, non-modeled claims were "plainly untrue" statements

---

[7] Plaintiffs argue in passing that the Individual Defendants' stock sales in 2017 imply knowledge of the inadequacy of reserve amounts (Dkt. 67 at 18), but as discussed below, that argument fails for the same reasons it fails to establish scienter.

regarding AFH's "ability to predict IBNR reserves with great accuracy." (Dkt. 67 at 16.) But apart from summarily stating that such statements are untrue, the TAC contains no allegations explaining the basis for this assertion. Plaintiffs, for example, do not allege anything about the predictive analytics and claims review processes or AFH's experience tending to suggest that these could not, or in fact did not, help Defendants predict reserve amounts with greater accuracy. In fact, a majority of Plaintiffs' arguments are predicated on the assumption that these processes did give Defendants the ability to predict reserve amounts with greater accuracy. (Plaintiffs then ask the Court to assume Defendants hid this information from the market). Plaintiffs also challenge "the facts and data about the Michigan claims that would have led reasonable investors to believe the situation was truly under control." (*Id.* at 17.) But Plaintiffs do no more than quote the facts and data that were allegedly misleading without providing any explanation for why these facts and data misleadingly "downplayed the significance of the existing exposure on the Michigan claims." (*See id.* at 17-18.) Without more detailed allegations, these statements cannot form the basis of a viable securities fraud claim under Rule 9(b).[8]

### 4.    Omission of Trend of Claim Severity

Finally, Plaintiffs argue that Defendants' failure to disclose a known trend of increasing claim severity rendered their representations about reserve adequacy and

---

[8] Defendants argue that several of the challenged statements regarding AFH's specialization and predictive analytics constitute nonactionable puffery. As these statements fail to state a claim under the *Omnicare* analysis, the Court does not opine on whether the statements constitute puffery.

financial statements misleading.[9] Specifically, the TAC alleges that Defendants failed to disclose that in 2017 "AFH was continuing to see claim payments in excess of case reserves for older claims" and "that Defendants were disregarding this negative trend[] with respect to older claims payments based on the unreliable assumption that the reserve deficiencies on these older claims would be offset by favorable loss reserve trends for claims from more recent years (resulting from AFH's recent implementation of predictive analytic tools)." (Dkt. 61 at ¶137.)[10]

On a May 9, 2017 call Wollney stated, "While Michigan claims will continue to run off over time; as of March 31, 2017, open claim inventory related to the state has been reduced by 8.5% compared to year-end 2016…" (Dkt. 61 at ¶147.) Similarly, on a public conference call on August 8, 2017, Defendant Wollney said, "But I can tell you that the reserve levels we established at year-end 2016 for Michigan do appear to be holding up consistent with the expectations we had. Paid severity in Michigan seems to be flattening out…" (*Id.* at ¶154.) There is no doubt that Wollney and the modeling were wrong. According to the Plaintiffs' own Complaint "Defendants were disregarding this negative trend[ ] with respect to older claims payments based on the unreliable assumption that the reserve deficiencies on these older claims would be offset by favorable loss reserve trends for claims from more recent years." (*Id.* at ¶137.) But if AFH and its unreliable assumptions were wrong, where is the fraud? It

---

[9] Plaintiffs also argue that Defendants failed to disclose the trend of ongoing reserve insufficiency, but because this Court has already concluded that Plaintiffs have not adequately alleged that Defendants were aware of reserve insufficiencies between the reserve increases every year, this argument fails.

[10] Plaintiffs acknowledge that Defendants disclosed this information on March 1, 2018, (*see* Dkt. 61 at ¶86) ("[T]he older accident years using up IBNR exceeded what the newer claims were doing to help IBNR.").

may be that AFH, through Wollney, was disclosing incorrect information about the severity of the non-modeled claims, but there is nothing in the TAC to suggest that Defendants knew the information was wrong *at the time* the statements were made. *See City of Westland*, 129 F. Supp. 3d at 76 (finding plaintiffs failed to allege omissions claim where complaint "allege[d] no facts tending to show that [defendant's] IBNR reserves did not fairly align with information it possessed *at the time*.") (emphasis in original). Moreover, Plaintiffs do not allege "particular (and material) facts going to the basis for the [Defendants'] opinion" that non-modeled Michigan claims were under control in 2017, "whose omission makes the opinion statements at issue misleading …." *Omnicare*, 575 U.S. at 194. The TAC merely alleges that Defendants were aware of a negative trend regarding these claims. Without more particularized allegations regarding the information Defendants' possessed regarding negative claim severity, Defendants' omissions claim fails.

Thus, Plaintiffs fail to adequately allege an omission claim based on the failure to disclose the negative claim severity trend involving older, non-modeled claims from Michigan prior to March 1, 2018.

### B.   Scienter

Under the PSLRA, Plaintiffs must state with particularity facts giving rise to a *strong* inference that the defendant "either knew the statement was false [or misleading] or was reckless in disregarding a substantial risk that it was false [or misleading]." *Makor Issue & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008); 15 U.S.C. § 78u-4(b)(2). "To qualify as 'strong' … an inference of scienter must

be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Although the Court has already concluded that Plaintiffs' claims are inadequately pled under the first element of securities fraud, the Court nonetheless considers the sufficiency of Plaintiffs' scienter allegations.

First, Plaintiffs reiterate that Defendants, through the use of predictive analytics and their close monitoring of claims, "had access to information that undermined the veracity" of their statements. (Dkt. 67 at 23.) These arguments fail to prove scienter for the same reason they fail to establish an actionable misstatement or omission—they do not state with particularity the information to which Defendants had access—and the Court declines to further address these arguments. *See e.g., City of New Orleans Employees' Ret. Sys. v. PrivateBankcorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *8 (N.D. Ill. Nov. 3, 2011) ("Vague allegations that defendants had access to undisclosed information have been rejected under the PSLRA.") (internal quotations omitted).

Similarly, Plaintiffs argue that because maintaining adequate reserves is critical to AFH's business and because "[o]fficers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance," it can be assumed that the Individual Defendants had knowledge of claims information indicating that reserve amounts were inadequate. *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727

(N.D. Ill. 2003) (internal quotations omitted). But again, Plaintiffs have not adequately alleged the existence of any internal information that contradicted AFH's public statements that reserve amounts were adequate. *See City of New Orleans*, 2011 WL 5374095, at *8 ("[A]lleg[ing] that all the defendants had access to unspecified information and knew of the alleged misrepresentations by virtue of their high-level positions … fails to meet the heightened PSLRA pleading requirements").

Next, Plaintiffs contend that "[a]s Atlas's top executives who signed the Company's SEC filings, the Individual Defendants were charged with oversight of integral financial metrics relating to Atlas's financial reporting and risk exposure, such as loss reserves," such that their failure to detect and disclose reserve insufficiencies in spite of such monitoring supports a strong inference of scienter. (Dkt. 67 at 24-25.) Plaintiffs cite to *In re Countrywide Fin. Corp. Deriv. Litig.*, in which the court found that the individual defendants' failure to monitor information that would have revealed a deviation from underwriting standards, in spite of their affirmative duty to monitor such information, supported a strong inference of scienter. 554 F. Supp. 2d 1044, 1065 (C.D. Cal. 2008). But this case is distinct in several regards. First, Plaintiffs fail to allege that the Individual Defendants were "charged with oversight of integral financial metrics" or that they had a personal duty to monitor claims. In fact, the TAC states that another chief executive, Joseph Shugrue, was responsible for claim monitoring. (Dkt. 61 at ¶¶83; 107.) More important, Plaintiffs do not allege that Defendants failed to monitor claims information—to the contrary, Plaintiffs maintain that Defendants did monitor

24

claims. Further, Plaintiffs fail to allege any specific information Defendants discovered as a result of this monitoring indicating that reserve amounts were inadequate. By contrast, the plaintiffs in *Countrywide* alleged for example that "reports generated by the Chief Risk Officer [analyzing loan performance and adherence to underwriting policies] were regularly delivered to those executives" such that the reports contributed to a strong inference that the executives should have known of deviations from underwriting standards.

*Id.* at 1066.[11]

Plaintiffs also argue that AFH's dismissal of two independent public accountants during the Class Period supports a strong inference of scienter. First, on June 18, 2018, AFH announced that it dismissed its independent public account BDO. (Dkt. 61 at ¶16.) Plaintiffs argue that this Court should infer that BDO was fired due to a disagreement regarding reserves because the dismissal came shortly after AFH's second reserve increase and AFH's announcement that its filling of its Q4 2017 financial results would be delayed. But as Defendants point out, AFH disclosed at the time, and BDO confirmed, that "there were no disagreements with BDO on any matter of accounting principles or practices, financial statements disclosure, or auditing scope or procedure[.]" (Dkt. 72 at 14.) The firing of BDO, thus, does not support a strong inference of scienter.

---

[11] Plaintiffs also cite to *Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75 (1st Cir. 2008), which found Defendant's statements that it had been monitoring a product defect supportive of an inference of scienter. But this allegation was accompanied by particularized allegations about contemporaneous information available to Defendants such as reports and complaints from doctors regarding the product defect. *Id.* at 91. Here, merely asserting that Defendants said they were monitoring claims, without more, is insufficient to support a strong inference of scienter.

Plaintiffs also allege that on April 30, 2019 AFH disclosed that it fired its independent accountant, RSM, explaining that it disagreed with RSM's conclusion that insurance reserves in certain of AFH's subsidiaries were understated. (*Id.* at ¶22.) While Defendants are correct that a mere disagreement about accounting judgments or principles does not establish scienter, *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020–21 (5th Cir. 1996), the disagreement between RSM and AFH goes beyond this. RSM's conclusion that AFH's reserves were understated and that this "constituted a material misstatement of the Corporation's financial condition" would certainly tend to put AFH on notice of reserve inadequacy. (Dkt. 61 at ¶22.) Nevertheless, the strength of the inference of scienter is significantly reduced by the fact that AFH promptly disclosed the disagreement and that AFH based its disagreement on a contrary conclusion reached by its actuaries. *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) ("[T]he Court will not intervene in a business and accounting judgment simply because the [third-party] accountants reached different conclusions than [internal] accountants.").

Similarly, Plaintiffs maintain that the Missouri Department of Insurance's conclusion that reserve amounts for one of AFH's subsidiaries were inadequate as of December 31, 2015 contributes to an inference of scienter. Like RSM's conclusion of reserve inadequacy, Missouri's determination of reserve inadequacy certainly put AFH on notice that its reserve amounts may be insufficient. The inference of scienter is strengthened by AFH's failure to disclose Missouri's conclusion, but is undercut by

26

the fact that the opinion pertained to only one of AFH's subsidiaries and to a time pre-dating the Class Period by over a year.

Finally, Plaintiffs argue that the Individual Defendants' stock sales towards the beginning of the Class Period contribute to an inference of scienter. While stock sales may provide circumstantial evidence of scienter, in order to support such an inference they must be "unusual" or "suspicious," meaning "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 955-56 (N.D. Ill. 2003) (internal quotations omitted). In determining whether the allegations rise to this level, "the Court can consider the amount and percentage of overall shares sold, the profit made, the timing of the stock sales and the consistency of the sales with the insider's prior trading history." *Id.*

Plaintiffs allege that Defendant Wollney sold 36,668 shares (9.8% of his holdings) and realized $721,880. (Dkt. 61 at ¶108.) Wollney retained 336,817 shares after the sale. (Dkt. 65 Ex. T.) Likewise, Romano sold 26,668 shares (2.6% of his holdings), made $525,675, and retained 75,486 shares. (Dkt. 65 Ex. R.) While the significant amounts of profit tend to support an inference of scienter, this inference is weakened by the fact that both Defendants sold a small portion of the shares they owned and retained a significant number of shares after the sale. *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 943 (N.D. Ill. 2015) ("Total sales amounting to a low percentage of an insider's percentage of stock holdings undercut any inference of scienter.") (collecting cases); *City of Austin Police Ret. Sys. v. ITT Educ.*

27

*Servs., Inc.*, 388 F. Supp. 2d 932, 951 (S.D. Ind. 2005) ("The fact that all [defendants] retained significant holdings also weighs against any inference of scienter.")

As for timing, Plaintiffs allege that Defendants Wollney and Romano, along with three other corporate executives, sold stock in a coordinated fashion between November and December 2017 when AFH's stock price was near its Class Period high and shortly before AFH disclosed another increase to its reserves in March 2018. (Dkt. 61 at ¶¶106-113.) The sales occurred during the time that Joseph Shugrue, one of the corporate executives that sold AFH stock at the same time as the Individual Defendants, was conducting an extensive review of non-modeled claims. (*Id.* at ¶107.) Further, this was the first time these individuals had sold AFH stock. (*Id.* at ¶¶108-112.)

While the first-time sale of stock is a notable change in the Defendants' trading history that supports an inference of scienter, the Court declines to infer that Shugrue's review of claims revealed information about reserve inadequacies, consistent with its conclusion that Plaintiffs have not adequately pled that Defendants' review of claim information revealed contradictory information regarding reserve amounts. The sales are also closer in time to AFH's release of its third quarter financial results on November 6, 2017 than they are to the reserve increase on March 1, 2018. *See In re Avon Prod., Inc. Sec. Litig.*, No. 05 CIV.6803 LAK MHD, 2009 WL 848017, at *22 (S.D.N.Y. Feb. 23, 2009) (Stock "sales occur[ing] shortly after announcements of quarterly results, [are] a pattern that appears benign on its face, and the opposite of an indication of fraud."). Plaintiffs' allegations, thus,

do not raise a compelling inference that Defendants sold stock knowing that further reserve increases would be required.[12]

In sum, the evidence in support of an inference of scienter amounts to (1) Missouri's conclusion that reserve amounts for one of AFH's subsidiaries were inadequate prior to the start of the Class Period, (2) RSM's conclusion at the very end of the Class Period that reserve amounts for two of AFH's subsidiaries were inadequate and material misstatements of AFH's financial condition, and (3) Individual Defendants' novel stock sales towards the beginning of the Class Period at a sizeable profit. Considering this evidence together, the Court concludes that these allegations do not give rise to a strong inference of scienter. [13]

Count I is dismissed without prejudice.

## II. Count II: Section 20(a)

In addition to the section 10(b) claims asserted against the Defendants in Count I of the complaint, Plaintiffs also seek to hold Wollney and Romano liable as "controlling" persons under section 20(a) of the Exchange Act. "To state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b–5." *Pugh v. Tribune Co.*, 521 F.3d 686, 693

---

[12] The TAC includes allegations regarding Defendants' motive to understate AFH's loss reserves. Namely, Plaintiffs allege that the 2017 reserve increase placed one of AFH's subsidiaries into noncompliance with a covenant in a loan agreement and that Defendants understated reserve amounts in order to secure funds to repay the amount outstanding on that loan agreement. (Dkt. 61 at ¶¶ 128-134.) The Court declines to consider these allegations in assessing scienter because, apart from a passing mention in a footnote with no legal authority, Plaintiffs do not raise them in their arguments in support of a finding of scienter.

[13] As the Court has determined Plaintiffs have failed to plead actionable false statements or omissions or scienter, the Court declines to address the parties' arguments on loss causation.

(7th Cir. 2008). Since the Court has found that Plaintiffs have failed to adequately plead a primary violation of securities laws, Count II must also be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted. The Court declines to dismiss either Count with prejudice at this juncture, however, any amendment will be subject to close scrutiny. *See Pension Tr. Fund for Operating Engineers v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018) ("We repeatedly have said that a plaintiff whose original complaint has been dismissed … should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. This admonition carries special weight in securities fraud cases ….") (internal quotations and citation omitted). The Third Amended Complaint is dismissed without prejudice. If plaintiffs file an amended complaint, they shall be mindful of all the issues addressed in this opinion and shall file an amended complaint by June 19, 2020. Failure to file by June 19, 2020 will result in this case being dismissed with prejudice.

E N T E R:

Dated: May 26, 2020

_____
MARY M. ROWLAND
United States District Judge

30