**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PHILIP FRYMAN and ARAM HOVASAPYAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ATLAS FINANCIAL HOLDINGS, INC., SCOTT D. WOLLNEY, and PAUL A. ROMANO,<br><br>Defendants. | Case No. 1:18-cv-01640<br><br>**FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

612140.1

# TABLE OF CONTENTS

I.      NATURE AND OVERVIEW OF THE ACTION ............................................................ 1

II.     JURISDICTION AND VENUE ..................................................................................... 11

III.    PARTIES ....................................................................................................................... 12

IV.     BACKGROUND ........................................................................................................... 13

        A.      Overview Of AFH And Its Subsidiaries ............................................................ 13

        B.      Overview Of  The Commercial Auto Insurance Industry.................................... 16

        C.      Overview Of Insurance Reserves, AFH's Reserving Process, and Applicable
                GAAP Rules....................................................................................................... 16

        D.      Regulation S-K Required Defendants to Disclose the Ongoing Inadequacy of
                Atlas's Reserves................................................................................................ 22

V.      OVERVIEW OF DEFENDANTS' FRAUD .................................................................. 24

        A.      At the Start of the Class Period, When Announcing Atlas's 2016 Financial
                Results, Defendants Announce a Massive, Yet Materially Understated, Increase to
                Atlas's Reserves................................................................................................ 24

        B.      Atlas's Under-reserving Results in Regulatory Action After the Missouri and
                Illinois Departments of Insurance Investigate Gateway, American Service, and
                American Country.............................................................................................. 28

        C.      The Truth Begins to Emerge: When Announcing Atlas's 2017 Financial Results,
                Defendants Announce a Second Significant, but Still Materially Misleading,
                Reserve Increase ............................................................................................... 30

        D.      Atlas's Under-reserving Results in a Second Regulatory Action After the New
                York Department of Financial Institutions Investigates Global Liberty .............. 35

        E.      The Truth Continues to Emerge: Atlas's Credit is Downgraded and Defendants
                Fire Atlas's Independent Public Accountant, BDO ............................................ 36

        F.      Defendants Continue to Falsely Reassure Investors Regarding Atlas's Loss
                Reserves ........................................................................................................... 38

        G.      Further Undisclosed Facts And Risks Are Revealed In 2019: Defendants
                Announce a Third Reserve Increase and Dismiss RSM For Calling Attention To
                The Company's Material Understatement Of Reserves And Associated Materially
                Misstated Financial Condition ........................................................................... 40

H. Relevant Post-Class Period Events Reveal the True Extent and Fallout of AFH's Ongoing Reserve Deficiencies .............................................................. 42

    1. The Illinois Regulatory Order ................................................... 42

    2. Atlas is Unable to Timely File its 2018 10-K and 2019 10-Qs, and is Delisted from NASDAQ ........................................................... 43

    3. With its Stock Worth Pennies, AFH Finally Reveals the Amount of the 2018 Reserve Increase, and is Forced to Materially "Revise" Previously Reported Net Claims Incurred ...................................... 44

VI. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................... 46

VII. ADDITIONAL SCIENTER ALLEGATIONS ................................................. 66

A. The Individual Defendants And Other Key Atlas Financial Executives And Directors Began Dumping Atlas Financial Stock In A Highly Unusual And Coordinated Fashion Between November 8, 2017 and December 21, 2017 ........ 67

B. Defendants' Manipulation Of AFH's Reserves Involved The Company's Core Operations ...................................................................................... 70

C. Defendants Were Experienced Executives At A "Specialty" Insurance Company .......................................................................................... 72

D. Defendants Were Admittedly Aware Of Negative Undisclosed Trends And Claim To Have Been Closely Monitoring The Negative Information That Was Withheld From Investors ............................................................... 74

E. Regulatory Investigations During the Class Period Further Demonstrate Defendants' Scienter ....................................................................... 77

F. Defendants Were Motivated To Understate Atlas Financial's Reserves To Avoid Non-Compliance With Atlas Financial's Covenants With Its Lenders ............... 80

G. Defendants Were Motivated To Understate Atlas Financial's Reserves To Issue Securities (Senior Unsecured Notes Issued on April 26, 2017) To Raise Funds To Repay The Amount Outstanding Under Its Loan Agreement With Fifth Third Bank .................................................................................................. 81

H. Atlas Financial Acted With Corporate Scienter .................................. 82

VIII. LOSS CAUSATION ............................................................................... 83

IX. CLASS ACTION ALLEGATIONS .......................................................... 83

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE
        (FRAUD-ON-THE-MARKET DOCTRINE) ................................................................. 85

XI.     NO SAFE HARBOR ......................................................................................................... 86

XII.    CLAIMS ............................................................................................................................ 87

XIII.   PRAYER FOR RELIEF .................................................................................................... 91

XIV.    JURY TRIAL DEMANDED ............................................................................................. 91

Lead Plaintiffs Philip Fryman and Aram Hovasapyan ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things: (a) review and analysis of regulatory filings made by Atlas Financial Holdings, Inc. ("Atlas," "Atlas Financial," "AFH," or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Atlas Financial; and (c) review of other publicly available information concerning Atlas Financial.

## I.     NATURE AND OVERVIEW OF THE ACTION

1.     This is a securities fraud class action on behalf of persons and entities that purchased or acquired Atlas Financial securities between February 22, 2017, and April 30, 2019, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Atlas Financial's business is conducted through insurance subsidiaries, which during the relevant period consisted of: (1) American Country Insurance Company ("American Country"); (2) American Service Insurance Company, Inc. ("American Service"); (3) Gateway Insurance Company ("Gateway"); and (4) Global Liberty Insurance Company of New York ("Global Liberty").  At all relevant times, AFH's common stock traded on the NASDAQ Stock Market ("NASDAQ") under the symbol "AFH."

3.     AFH holds itself out as a "*specialty*"[2] insurance company, which claims to have "extensive experience and *expertise with respect to underwriting and claims management* in [its] specialty area of insurance."[3] Specifically, Atlas provides specialty commercial transportation insurance for taxi, limousine, paratransit and other transport businesses around the United States.

4.     During the Class Period, AFH touted to investors that the executives of the

---

[1] "Defendants" refers collectively to Atlas Financial, Scott D. Wollney ("Wollney"), and Paul A. Romano ("Romano").

[2] Unless otherwise noted, all emphasis in this Complaint is added.

[3] *See* Annual Report on Form 10-K for the 2016 fiscal year, filed with the SEC on March 13, 2017.

Company possessed substantial sophistication and experience in its niche market. For example, the Company's 2016 Annual Report claimed:

> ***Experienced management team***. We have a talented and experienced management team who ***have decades of experience in the property and casualty insurance industry***. Our senior management team has worked in the property and casualty industry for an average of more than 25 years ***and with the [AFH's subsidiaries], directly or indirectly, for an average of 15 years.***

5.      Despite Defendant's claims of specialized expertise and experience, AFH's loss reserves were materially understated during the Class Period, thereby misleading investors as to the Company's true financial condition. Loss reserves are critical to an insurance company like AFH because every dollar added to loss reserves comes at the expense of net income.

6.      Insurance companies are required to hold reserves that are sufficient to cover losses owing to both: (1) known claims on insurance policies that they have provided to customers ("case reserves"); and (2) presently unknown claims on those policies – "incurred but not reported" losses ("IBNR"). Loss reserves should properly reflect the cost of claims that the carrier will be responsible for, whether known or unknown. The value of an insurance company is largely determined by the amount of its "surplus" – the capital it holds in excess of its loss reserves. As such, Defendants were highly motivated to understate loss reserves in order to inflate AFH's reported net income, capital surplus, and overall value.

7.      On February 22, 2017, AFH shocked investors when it reported its preliminary financial results for the 2016 fiscal year ended December 31, 2016, announcing that it needed to significantly strengthen its loss reserves. The Company cited "significantly increased severity in light commercial auto within the Michigan market and pre-acquisition claims at Global Liberty[]" as a primary reason for the reserve strengthening. In the February 22, 2017, press release, Defendant Wollney stated:

> ***While Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving, we did not anticipate the level of loss development in Michigan increasing dramatically over the past year.*** Our team is confident that ***we have addressed the issues at the heart of this problem, have taken appropriate steps***, and will learn from it as part of our ongoing commitment to continuous improvement, which has always been a priority at Atlas. With respect to pre-

acquisition related claims at Global Liberty, the transaction was structured to mitigate potential development. ***We have isolated any remaining exposure with a clear plan in place for remaining claims***, and continue to feel very good about the strategic benefits and expected future profitability of this business. ***While the impact of our reserve strengthening is significant, we believe it is isolated and that our overall book of business is sound, as will be demonstrated going forward***.

8.     In the press release, Defendant Wollney attempted to assuage investor fears in light of the massive year-end 2016 reserve increase.  Defendant Wollney touted the Company's increased use of technology, including predictive analytics, and sought to reassure investors by stating that "the changes made in our claim process will yield an overall better result in our ultimate loss costs going forward."

9.     While Defendants downplayed the FY 2016 reserve strengthening as "isolated" and assured investors that AFH employed "conservative reserving," they misrepresented and failed to disclose that AFH's reserves were still materially understated, even despite the significant 2016 reserve strengthening.  Moreover, at the very time they assured investors that "we have isolated any remaining exposure," Defendants concealed that AFH was under investigation for under-reserving by insurance regulators from the State of Missouri, the State of Illinois, and the State of New York.

10.     The Company's 2016 Form 10-K, filed on March 13, 2017, revealed that the amount of the reserve increase was $32.6 million, while 2016 net income was only $2,646,000.  But in any event, the $32.6 million reserve increase was itself materially understated and misleading.

11.     On May 11, 2017, the State of Missouri Department of Insurance, Financial Institutions and Professional Registration ("Missouri Department of Insurance"), concluded an investigation into reserving practices at Gatewayin conjunction with examiners from the State of Illinois and issued a report and order highly critical of Gateway's reserving practices.  *See* Ex. A (the "Missouri Regulatory Order").  The Missouri Regulatory Order examined the period January 1, 2012 through December 31, 2015, and stated that "[t]he examination also evaluated material transactions or events occurring subsequent to December 31, 2015." Ex. A, p.1.  The examination

focused on insurance pools of Gateway and two other AFH subsidiaries, American Service and American Country. *Id*. at pp. 6-7. The pooling agreement allocated 50% to American Service, 30% to American Country, and 20% to Gateway. *Id.*

12. The Missouri Regulatory Order identified regulatory violations related to significant under-reserving at Gateway. For example, in its "Summary of Recommendations," the Missouri Department of Insurance admonished that:

> The Company should ensure that Loss and Loss Adjustment Expense Reserves are sufficient and adequately supported. ***This resulted partly because the Company established reserves below what its own appointed actuary had recommended. The reserves recommended by the appointed actuary were found to be deficient as well and were not adequately supported.*** Ex. A, p. 15.

13. The Missouri Regulatory Order concluded that reserves on the pooled business were deficient on a combined basis by approximately $30.1 million. Ex A, p. 15. It further detailed that reserves on the examined pools were $6 million below the opining actuary's recommendation, and the actual recommendation was itself $24 million below the necessary level. *Id*. Reasoning that "Gateway's share of the pooled business is 20%," the order concluded that Gateway's overall reserves were deficient by approximately $6 million. However, because the other two entities in the pools were AFH subsidiaries, the entire $30.1 million reserve deficiency inured to AFH. *Id.* In addition, the Missouri Department of Insurance noted that Gateway's $6 million reserve deficiency "reduces [its] surplus of $18.8 million by almost one-third." Ex. A, p. 2.

14. The Missouri Regulatory Order ordered the reserve deficiencies to be rectified and further ordered rectification of Gateway's reserve methodology, stating that "[m]anagement's current 'reserve memo' does not address IBNR, and thus does not fulfill the requirements of Statement of Statutory Accounting Principles 55 (SSAP)." Ex. A, p. 15. The Missouri Regulatory Order made clear that the reserve deficiency had not yet been made up by the date of the report, stating "The Company strengthened reserves during 2016 due, largely to continued development on existing claims. Changes to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company." *Id.*

15. Defendants disclosed neither the Missouri Regulatory Order when they received it

on or about May 11, 2017, nor the additional material $30.1 million reserve deficiency identified therein.

16.    Instead, Defendants falsely reassured investors about their reserving process, and that further reserve increases would not be necessary.  For example, on a May 9, 2017 conference call, Defendant Wollney emphasized that Defendants were "monitoring loss development closely and are pleased to confirm that the results in the first quarter were consistent with the loss ratio range provided in our last [conference] call."  On an August 8, 2017 public conference call, Defendant Wollney stated, "I can tell you that the reserve levels that we established at year-end 2016 for Michigan do appear to be holding up consistent with the expectations we had …. we do have a team of people focused specifically on running off those older Michigan claims and we feel confident that they're doing the right job."

17.    Then, between November 8 and December 21, 2017—while AFH's stock was near its Class Period high and at the very time Defendants claimed to have been performing a file-by-file review of claims to ensure reserve adequacy, led by Joseph Shugrue—the Individual Defendants and several high-ranking AFH executives engaged in highly suspicious and unusual sales of AFH stock.  Defendant Wollney sold 36,668 shares of AFH stock (nearly 10% of his holdings), reaping proceeds of $721,880; Defendant Romano sold 26,668 shares of AFH stock (over 26% of his holdings), reaping proceeds of $525,675; Joseph Shugrue, AFH's then-Vice President for Claims sold 23,334 shares of AFH stock (approximately 24% of his holdings), reaping $456,173; Bruce Wayne Giles, AFH's Vice President for Product Development and Underwriting, sold 23,334 shares of AFH stock (approximately 25% of his holdings), reaping $459,172 from these sales; Leslie DiMaggio, AFH's then-Vice President for Operations and IT, sold 23,334 shares of AFH stock (approximately 24% of her holdings), realizing $459,172 from these sales.  Prior to the Class Period, *none* of these individuals had sold *any* of their AFH stock.

18.    On March 1, 2018, the Company again shocked investors by announcing that yet another increase to its reserves was required.  The Company's March 1, 2018 press release stated, in relevant part:

*Atlas performed a comprehensive review of its reserves and based on year-end actuarial work coupled with a detailed internal file audit for claims with reserves not established by the Company's predictive analytics tools, overall reserves were strengthened.*

**Facts Surrounding Reserve Changes**

• Atlas previously identified that claim expenses in Michigan were significantly outpacing other states and took a significant charge. Although exposure in Michigan was reduced to approximately 1% of the Company's business by year end 2017, *payments for claims in this state continued to be disproportionate to historic premiums earned.*

• In addition, *remaining liability for non-New York Global Liberty business written prior to 2016 is expected to settle for greater amounts than previously expected.*

• Overall remaining actuarially determined liability for *remaining claims related to accident year 2015 and prior in general was indicated to be significantly higher than carried reserves.*

\*    \*    \*

• Based on year end 2017 actuarial work Atlas determined that this significant reserve increase is necessary to ensure sufficient IBNR levels to extinguish the remaining claims especially for older accident years.

Scott D. Wollney, Chief Executive Officer, stated, "While we are disappointed that book value was reduced by reserve strengthening related to prior periods, we are reassured that results for more recent accident years are coming in as expected. The significant commitment we've made to analytics and technology is amplifying the expertise, data and heritage we've always identified as valuable assets of our insurance subsidiaries. The majority of our case reserves are now based on predictive modeling, and thus far this model has proved to be working, helping us to bring claims to ultimate faster and with greater accuracy. *We believe the file by file review conducted by our experienced team will also serve as a reliable benchmark against which future payments for older claims can be measured.*"

19.    In the March 1, 2018 press release, AFH disclosed net loss for full-year 2017 was $3.20 per share, and that the statutory surplus for AFH's four subsidiaries was expected to be between $85-$90 million.

20.    Also on March 1, 2018, Defendants held a public conference call with investors, analysts, and other market participants.  Wollney stated that they "obviously pay close attention to [AFH's] claim activity[.]"   Regarding the purported "file by file review" conducted by the Company, Defendant Wollney explained that "Joe Shugrue and his team of experienced adjusters

with 10 years to 20 years or more years of experience at the end of the year looked at each and every one of those claims and evaluated their expected outcomes. We have a lot of confidence. All of those claims at this point are at least a year old and the amount that the audit—the internal audit assessed would be necessary is less than the IBNR we put for those years."

21.     On the March 1, 2018 conference call, when asked what made Defendants confident that reserves would not need to be increased the following year, Defendant Wollney laid out three specific reasons:

> *[T]o be clear, the first is, the strengthening here is really focused on these older years and those claims are now mature enough that we really feel we can handicap them and that's what our file review is intended to do.*
>
> \*\*\*
>
> *The second is the case reserve set by the predictive model, which is claim specific has been behaving as expected* …. That does appear to actually be a long-term phenomenon, not just a short-term.
>
> \*\*\*
>
> *And then the final piece is that the same approach that concluded that there needed to be strengthening in 2015 and prior, also concluded that 2016 and 2017 were more or less consistent with what we thought. And again, that lines up with the timeline of the things we did in our business to be more precise and effective with risk selection, to take rate in a hardening market.* And it also lines up with the reported frequency in our existing claim inventories. So, we're not seeing claim inventories building on a year-over-year basis, despite the fact that our of book business grew, we're seeing reported claim frequency down and we're seeing relative stability in terms of average page kind of on our development triangles in aggregate. So, all of those things together give us the level of confidence that we have[.]

22.     Following the March 1, 2018 disclosure, AFH's stock price fell $7.70 per share, over 40%, to close at $11.10 per share on March 2, 2018, on unusually heavy trading volume.

23.     On March 15, 2018, the Company announced that the filing of its 4Q 2017 and year-end 2017 financial results would be delayed "to enable the Company and its auditors to finalize year end work." In response, AFH's stock price dropped $0.65 per share (24%), from $12.75 on March 14, 2018, to close at $12.10 on March 15, 2018. Ultimately, when the 2017 10-K was belatedly filed on April 3, 2018, Defendants disclosed that the amount of the reserve increase was a massive $75.4 million. The 2017 10-K further disclosed that the Company's net income was -$38.8 million and that the Company's combined statutory capital and surplus had

dropped to $87.8 million.

24.     On March 29, 2018, the New York State Department of Financial Services ("New York Department of Financial Services") concluded its report on examination of Atlas subsidiary, Global Liberty, noting Global Liberty's reserves were materially understated and not in regulatory compliance during the timeframe of January 1, 2013 through December 31, 2016.  *See* Ex. B ("New York Regulatory Report"), p. 18.  "Transactions occurring subsequent to this period were reviewed where deemed appropriate by the examiner."  *Id*. at p.2.  Specifically, the report stated:

> ***It is recommended that the Company address the ongoing reserve inadequacies and increase its carried reserves to an appropriate level*** ….
>
> ***Further, it is recommended that the Company's future actuarial report underlying the statement of actuarial opinion provides sufficient details of documentation and footnotes to clearly explain the calculations so that an independent reviewer can evaluate the work.***

*Id*. at p. 18.

25.     The New York Regulatory Report indicated that Global Liberty's reserves were deficient by $10.885 million, and observed that "[s]ubsequent to the examination, the Company recognized $9.674 million of the $10.885 examination deficiency in the 2017 annual statement." Ex. B, p. 18.  Thus, a $1.2 million reserve deficiency apparently remained pertaining to Global Liberty and the New York Regulatory Report, even after AFH's 2017 reserve strengthening. Accordingly, the New York Regulatory Report "recommended that the Company address the ongoing reserve inadequacies and increase its carried reserves to an appropriate level…." *Id.* at p. 20.  Defendants did not disclose the report or the ongoing reserve deficiency identified in it.

26.     According to the New York Regulatory Report, Global Liberty's reported net income for the entire four-year examination period was only $1.4 million.  *Id*. at p. 15.  Had reserves been properly recorded, Global Liberty would have had an approximate $9.5 million net *loss* for the same period.  *Id*. at p. 17.  Moreover, the approximate $10.885 million reserve understatement accounted for approximately 52.2% of Global Liberty's capital surplus.

27.     The New York Regulatory Report on Global Liberty further identified insufficient risk management and internal controls.  Specifically, the report stated, "It is recommended that the

Company take the necessary steps to address the weaknesses in its IT controls and/or processes in order to improve or strengthen its operation integrity, efficiency and effectiveness." Ex. B, p. 19.

28. On June 15, 2018, insurance rating company A.M. Best announced that it was downgrading the credit rating of Atlas Financial and the Company's insurance subsidiaries. According to A.M. Best, these actions were taken because, among other reasons, the balance sheet strength of certain of Atlas Financial subsidiaries were "very weak." Also according to A.M. Best, the "rating downgrades reflect the significant reserve strengthening charge taken in the fourth quarter of 2017," which caused "significant operating losses."

29. Then, on June 18, 2018, Defendants filed a Form 8-K with the SEC, signed by Defendant Romano, disclosing that the Company had "dismissed" its independent public accountant, BDO USA, LLP ("BDO"). The Company further disclosed that as of June 15, 2018, it had approved the engagement of RSM US LLP ("RSM") to replace BDO as its independent public accountant for the year ended December 31, 2018. Defendants did not provide a reason for BDO's dismissal.

30. Following these announcements, the Company's stock price fell $1.00 per share, more than 9%, to close at $9.95 per share on June 18, 2018, on heavy trading volume.

31. Then, in a stark turn from their prior assurances, on March 4, 2019, Defendants gave investors yet another jolt, issuing a press release announcing yet *another* necessary reserve increase. Defendants stated, among other things, that "[a]ctuarial work conducted in connection with year-end indicated a need to increase reserve estimates for unpaid losses due primarily to bodily injury claims from accident years 2016 and prior" and that "[t]hese claims are showing higher severity and have been open for longer periods than we had estimated." Accordingly, Defendant Wollney explained, AFH was "strengthening its reserves to account for the possibility of higher costs for the tail on these prior accident years."

32. The Company's stock price fell $2.21 per share on March 4, 2019, to close at $6.80 per share on March 4, 2019. The Company's stock price continued to fall the next trading day, dropping another $4.14 per share, more than *60%*, to close at $2.66 per share on March 5, 2019,

on heavy trading volume.

33.     On March 18, 2019, Defendants filed a Form 12b-25 notice of late filing with the SEC, stating that they were unable to timely file the Company's 2018 Form 10-K citing the need for "additional time for the registrant and its auditor to complete the year-end audit process."

34.     On April 9, 2019, Defendants disclosed that they had received a delinquency notice from NASDAQ for failure to timely file Atlas's 2018 Form-10K.

35.     On April 30, 2019, Defendants filed a Form 8-K with the SEC, signed by Defendant Romano, disclosing that the Company had "dismissed" its independent public accountant, RSM US, LLP ("RSM"), on April 29, 2019, barely ten months after it had dismissed its prior auditor, BDO.  The filing explained that "[o]n April 26, 2019, RSM informed the Corporation in writing that, based on its audit work to such date, it had concluded that the December 31, 2018 *insurance reserves in certain of the Corporation's insurance subsidiaries were understated, and that such understatement constituted a material misstatement of the Corporation's financial condition as reflected in the statutory financial statements of such insurance subsidiaries for the fiscal year ended December 31, 2018*."  The filing stated that the Company "disagrees with the conclusion of RSM based on the Corporation's assessment of reserve estimates and the related work of the Corporation's independent third party actuaries."  Defendants did not, however, disclose the written correspondence it received from RSM regarding RSM's assessment of the Company's understatement of reserves, nor did Defendants provide any further explanation of its own assessment of reserve estimates or the work purportedly done by the Company's "independent third party actuaries" to justify their claim that insurance reserves were, finally, at appropriate and sufficient levels.

36.     In response to this news, the Company's stock price fell $0.34 per share (24%) to close at $1.28 on April 30, 2019.  AFH's stock price continued to slide the next trading day, falling an additional $0.29 per share (26%) to close at $0.99 on May 1, 2019.

37.     On July 10, 2019, Defendants disclosed that the Circuit Court of Cook County entered an Agreed Order of Rehabilitation with respect to American Country and American

Service, pursuant to a verified complaint filed by the Director of the Illinois Department of Insurance. *See* Ex. C (the "Illinois Regulatory Order"). Thereafter, Gateway was redomesticated in Illinois and also placed into rehabilitation. Significantly, the three Atlas subsidiaries subject to rehabilitation under the Illinois Regulatory Order are the same three subsidiaries previously under examination by Illinois regulators and determined to have materially deficient reserves, as indicated in the May 2017 Missouri Regulatory Order (3 years prior). This, combined with RSM's determination that AFH's reserves were materially understated as of December 31, 2018, strongly suggests that the regulatory violations and deficiencies identified in the May 2017 Missouri Regulatory Order were never satisfactorily resolved by AFH.

38.     Throughout the Class Period, Defendants repeatedly made materially false and/or misleading statements, as well as failed to disclose material adverse facts about AFH's business, operations, and prospects. Despite their actual knowledge of material facts to the contrary, Defendants misled investors to believe that the Class Period reserve increases were necessitated by "isolated" issues; further material reserve increases would not be necessary; AFH's reserves were adequate; and, the Company's internal control over financial reporting were effective. As a result of the foregoing, Defendants' statements about AFH's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

39.     From its Class Period high of $21.35 per share on January 5, 2018, AFH stock plummeted to $0.99 per share by the end of the Class Period as a result of Defendants' conduct. Now a penny stock trading at approximately seventy cents (or less) per share, AFH's stock—and its investors—have never recovered.

## II.     JURISDICTION AND VENUE

40.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17

C.F.R. § 240.10b-5).

41.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

42.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

43.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.     PARTIES

44.     Lead Plaintiff Philip Fryman, as set forth in the certification previously filed with the Court (Dkt. No. 18-3), incorporated by reference herein, purchased Atlas Financial securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

45.     Lead Plaintiff Aram Hovasapyan, as set forth in the certification previously filed with the Court (Dkt. No. 18-3), incorporated by reference herein, purchased Atlas Financial securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

46.     Defendant Atlas Financial is incorporated in the Cayman Islands and the Company's corporate headquarters are located in Schaumburg, Illinois.  At all relevant times, Atlas Financial's common stock traded on the NASDAQ Stock Market ("NASDAQ") under the symbol "AFH."

47.     Defendant Scott D. Wollney ("Wollney") was the Chief Executive officer ("CEO") of Atlas Financial at all relevant times.

48.     Defendant Paul A. Romano ("Romano") was the Chief Financial officer ("CFO") of Atlas Financial at all relevant times.

49.     Defendants Wollney and Romano, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Atlas Financial's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants, as the Company's management, were responsible for maintaining effective internal controls over financial reporting. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.     BACKGROUND

### A.     Overview Of AFH And Its Subsidiaries

50.     AFH is a financial services holding company. According to the Company's 2016 Annual Report, AFH's "***core business*** is the underwriting of commercial automobile insurance policies, focusing on the 'light' commercial automobile sector." This sector includes taxi cabs, non-emergency para-transit, limousine, livery and business auto.

51.     In AFH's 2016 Annual Report, the Company held itself out as a "***specialty***" insurance company, which claims to have "extensive experience and ***expertise with respect to underwriting and claims management*** of in [its] specialty area of insurance."

52.     Similarly, AFH touted to investors that the executives of the Company possessed substantial sophistication and experience in its niche market. For example, the Company's 2016 Annual Report claimed:

*Experienced management team*. We have a talented and experienced management team who *have decades of experience in the property and casualty insurance industry*. Our senior management team has worked in the property and casualty industry for an average of more than 25 years and with the [AFH's subsidiaries], directly or indirectly, for an average of 15 years.

53. AFH's business is conducted through insurance subsidiaries, which during the relevant period consisted of: (1) American Country; (2) American Service; (3) Gateway; and (4) Global Liberty.

54. AFH acquired American Country and American Service at the end of 2010. In connection with the acquisition, AFH streamlined the operations of these insurance subsidiaries to focus on the "light" commercial automobile lines of business. During 2011 and 2012, AFH disposed of non-core assets and placed into run-off certain non-core lines of business previously written by these insurance subsidiaries. Since disposing of these non-core assets and lines of business, AFH's sole focus has been the underwriting of specialty commercial insurance for users of "light" vehicles in the United States.

55. AFH acquired Gateway in January 2013 from an unaffiliated third party. Gateway provides specialized commercial insurance products, including commercial automobile insurance to niche markets such as taxi, black car and sedan service owners and operators. The total purchase price for Gateway was approximately $14.3 million, consisting of a combination of cash and $2 million of AFH preferred shares (consisting of 2 million preferred shares). The Gateway purchase was subject to certain pre and post-closing adjustments, including, among others, the future development of Gateway's actual claims reserves for certain lines of business and the utilization of certain deferred tax assets over time. Pursuant to the terms of the stock purchase agreement, the Company issued an additional 940,500 preferred shares due to the favorable development of Gateway's actual claims reserves for certain lines of business during the first quarter of 2015. During the first quarter of 2016, the Company canceled 401,940 preferred shares pursuant to the Gateway stock purchase agreement due to the unfavorable development of Gateway's actual claims reserves for certain lines of business. During the third quarter of 2016, the Company and the former owner of Gateway's parent company agreed to settle the additional consideration

related to future claims development and utilization of certain tax assets. In connection therewith, Atlas Financial redeemed all 2,538,560 of the remaining preferred shares issued to the former owner of Gateway.

56.     On March 11, 2015, AFH acquired Global Liberty in a transaction that was structured similar to the acquisition of Gateway.  AFH acquired Global Liberty for a total purchase price of $23.2 million, consisting of a combination of cash and Atlas Financial preferred shares, and was estimated at approximately 1.3 times combined U.S. GAAP book value.   The consideration consisted of approximately $19.2 million in cash and $4.0 million of Atlas Financial preferred shares (consisting of a total of 4,000,000 preferred shares at $1.00 per preferred share). Global Liberty provides specialized commercial insurance products, including commercial automobile insurance to niche markets such as taxi, black car and sedan service owners and operators primarily in the New York market.  During the fourth quarter of 2016, the Company canceled 4,000,000 preferred shares pursuant to the stock purchase agreement due to unfavorable development of Global Liberty's pre-acquisition claims reserves.

57.     According to AFH's 2016 Annual Report, "Gross premium written from commercial automobile was $223.8 million, $207.8 million, and $119.5 million for the years ended December 31, 2016, 2015, and 2014, respectively." Additionally, "As a percentage of [AFH's subsidiaries'] overall book of business, commercial auto gross premium written represented 99.4%, 99.3%, and 97.6% of gross premium written for the years ended December 31, 2016, 2015, and 2014, respectively."

58.     For fiscal year ended December 31, 2016, Atlas reported net income as $2,646,000 and combined statutory capital and surplus of its insurance subsidiaries as $113.9 million.  The amount of Atlas's total reserves for this fiscal year was $139 million, and the amount of Atlas's reserve increase was $32.6 million.

59.     For fiscal year ended December 31, 2017, Atlas reported net income as –$38.8 million and combined statutory capital and surplus of its insurance subsidiaries as $87.8 million. The amount of Atlas's total reserves for this fiscal year was $211.6 million, and the amount of

Atlas's reserve increase was $75.4 million.

60.     For fiscal year ended December 31, 2018, Atlas reported net income as –$80 million and combined statutory capital and surplus of its insurance subsidiaries as $14.4 million. The amount of Atlas's total reserves for this fiscal year was $273.5 million, and the amount of Atlas's reserve increase was $82.7 million.

### B.     Overview Of The Commercial Auto Insurance Industry

61.     The "light" commercial automobile policies AFH underwrites provide coverage for light weight commercial vehicles typically with the minimum limits prescribed by statute, municipal or other regulatory requirements. The majority of AFH's policyholders are individual owners or small fleet operators.

62.     AFH's 2016 Annual Report further indicated that "the 'light' commercial automobile sector is a subset of the historically profitable commercial automobile insurance industry segment" but "in more recent years the commercial automobile insurance industry has seen profitability pressure within certain segments, underperforming the broader property & casualty ("P&C") industry."  According to AFH, "for 2015 the total market for commercial automobile liability insurance was approximately $31.3 billion."

### C.     Overview Of Insurance Reserves, AFH's Reserving Process, and Applicable GAAP Rules

63.     AFH, like all insurance companies, establishes loss reserves to ensure that the Company has sufficient liquid capital to pay claims that are submitted from its insured customers. For insurance companies, reserves are a critical, if not the most important, measure of financial health as they represent expected future losses that the company will be required to pay out for claims on the insurance policies it has issued and underwritten.

64.     The establishment of reserves is meant to ensure that a sufficient portion of the premiums received in connection with a business line will be available to cover the claims filed that relate to that business line. Loss reserves established by an insurer or reinsurer reflect the estimated cost of claims that the carrier will be required to pay in the future on insurance that has

been written as of the date of the financial statement. Loss reserves are for the losses, known or unknown, which have been incurred as of the financial reporting date on all policies active or expired. They include an examination of reported but unpaid claims (called case reserves), estimates of claims not yet reported, estimates of closed claims which may be reopened, and estimates of the shortfall expected in case reserves, based on history, to reflect that even on reported claims, information is never complete until the claim is settled. In order for the level of reserves established in connection with a given group of policies to be adequate, the reserves must be based upon actuarial analysis of accurate underlying data concerning the nature of the claims filed (and expected to be filed) and the business lines (*i.e.*, workers' compensation, commercial multi-peril, etc.) associated with the claims.

65.     Loss reserves fall into two distinct categories. The first category consists of individual case reserves for reported losses and loss expenses associated with a specific reported insured claim. Once AFH receives an insurance claim, a case reserve should be established based upon known facts about the claim at that time, and is modified on an ongoing basis based upon the development of additional facts.

66.     The second category of loss reserves consists of the IBNR losses, which include expected losses and claims adjustment expense ("CAE") amounts for claims incurred but not yet reported and the expected loss development of reported claims. CAE reflects the costs associated with the payment of losses and settlement of claims other than the amount of the loss itself, such as the expense of investigating claims and providing payment to attorneys. There are both case reserves and IBNR reserves for CAE. For example, according to AFH's 2016 Annual Report: "The provision for unpaid claims represent the estimated liabilities for reported claims, plus those incurred but not yet reported and the related estimated claims adjustment expenses, such as legal fees." AFH's 2016 Annual Report further indicated that "Unpaid claims adjustment expenses are determined using case-basis evaluations and statistical analyses, including insurance industry claims data, and represent estimates of the ultimate cost of all claims incurred.

67.     As AFH explained in its 2016 Annual Report, the Company's net claims incurred

expenses is a critical metric to the Company's financial performance. AFH explained:

> Net claims incurred expenses are a function of the amount and type of insurance contracts we write and of the claims experience of the underlying risks. We record net claims incurred based on an actuarial analysis of the estimated claims we expect to be reported on contracts written. We seek to establish case reserves at the maximum probable exposure based on our historical claims experience. Our ability to estimate net claims incurred accurately at the time of pricing our contracts is a critical factor in determining our profitability. The amount reported under net claims incurred in any period includes payments in the period net of the change in the value of the reserves for net claims incurred between the beginning and the end of the period.

68.     In 2015, Atlas Financial implemented plans to incorporate predictive analytics into its business model, touting in a February 2015 press release the anticipated benefits of the "sophisticated analytics platform to leverage the information and expertise within our organization with the objective of always outperforming the industry across market cycles."

69.     On June 1, 2016, AFH's predictive analytics were integrated into AFH's claims processes with the objective of identifying potentially large claims earlier than previously possible. Importantly, the timing of AFH's implementation of predictive analytics had a significant undisclosed impact on AFH's claims and reserves. Specifically, claims after June 1, 2016 had "modeled" case reserves that took into account predictive analytics, whereas claims prior to that date were so-called "non-modeled" claims where the case reserves were not set using predictive analytics.

70.     Defendants claimed that their reserving practices followed a conservative approach in order to cover Atlas's estimated liability for the payment of claims and expenses related to the administration of claims incurred on the insurance policies the Company had written.  For example, at the start of the Class Period, on February 22, 2017, Defendant Wollney noted that "Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving[.]"

71.     Moreover, as part of their approach to reserving, Defendants emphasized their close monitoring of AFH's loss development.  For example, during a public conference call on May 9, 2017, Defendant Wollney reassured investors that Defendants were "monitoring loss development

closely and are pleased to confirm that the results in the first quarter were consistent with the loss ratio range provided in our last [conference] call." Similarly, during a public conference call on August 8, 2017, Defendant Wollney reassured investors that "we're monitoring trends by segment and geography closely."

72.     Insurers, such as AFH, must adhere to a number of accounting guidelines, including the guidelines of the National Association of Insurance Commissioners Statement of Statutory Accounting Principles ("SSAP"), which are the accounting principles or practices that are prescribed or permitted by the insurer's domiciliary state insurance department.

73.     SSAP 55 governs accounting for unpaid claims, losses, and loss adjustment expenses.  Pursuant to SSAP 55, para. 10, "The liability for claim reserves and claim liabilities, unpaid losses, and loss/claim adjustment expenses shall be based upon the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience."  SSAP 55, para. 19 further provides that insurers are required to "accrue the midpoint of a range of loss or loss adjustment expense reserve estimates when no point within management's continuous range of reasonably possible estimates is determined to be a better estimate than any other point."

74.     Insurers, such as AFH, also must prepare their financial statements in accordance with Generally Accepted Accounting Principles ("GAAP").  GAAP are the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements.  The SEC has the statutory authority for the promulgation of GAAP for public companies, such as AFH, and has delegated that authority to the Financial Accounting Standards Board ("FASB").  FASB's Accounting Standards Codification ("ASC"), as well as SEC rules and interpretive releases, represent sources of authoritative GAAP for SEC registrants.  ASC 944-40-30 governs insurance reserve setting and ASC 944-40-50 governs disclosure requirements.

75.     ASC 944-40-30-1 mirrors the requirements of SSAP 55 para. 10, and provides that "liability for unpaid claims shall be based on the estimated cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience."

76.     Additionally, GAAP requires insurers to disclose, and in certain circumstances, also accrue loss contingencies when loss reserve estimates are impacted by judgmental adjustments to historical experience.  *See* ASC 944-40-50; Statement of Financial Accounting Standards ("SFAS") 5, ¶1.  A loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to possible loss. *See* SFAS 5, ¶1. GAAP requires that an estimated loss from a loss contingency be accrued by a charge to income if both of the following conditions are met: (a) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (b) the amount of loss can be reasonably estimated.  *See* SFAS 5, ¶8. Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS 5 are not met, or if an exposure to loss exists in excess of the amount accrued, insurers are still required to disclose the contingency when there is at least a "reasonable possibility" that a loss or an additional loss may have been incurred.  SFAS 5, ¶10. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.  *See* SFAS 5, ¶10.

77.     ASU 2015-09 updated the disclosure requirements under ASC 944-40-50, to require insurers to "disclose information about significant changes in methodologies and assumptions used in calculating the liability for unpaid claims and claim adjustment expenses, including reasons for the change and the effects on the financial statements," which includes disclosure of "changes in actuarial methodologies and assumptions."  FASB Update No. 2015-09, BC26.  These changes were effectuated to address deficiencies in "[e]xisting guidance in Topic 944 [which] does not prescribe a method for calculating the liability for unpaid claims and claim adjustment expenses, and insurance entities apply significant judgment when selecting the

actuarial methods and assumptions used." *See id.*

78. Accordingly, Atlas was required under GAAP to disclose its management's basis for estimating loss reserves, including any major risks and uncertainties concerning these estimates. ASC 944-40-50-4F; ASC 944-40-50-4I. GAAP also required Defendants to disclose the manner in which its management's process to determine estimated loss reserves diverged from the actuarial analyses of its internal and external actuaries. *Id.* GAAP also required Atlas to disclose loss contingencies when its management's reserve estimates were impacted by judgmental adjustments to historical experience for purposes of estimating future claims costs. *See id.*; SFAS 5, ¶10.

79. During the Class Period, Defendants were aware that their reserving practices violated SSAP 55 as a result of the Missouri Regulatory Order, dated May 11, 2017, and the New York Regulatory Report, dated March 29, 2018. However, Defendants never disclosed this noncompliance and further, they continued their under-reserving practices. The Missouri Regulatory Order specifically stated: "the Company established reserves below what its own appointed actuary had recommended. The reserves recommended by the appointed actuary were found to be deficient as well and were not adequately reported. Management's current 'reserve memo' does not address IBNR, and thus does not fulfill the requirements of [SSAP] 55. Should the Company wish to materially deviate from the appointed actuary's central estimate in the future, it should ensure that supporting detail complies with SSAP 55." Ex. A, p. 15.

80. The New York Regulatory Report similarly stated, "It is recommended that the Company address the ongoing reserve inadequacies and increase its carried reserves to an appropriate level, pursuant to . . . Paragraph 10 of SSAP No. 55 . . . . Further, it is recommended that the Company's future actuarial report underlying the statement of actuarial opinion provides sufficient details of documentation and footnotes to clearly explain the calculations so that an independent reviewer can evaluate the work." Ex. B, p. 18.

81. Moreover, during the Class Period, Defendants violated GAAP disclosure requirements regarding their basis and methodology for calculating Atlas's loss reserves.

Defendants concealed the major risks and uncertainties presented by their ongoing under-reserving practices, as identified by the Missouri Regulatory Order and the New York Regulatory Report. Moreover, Defendants failed to disclose the manner in which their estimates of loss reserves diverged from those of internal and external actuaries. Indeed, the Missouri Regulatory Order specifically provided that on a combined basis, Gateway, American Country and American Services' loss reserves were $6 million below what Atlas's own appointed actuary had recommended, and $24 million below the level determined to be necessary. Ex. A, p. 15. Yet, Defendants never disclosed this information, nor did they disclose the impact it had on their reserving, or their financial statements.

82. Further, Defendants violated GAAP's requirement to disclose loss contingencies when their reserve estimates were impacted by judgmental adjustments to historical experience for purposes of estimating future claims costs. *See id.*; SFAS 5, ¶10. Defendants' estimates incorporated their beliefs that deficiencies on older claims would be offset by favorable loss reserve trends from more recent years resulting from Atlas's predictive modeling, that their file-by-file analysis would accurately represent ultimate liabilities on those claims, and management's decision to rely less on outside actuarial opinions. These judgmental adjustments impacted significant accounting estimates in Atlas's financial statements, and should have been disclosed as loss contingencies, but were not so disclosed during the Class Period, in violation of GAAP.

### D. Regulation S-K Required Defendants to Disclose the Ongoing Inadequacy of Atlas's Reserves

83. Regulation S-K required Defendants to describe, in Atlas's financial statements filed with the SEC during the Class Period, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303").

84. Known as Management Discussion and Analysis ("MD&A") requirements, Item 303 is intended to provide "in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of

operations of the registrant, with particular emphasis on the registrant's prospects for the future." SEC Release Nos. 33-8056; 34-34-45321. Moreover, "Disclosure is **mandatory** where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." *Id.*

85.     Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

86.     Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

> i.     Describe any *unusual or infrequent events or transactions* or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

> ii.     Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

87.     Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such *required* disclosures include: "[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." S.E.C. Release No. 6835, 1989 WL 1092885, at

*4 (May 18, 1989).

88.     Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).

89.     Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

90.     Here, the inadequacy of Atlas's reserves, its flawed methodology for estimating reserves, and the trend of ever-increasing claim severity, were known trends or uncertainties likely to have a material unfavorable impact on Atlas's net income or statutory surplus.  As such, Atlas was required to include specific disclosures regarding the same in its MD&A in SEC filings during the Class Period.  It did not.

## V.    OVERVIEW OF DEFENDANTS' FRAUD

### A.    At the Start of the Class Period, When Announcing Atlas's 2016 Financial Results, Defendants Announce a Massive, Yet Materially Understated, Increase to Atlas's Reserves

91.     On February 22, 2017, AFH shocked investors when it issued a press release announcing a substantial increase in its loss reserves.  At the time, all four of Atlas's insurance subsidiaries were under scrutiny by insurance regulators in the states of Missouri, Illinois, and New York.  Defendants revealed that the amount of the reserve increase was $32.6 million in

Atlas's 2016 Form 10-K, filed shortly thereafter on March 13, 2017. Defendants reassured investors that the primary reason for the increase was Michigan claims and the secondary reason were pre-acquisition Global Liberty claims and reassured investors that reserves would not need to be increased again. The press release stated in relevant part:

> Chicago, Illinois (February 22, 2017) -Atlas Financial Holdings, Inc. (NASDAQ: AFH) ("Atlas" or the "Company") today announced selected preliminary financial results for its fourth quarter and year ended December 31, 2016, which included *reserve strengthening on higher than expected losses related primarily to significantly increased severity in light commercial auto within the Michigan market and pre-acquisition claims at Global Liberty. To a lesser extent, the overall severity trend on smaller losses in other markets was also a consideration.* After the impact of taxes and of preferred share adjustments related to acquisition agreements, the impact on net income will be approximately $17 million for the fourth quarter and year ended December 31, 2016. *The Company performed a comprehensive review of its reserves as a result of changing loss payment trends identified through year-end actuarial work, and ultimately decided that it was appropriate to strengthen reserves at this time.*

> Scott D. Wollney, Chief Executive Officer stated, "*While Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving, we did not anticipate the level of loss development in Michigan increasing dramatically over the past year. Our team is confident that we have addressed the issues at the heart of this problem, have taken appropriate steps, and will learn from it as part of our ongoing commitment to continuous improvement, which has always been a priority at Atlas. With respect to pre-acquisition related claims at Global Liberty, the transaction was structured to mitigate potential development. We have isolated any remaining exposure with a clear plan in place for remaining claims, and continue to feel very good about the strategic benefits and expected future profitability of this business. While the impact of our reserve strengthening is significant, we believe it is isolated and that our overall book of business is sound, as will be demonstrated going forward.*"

> As a percentage of the Company's policy count, business written in the state of Michigan was reduced significantly on a year-over-year basis beginning in 2013 as a result of relative underperformance. In 2012, Michigan business represented 18.5% of total policy count; in the past year, policies in that state represented 4.5% of the total. Despite the reduction in relative exposure, losses paid in connection with Michigan claims have been disproportionate, representing 21% of all loss amounts paid in 2016 for commercial auto liability claims. Claims paid under $25,000 represented 43% of the total paid in the state with average severity in this cohort increasing 24% on a year over year basis in 2016. In particular, average severity for personal injury protection ("PIP") coverage, which is mandatory in Michigan, paid in 2016 increased by 115% as compared to 2015, litigated PIP claim settlements increased by 25% year over year and PIP claims closing without payment decreased from 50% to 32%. Severity trends for large claims were more

FOURTH AMENDED CLASS ACTION COMPLAINT

stable. In total, based on claim payment made through year-end 2016, Michigan claims for policy years 2010 through 2015 exceeded the amount that would have been proportionate by approximately $23 million.

…. Having taken actions to eliminate this exposure, the Company anticipates business in Michigan to be less than 1% of Atlas' in-force business by the end of 2017.

Mr. Wollney continued, "*As a specialist, we put a priority on addressing changes in our market in a nimble way. To this end, in recent years Atlas enhanced and initiated numerous underwriting and claim related processes designed to leverage our expertise in the specialty light commercial auto sector, including the elevated use of predictive analytics.* We have proactively compressed settlement time, particularly with respect to larger claims, providing earlier visibility into potentially changing claim trends. It is important to acknowledge our entire claims team's excellent work, including our Michigan adjusters who are diligently addressing the challenges in that market. *Observations from the year-end 2016 reserve analysis that led to the conclusion that reserve strengthening for older years appears appropriate also confirm our belief that the changes made in our claim process will yield an overall better result in our ultimate loss costs going forward. The Company is committed to learn from the factors surrounding our reserve strengthening to ensure we can react to changes in our industry and niche as quickly as possible in the future.*"

…. As always, Atlas' focus is optimizing underwriting profit and ultimately return on equity as opposed to top-line growth on an absolute basis, and the Company believes that this reserve strengthening for past periods coupled with the use of advanced risk modeling has Atlas positioned correctly in 2017.

After considering the potential residual effect of reserve strengthening, the Company anticipates its reported Loss & LAE ratio for the most current accident year to be in the range of 59% to 61%. While this is encouraging, Atlas will be diligent in its efforts to deliver potentially improved loss ratios, especially related to more recent accident years through appropriate underwriting and pricing, disciplined claims handling as well as further leveraging the investments it has made in predictive analytics. *However, credit for such improvement will not be recognized until it is reflected in future loss settlements. Overall reserves will be consistently re-evaluated and Atlas anticipates seeing the positive impact of severity mitigation activities will become apparent in losses settled during 2017 and forward.*

Based on preliminary unaudited financial results, the Company anticipates book value to be in the range of $10.35 to $10.55 per common share diluted as at December 31, 2016, as compared to $10.15 at December 31, 2015, which includes modest income for the year after this reserve adjustment . . . .

92.     During a public conference call on March 14, 2017, with investors and analysts to discuss the Company's Q4 2016 and FY 2016 financial results, Defendants provided further

information about the events leading to the substantial increase to the Company's loss reserves and further reassured investors that the issues necessitating the increase were "isolated," and future reserve increases would not be necessary. Specifically, Defendant Wollney stated:

> For the next few minutes, I'll briefly address the recent reserve strengthening that we've preannounced last month and about which I've spoken with many of you subsequent to that release. *We feel very strongly that we've isolated the issue and that we were open with investors as to both the cause and the short-term impact it had on our operating results.*
>
> *As a result of the proactive measures we took and are taking, we believe that Atlas is well positioned going forward . . . .*
>
> *For the 2016 fourth quarter and year-end, Atlas performed a comprehensive review of its reserves. As a result of changing loss payment trends identified through year-end actuarial work, we ultimately decided that it was appropriate to strengthen reserves at this time.* The impact on net income after tax and preferred share adjustments related to acquisitions was approximately $17 million. *The primary cause of the reserve strengthening was related to increased severity in light commercial auto within the Michigan market for business written in prior accident years.*
>
> *Certain unrelated pre-acquisition claims at Global Liberty were also identified as requiring reserve strengthening. The bulk of the net impact on our balance sheet related to Michigan . . . . By the end of 2017, we expect Michigan to be less than 1% of our overall book of business . . . . There are no other states or segments in our book of business that showed the kind of great need or severity challenges I just described.* And the predictive analytics we've implemented in the claims area last year will help ensure that any such trends can be identified even earlier in the future.

93. Further, during the March 14, 2017 conference call, Defendant Wollney assured investors that the reserve increase was "appropriately conservative." Specifically, Defendant Wollney stated:

> *And so, we do believe that the reserve strengthening is appropriately conservative, reflecting both the disproportionate amount of reserves that claims in Michigan used up through the end of 2016 as well as the expected future payment for the run-off of remaining claims, again, with the expectation that what we saw in 2016 would not improve from a reserve standpoint.*

94. Atlas's 2016 10-K, filed on March 13, 2017, also misleadingly assured investors that the Company's internal control over financial reporting was effective as of December 31, 2016.

95.     On May 9, 2017, Defendant Wollney again falsely reassured investors that "the reserve charges that Atlas took surrounding our Michigan book of business is ***something that we believe has been isolated***."

   **B.   Atlas's Under-reserving Results in Regulatory Action After the Missouri and Illinois Departments of Insurance Investigate Gateway, American Service, and American Country**

96.     Less than three months after Defendants announced the first reserve increase of the Class Period, on May 11, 2017, the Missouri Department of Insurance, issued a report and order subsequent to an examination of Gateway, conducted in conjunction with the Illinois Department of Insurance. The Missouri Regulatory Order noted violations related to the under-reserving of Gateway, American Country, and American Service during the timeframe of January 1, 2012 through December 31, 2015. *See* Ex. A. Specifically, the Missouri Regulatory Order stated:

> The Company should ensure that Loss and Loss Adjustment Expense Reserves are sufficient and adequately supported. ***This resulted partly because the Company established reserves below what its own appointed actuary had recommended. The reserves recommended by the appointed actuary were found to be deficient as well and were not adequately supported.***

Ex. A, p. 15.

97.     Reasoning that "Gateway's share of the pooled business is 20%," the Missouri Regulatory Order concluded that its overall reserves were deficient by approximately $6 million." However, because the other two entities in the pools were AFH subsidiaries, the entire $30.1 million reserve deficiency inured to AFH. In addition, the Missouri Department of Insurance noted that Gateway's $6 million reserve deficiency "reduces [its] surplus of $18.8 million by almost one-third." Ex. A, p. 2.

98.     The Missouri Regulatory Order ordered the reserve deficiencies to be rectified and further ordered rectification of Gateway's reserve methodology, stating that "[m]anagement's current 'reserve memo' does not address IBNR, and thus does not fulfill the requirements of Statement of Statutory Accounting Principles 55 (SSAP)." Ex. A, p. 15. The Missouri Regulatory Order made clear that the reserve deficiency had not yet been made up by the date of the report, stating, "The Company strengthened reserves during 2016 due, largely to continued development

on existing claims. Changes to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company." *Id.* Defendants disclosed neither the Missouri Regulatory Order nor the additional material $30.1 million reserve deficiency identified therein.

99. After the Missouri Regulatory Order was issued, despite the Missouri Department of Insurance's finding that Gateway, American Country, and American Service's reserves were "deficient," Defendants continued to falsely reassure investors that Atlas's reserve increase was based solely on particular "isolated" issues that would soon be resolved, and, that Atlas's business model was viable. Defendants falsely reassured investors that Atlas's reserving practices and claims monitoring ensured that another reserve increase would not be necessary and that reserves were adequate. Indeed, on August 8, 2017, Defendant Wollney told investors:

> ***I can tell you that the reserve levels that we established at year-end 2016 for Michigan do appear to be holding up consistent with the expectations we had.*** Paid severity in Michigan seems to be flattening out, again just based on the sort of early information we have in the first half of this year.
>
> As I touched on, the inventory claim count has dropped 16% since the end of 2016. We currently have about 450 claims open for Michigan in terms of the third-party bodily injury and PIP claims, and we are seeing that inventory declining. So claim closure rate is definitely exceeding the rate of inbound claims, which is slowing dramatically.
>
> Last year, I think, we saw the biggest amount of claims settlement that we've seen historically and probably will see based on the fact that there was a three-year statute related to Michigan PIP and a lot of the exposure in that state for us was created in 2013, in terms of claims made against 2012 and 2013 accident years. And so now that that three-year statute has run on the years where we had the biggest in-force exposure, that is also going to result in fewer claims coming in, especially bigger, older claims. ***So, we do have a team of people who are focused specifically on running off those older Michigan claims and we feel confident that they're doing the right job***.

100. By concealing the basis and methodology for their estimates of Atlas's loss reserves, including the material risks and uncertainties presented by the state regulators' findings, as required by GAAP, Defendants were able to artificially inflate Atlas's stock price during the Class Period.

**C.** **The Truth Begins to Emerge: When Announcing Atlas's 2017 Financial Results, Defendants Announce a Second Significant, but Still Materially Misleading, Reserve Increase**

101.    On March 1, 2018, after market closed, AFH issued a press release announcing its preliminary financial results for the 2017 fiscal year ending December 31, 2017, and shocked investors by disclosing that the Company expected to report a net loss of approximately $3.20 for the 2017 fiscal year.

102.    AFH's March 1, 2018, press release disclosed that the massive net loss for 2017 had resulted from the need to massively increase its reserves for claims relating to accident years prior to 2016.  Defendants disclosed that the amount of the reserve increase was $75.4 million in the Company's 2017 10-K.  The March 1, 2018 press release, in relevant part, stated:

> Atlas performed a comprehensive review of its reserves and based on year-end actuarial work coupled with a detailed internal file audit for claims with reserves not established by the Company's predictive analytics tools, overall reserves were strengthened.

> **Facts Surrounding Reserve Changes**

> • Atlas previously identified that claim expenses in Michigan were significantly outpacing other states and took a significant charge. Although exposure in Michigan was reduced to approximately 1% of the Company's business by year end 2017, payments for claims in this state continued to be disproportionate to historic premiums earned.

> • In addition, remaining liability for non-New York Global Liberty business written prior to 2016 is expected to settle for greater amounts than previously expected.

> • Overall remaining actuarially determined liability for remaining claims related to accident year 2015 and prior in general was indicated to be significantly higher than carried reserves.

> • Risk selection and pricing precision supported by modelling in underwriting beginning in 2015 appears to have contributed improvement in expected loss ratio for premiums earned in 2016 and 2017.

> • Payment activity in calendar year 2017 attributed to the use of predictive modelling in claims was accelerated as expected. The Company believes that this represents an ultimate reduction in future expected losses, but it appears to be too early for credit to be given to this potential outcome from an actuarial perspective.

> • While the Company did see positive trends relating to more recent accident years in which predictive modelling had an impact, based on year-end work, it is clear

that the challenges from the past outpaced more recent benefits.

• Based on year end 2017 actuarial work Atlas determined that this significant reserve increase is necessary to ensure sufficient IBNR levels to extinguish the remaining claims especially for older accident years.

Scott D. Wollney, Chief Executive Officer stated, "While we are disappointed that book value was reduced by reserve strengthening related to prior periods, we are reassured that results for more recent accident years are coming in as expected. The significant commitment we've made to analytics and technology are amplifying the expertise, data and heritage we've always identified as valuable assets of our insurance subsidiaries. The majority of our case reserves are now based on predictive modeling, and thus far this model has proved to be working, helping us to bring claims to ultimate faster and with greater accuracy. *We believe the file by file review conducted by our experienced team will also serve as a reliable benchmark against which future payments for older claims can be measured.* Going forward, we plan to share quarterly actual loss development experience for both the audited claim files for older accident years as well as paid to case reserve outcomes for predictive model based case reserves."

103.    On this news, the Company's stock price fell $7.70 per share, over 40%, to close at

$11.10 per share on March 2, 2018, on unusually heavy trading volume.

104.    On March 1, 2018, Defendants held a public conference call with investors and

analysts to discuss the Company's preliminary financial results announced that day.  Therein,

Defendant Wollney began by addressing the reserve increases:

Here are the facts. Last year we identified that claims expense in Michigan were significantly outpacing other states and took a significant charge. *To-date the disproportional amount of claims we've paid in Michigan exceeds $38 million. We also recognize that claims of Global Liberty related to prior years' business continued being settled for more than case reserves, while New York business at Global is moving in the right direction, particularly non-New York business from 2016 and earlier years developed worse than expected.*

In addition to these two specific issues, while we have reasons to believe that our niche is less exposed to volatility than other areas of commercial auto insurance, *based on year-end actuarial work, there appears to be an overall increase in both paid severity and future expected unpaid amounts across our book of business primarily for accident years 2015 and prior.*

While we did see positive trends relating to more recent accident years and our predictive model driven business, based on year-end work, we are again moving to our outside independent actuary select point resulting in a significant reserve increase for remaining claims, *especially those older accident years prior to our*

*use of predictive analytics.* The end result is that after the effective reserve strengthening, as well as an approximate $0.55 per share DTA write down resulting from the Tax Cut and Jobs Act (sic) [Tax Cuts and Jobs Act], book value per share as of December 31, 2017 is expected to be between $7.25 and $8, and statutory surplus across Atlas's four insurance company subsidiaries will be between $85 million and $90 million.

105.　During the March 1, 2018 conference call, Defendant Wollney indicated: "At year-end 2017, *experienced members of our claims team also conducted a file by file claim review of non-modeled claims, as well as all remaining Michigan claims to reinforce our decision-making. The results of that review will serve as a benchmark against which sufficiency can be measured as these older claims run off*." Further, Defendant Wollney indicated that "Joe Shugrue[4] and his team of experienced adjusters with 10 years to 20 years or more years of experience at the end of the year looked at each and every one of those claims and evaluated their expected outcomes."

106.　During the March 1, 2018 conference call, Defendant Wollney indicated that predictive analytics had a seemingly positive impact on so-called "modeled claims" resulting in expected "compression of claim settlement times" as these changes led to claims payments being sped up. Moreover, Defendant Wollney indicated that AFH was confident that the payment of modeled claims was occurring for less than the case reserve.

107.　The announcement of the enormous reserve increases obviously blindsided investors and analysts. In response to an analysts question about how the Company's quarterly reserve process unfolded throughout the year, Defendant Wollney attempted to claim that the reserve increase caught Defendants off-guard but simultaneously admitted that Defendants had been aware that older non-modeled claims were paying out in excess of the case reserves throughout 2017:

> <Q - Matthew J. Carletti>: Couple of questions. I guess first, Scott, could you walk us through a bit of how the – even it sounds like this year that was a little bit of a more in-depth process, but on a more regular basis, how did the quarterly reserve processes take place as compared to, say, what I presume is a more in-depth Q4 process? Because it seems like this definitely came out, caught you guys by surprise

---

[4] As noted below, Joe Shugrue was one of several key AFH executives who engaged in highly unusual and suspicious sales of AFH stock between November and December 2017.

that I'm just [indiscernible] (00:21:19) that by kind of the interactions that we've had on prior calls and things like that. Just really with the idea of how it seems like this is rather pervasive in the older years, and how it kind of went under the radar for presumably at least three quarters?

<A - Scott D. Wollney>: Yeah. No, it did catch us by surprise candidly. *I mean, we obviously pay close attention to our claim activity as the analytics that we provided in the deck I think illustrate, we are looking very closely at claim settlement times, at claim settlement amounts. And really in calendar year 2017 there were two things going on simultaneously. There was the runoff of the older claims where we were paying above that factor based case reserves and that's what the IBNR we put up at the end of last year should have been there to cover.*

And at the same time, we were intentionally paying bigger claims faster as they were identified by our predictive modeling. *And so, when you look at those things in aggregate, the payments for the older claims were using up IBNR, the claims being paid against the predictive model based case. We're releasing redundancy into IBNR and on a quarterly basis, it – as the older claims became the minority and the newer claims became the majority, it looked like those things would essentially offset one another.* And then, so we knew that the claim payments were accelerating that was by design for the claims predicted to be larger and again we've got the specifics in terms of those closure rates on page 9.

We were not paying more to close those claims earlier, which is what we illustrate on page 10. So again, it wasn't an issue where we saw average paid severity is going up significantly on a calendar year basis. And because those older claims really relied pretty heavily on the IBNR being correct, until we did the full year actuarial work, we weren't comfortable coming to a conclusion that on an overall net basis, there was a significant need, but we did do a couple of things differently this year obviously than we've done in the past. We did this intensive file review that was possible because at this point claims from 2015 and prior are now at least a year old because almost all the claims for a given accident year get reported within a year.

108.    In other words, Defendant Wollney indicated that AFH was seeing the older non-modeled claims being paid for higher than case reserves. AFH, however, disregarded this negative trend based on the assumption that payments one newer modeled claims were paying less than case reserves and would offset the adverse trends with respect to the older claims. As Defendant Wollney more specifically stated:

<Q - Cliff Gallant>: The one thing – one of the things you were talking about in the Q&A was in terms of looking at the paids year, it sounded like what you said, and I just want to clarify that the total paid losses were coming in as you expected, what you didn't appreciate was that a high percentage of it was going – was coming from the old accident years. Is that correct?

<A - Scott D. Wollney>: *Well, I think in terms of the – how much of the older accident years using up IBNR exceeded what the newer claims were doing to help IBNR*, because if you think about what was happening at 45 days, we are putting up case reserves for claims that for those claims – under the model of the environment, those claims that had been paid were being paid for less than case, so on a incurred basis, the reserving process itself significantly replaced IBNR with case, and then the older claims that were being paid that had the lower factor reserves were actually legitimately using up IBNR on a paid basis.

*And in aggregate, there was sort of an offsetting effect and our expectation was as the run-off piece of that non-modeled claims got less and less, it's deterioration on IBNR would be more than offset by the benefit from what was going on the modeled claims, but based on the year end work, the conclusion was, there was not enough benefit in the new stuff. In fact, there may even be a reserving review that there it may have suggested the LDF need to be bigger than we think they are.*

And at the same time, the assessment of what's left in that old inventory actuarially is just bigger than our own team has assessed when they have looked at those individual cases file by file. So, it is a different of opinion, but it's also a different approach. It's a file-by-file review versus an actuarial assessment of 2015 and prior in the aggregate.

And again, the only thing that will resolve that difference of opinion is time and we will be communicating how those claims are working through the system on a quarter-by-quarter basis, because really it's the only way that we can ultimately demonstrate what the final outcome is going to be. You've got one – essentially one estimate that's based on math, and you've got another estimate that's based on a granular look at every single file. But as with any claim in the end, the final outcome is the thing that matters.

And so we want to just make sure we both have a very strong control environment internally, particularly for those older claims, which is where the problem seems to be. *And then be able to articulate that with great transparency to our stakeholders, shareholders and others, as we go forward. And again, make sure we've got the support to get more benefit from – or more credit for the benefits that we are actually seeing emerging in those newer accident years, but don't really think are reflected in the reserving decision.*

109.    However, on the March 1, 2018 conference call, Defendant Wollney also effectively conceded that AFH's view that the benefits of predictive analytics (*i.e.*, payments on modeled claims) would offset the negative trends from older claims (*i.e.*, payments on non-modeled claims) was unreasonable based on any traditional understanding of insurance reserves:

<Q - Robert Farnam>: Did you ever consider getting maybe a second opinion as

well? I mean, given that this charge is going to be so big, did you reach out to maybe another third-party to maybe get an analysis done?

<A - Scott D. Wollney>: So, we did do work with other outside experts, many of whom are actuaries, not necessarily reserving actuaries, to help us support what we believe was happening in the business. *But I think anybody using a traditional actuarial approach to assess reserves would probably see similar things in the sense that you do have old claims that are coming in and being paid for more than the reserves contemplated a year ago.*

*And we do have these moving parts where big claims are being paid earlier, an early evidence that the claims that are remaining are going to cost less than they used to. But I don't think that somebody coming and using a traditional reserving method is necessarily going to come in with a materially different number. But again, I think one of the things we want to do is, think about the fact that as we go forward not only do we want to continue to reaffirm the things that we believe are correct and share those with investors and other stakeholders, but we are going to bring in incremental opinions.*

110.    As such, Defendants continued to falsely reassure investors that Atlas's reserve increase was based solely on particular "isolated" issues that would soon be resolved, and, that Atlas's business model was viable.  Defendants falsely reassured investors that Atlas's reserving practices and claims monitoring ensured that another reserve increase would not be necessary and that reserves were adequate.  By concealing the basis and methodology for their estimates of Atlas's loss reserves, including the material risks and uncertainties presented by the state regulators' findings, as required by GAAP, Defendants were able to artificially inflate Atlas's stock price during the Class Period.

111.    On March 16, 2018, the Company disclosed that it was unable to timely file its 2017 Form 10-K, claiming that it needed "additional time for the registrant and its auditor [BDO] to complete the year-end audit process."

### D. <u>Atlas's Under-reserving Results in a Second Regulatory Action After the New York Department of Financial Institutions Investigates Global Liberty</u>

112.    Several weeks after Defendants announced the second reserve increase of the Class Period, on March 29, 2018, the New York Department of Financial Services released its report on

examination of Global Liberty, noting Global Liberty's inadequate reserves were not in regulatory compliance during the timeframe of January 1, 2013 through December 31, 2016. *See* Ex. B. The New York Regulatory Report indicated that Global Liberty's reserves failed to comply with SSAP 55, were deficient by $10.885 million, and that the Company had recognized $9.674 million of that deficiency in its 2017 annual statement. Ex. B, p. 18. Specifically, the New York Regulatory Report stated:

> ***It is recommended that the Company address the ongoing reserve inadequacies and increase its carried reserves to an appropriate level*** …. Further, it is recommended that the Company's future actuarial report underlying the statement of actuarial opinion provides sufficient details of documentation and footnotes to clearly explain the calculations so that an independent reviewer can evaluate the work.

*Id.*

113.    The New York Regulatory Report further identified insufficient risk management and internal controls. Specifically, the report stated, "It is recommended that the Company take the necessary steps to address the weaknesses in its IT controls and/or processes in order to improve or strengthen its operation integrity, efficiency and effectiveness." Ex. B, p. 19.

114.    Defendants never disclosed the New York Regulatory Report. Instead, Defendants continued to reassure investors that Atlas's business model was viable, that Atlas's reserving practices and claims monitoring ensured that another reserve increase would not be necessary, and that reserves were adequate.

115.    Atlas's 2017 10-K, filed on April 3, 2018, falsely reassured investors that the Company's internal control over financial reporting was effective as of December 31, 2017.

## E.    The Truth Continues to Emerge: Atlas's Credit is Downgraded and Defendants Fire Atlas's Independent Public Accountant, BDO

116.    Thereafter, on June 15, 2018, insurance rating company A.M. Best announced that it was downgrading the credit rating of Atlas Financial and certain subsidiaries. A.M. Best issued a press release announcing, among others:

> A.M. Best has removed from under review with negative implications and

downgraded the Long-Term Issuer Credit Rating (Long-Term ICR) to "c" from "b-" of Atlas Financial Holdings, Inc. (Atlas) [NASDAQ: AFH], the Financial Strength Rating (FSR) to C (Weak) from B (Fair) and the Long-Term ICRs to "ccc" from "bb" of American Service Insurance Company Inc. (Schaumburg, IL), American Country Insurance Company (Elk Grove Village, IL) and Gateway Insurance Company (St. Louis, MO), collectively referred to as the American Service Pool. A.M. Best also has removed from under review with negative implications and downgraded the FSR to C++ (Marginal) from B+ (Good) and the Long-Term ICR to "b" from "bbb-" of Global Liberty Insurance Company of New York (Global Liberty) (Melville, NY), another wholly owned subsidiary of Atlas. The outlook assigned to these Credit Ratings (ratings) is negative.

*The ratings of American Service Pool reflect its balance sheet strength, which A.M. Best categorizes as very weak, as well as its marginal operating performance, neutral business profile and marginal enterprise risk management (ERM).*

The ratings of Global Liberty reflect its balance sheet strength, which A.M. Best categorizes as adequate, as well as its marginal operating performance, limited business profile and marginal ERM. The ratings also consider significant drag from the lead rating unit, American Service Pool.

*The rating downgrades reflect the significant reserve strengthening charge taken in the fourth quarter of 2017, primarily due to Michigan-related claims and non-New York Global Liberty business written prior to 2016. This reserve strengthening caused significant operating losses at both companies, year-over-year decreases in policyholder surplus of 35% at American Service Pool and 27% at Global Liberty, as well as significantly reduced risk-adjusted capitalization levels that no longer support the current ratings.* American Service Pool has increased its quota share reinsurance cession effective April 1, 2018, to mitigate operating leverage on a going-forward basis.

117. On June 18, 2018, Defendants filed a Form 8-K with the SEC, signed by Defendant Romano, disclosing that the Company had "dismissed" its independent public accountant, BDO USA, LLP ("BDO"), on June 15, 2018. Defendants did not provide a reason for the dismissal of BDO, but claimed that they had had no prior disagreements with BDO specifically with respect to fiscal years ended December 31, 2016 and 2017, and the subsequent interim period through June 25, 2018.

118. The Company further disclosed that as of June 15, 2018, it had approved the engagement of RSM US LLP ("RSM") to replace BDO as its independent public accountant for the year ended December 31, 2018.

119.    On June 18, 2018, the Company's stock price fell another $1.00 per share, more than 9%, to close at $9.95 per share, on heavy trading volume.

### F.    Defendants Continue to Falsely Reassure Investors Regarding Atlas's Loss Reserves

120.    After announcing the second reserve increase of the Class Period, Defendants continued to misleadingly reassure investors that Atlas's reserves were adequate, and that another increase would not be necessary, and continued to tout Atlas's business model and approach to reserving.  On an August 7, 2018 earnings call, Defendant Wollney stated:

> We continue to be pleased with our results in 2018.  ***Our earnings per share are on track to achieve the level to which we previously guided  … The significant investment we've made in predictive analytics is helping to optimize the value we're able to deliver as a specialist.***
>
> ***
>
> In addition to an overall increase in average rate levels, ***our use of predictive analytics is helping to shift our overall business written to a larger percentage of accounts expected to generate below average losses***[.]
>
> ***
>
> ***In particular, you can see that overall inventories have declined and more challenging areas, like Michigan, continue to represent a lesser amount of our exposure.***
>
> ***
>
> ***Predictive model based case reserves represent the majority of our pending third-party liability claims for accident year 2017 and prior to this point.  Our expectation is that overall claims in this category will close at or slightly below the case reserves predicted by our models over time.  These models are refreshed regularly to refine predictive ability as well as to capture underlying loss trend information.***
>
> ***
>
> ***[W]e continue to close claims faster than in the past and for lower calendar year paid severity amounts.***  Ultimately, the goal of introducing analytics in our claims process was to accomplish this, and we're pleased to see data supporting this expectation.

121.    On a November 6, 2018 earnings call, Defendant Wollney reiterated assurances that older claims not covered by predictive modeling were being closely monitored, and were stable (*i.e*., that additional increases in loss reserves were not necessary):

> Year-to-date 2018, 486 older claims, which were not scored by the predictive

model, were closed with an aggregate paid amount of $14.3 million compared to an expected benchmark range of $9.2 million to $20.7 million. . . . *We're encouraged by closures in the middle of the anticipated range and are continuing to monitor the balance of this inventory[.]*

122.    As such, Defendants continued to falsely reassure investors that Atlas's reserve increases were based solely on particular "isolated" issues that would soon be resolved, and, that Atlas's business model was viable. Defendants falsely reassured investors that Atlas's reserving practices and claims monitoring ensured that another reserve increase would not be necessary and that reserves were adequate. Defendants continued to conceal the basis and methodology for their estimates of Atlas's loss reserves, including the material risks and uncertainties presented by the state regulators' findings.

123.    On that same call, Defendants were asked how their conversation with their actuaries was "different now at this point in the year compared to where it was last year or two years ago." Defendant Wollney responded:

> *So I think the key difference is, we've been focusing much more on the underlying data and the changes in the business to make sure that as we go into the year-end actuarial review, we avoid surprises* … We felt like that was an issue at year-end '17. *And we want to make sure that we do not have any surprises related to misinterpretation this year.* So we've been talking with and working with a number of resources to make sure that we've got a very good handle and that our actuaries have a very good handle on the impact of the underlying changes in the business.

124.    On that same call, Defendant Wollney further confirmed that Defendants had disagreed with Atlas's actuaries "in terms of the  conservativeness of the reserves" necessary for 2017. Specifically, Defendant Wollney stated:

> **<Q - Jon Paul Newsome>**: Thanks. Thanks for your patience. I just want to circle back here a little bit on some of these general topics that we've talked about. It sounds like because of the acceleration in the claims being in settlements that you've been doing internally, that is causing a little bit of a difference of opinion between the outside actuaries and perhaps you in terms of the conservativeness of the reserves. And I just want to make sure that's right. And that, if things turn out the way you think they are and you should be able do better than the – the company should be able to do better than the reserves you're going to put up based upon the outside actuaries. Is that just a fair assessment or am I misreading it?

> **<A - Scott D. Wollney>**: No. I think you're interpreting what we're saying correctly. And again, our goal is to be able to show evidence or incremental evidence of that in a way that can be actuarially supported as quickly as we can. I

mean, the first key is continue to deliver the results we're seeing operationally, which are favorable and then make sure that that information can be utilized both because there's enough of it, right, which is part of it, it's just credibility, there are enough data. And that we are making sure that we're able to share it with whomever has to understand it in a way that it can be contemplated as we go forward.

**G.      Further Undisclosed Facts And Risks Are Revealed In 2019: Defendants Announce a Third Reserve Increase and Dismiss RSM For Calling Attention To The Company's Material Understatement Of Reserves And Associated Materially Misstated Financial Condition**

125.    On March 4, 2019, Defendants unexpectedly – and contrary to their previous representations – issued a press release announcing a *third* consecutive increase to reserves. Defendant Wollney stated:

> *Actuarial work conducted in connection with year-end indicated a need to increase reserve estimates for unpaid losses due primarily to bodily injury claims from accident years 2016 and prior.  These claims are showing higher severity and have been open for longer periods than we had estimated.* . . . While our use of predictive analytics in underwriting and claims is having a positive impact on claim closures, we are still addressing historic challenges . . . However, we believe that claim closure data for more recent accident years demonstrates the fundamental efficacy of our predictive model-driven processes.

126.    Defendants provided additional detail during an earnings call that same day. Despite prior assurances that AFH was poised to avoid surprises, Wollney asserted that Defendants had *again* been caught off-guard by "actuarial estimation of ultimate claim severity" which exceeded the estimates provided by AFH's predictive analytics.

127.    Still, during the March 4, 2019 conference call, Defendants continued to misleadingly reassure investors as to the appropriateness and adequacy of the Company's reserves. For example, Defendant Wollney insisted that "we expect the process changes implemented in the past to have a favorable impact on our results over time, and the additional steps the company will be taking with the objective of maximizing shareholder value."  He further stated:

> While operating results during the past year demonstrate continuing improvement, it is taking longer than we would've hoped for these positive activities to be reflected in actuarial estimates. As was the case last year, *we believe that the incremental <u>reserve strengthening</u> taken as of December 31, 2018, is an <u>appropriate</u> step based on the available information to account for future liabilities*.
>
> *We've been providing data throughout the year to deliver transparency and believe claim closure data from our recent accident years demonstrates the fundamental efficacy of our processes*.

128.    Moreover,  Defendants continued to conceal the basis and methodology for their estimates of Atlas's loss reserves, including the material risks and uncertainties presented by the state regulators' findings.

129.    The Company's stock price fell $2.21 per share on March 4, 2019, to close at $6.80 per share on March 4, 2019. Atlas's stock price fell another $4.14 per share, or 60.88%, to close at $2.66 on March 5, 2019.

130.    On March 18, 2019, Defendants filed a notice of late filing Form 12b-25 with the SEC, disclosing that the Company was unable to timely file its 2018 Form 10-K, stating: "The registrant requires additional time for the registrant and its auditor to complete the year-end audit process.  Accordingly, the registrant is unable to file such report within the prescribed time period without unreasonable effort or expense."

131.    On March 20, 2019, AM Best further downgraded Atlas Financial.  On March 20, 2019, AM Best further downgraded Atlas Financial.  The A.M. Best press release regarding this downgrade stated that the rating for Gateway, American Service and American Country "reflect its balance sheet strength, which AM Best categorizes as very weak, as well as its marginal operating performance, neutral business profile and marginal enterprise risk management (ERM)." The press release further stated that "The ratings downgrades of Global Liberty take into consideration the significant reserve strengthening charge taken in the fourth quarter of 2018, which has resulted in material contraction in surplus and deterioration in risk-adjusted capitalization.  The ratings of Global Liberty reflect its balance sheet strength, which AM Best categorizes as weak, as well as its marginal operating performance, limited business profile and marginal ERM."  The outlook of these Credit Ratings was negative, however, A.M. Best stated it had concurrently "withdrawn these ratings as the companies have requested to no longer participate in AM Best's interactive rating process."

132.    On April 9, 2019, Defendants disclosed receipt of a NASDAQ delinquency notice, for its failure to timely file Atlas's 2018 Form 10-K.

133.    On April 30, 2019, Defendants filed a Form 8-K with the SEC, disclosing that the

Company "dismissed" its independent public accountant, RSM US, LLP ("RSM"), on April 29, 2019. The filing explained that "[o]n April 26, 2019, RSM informed the Corporation in writing that, based on its audit work to such date, it had concluded that the December 31, 2018 *insurance reserves in certain of the Corporation's insurance subsidiaries were understated, and that such understatement constituted a material misstatement of the Corporation's financial condition as reflected in the statutory financial statements of such insurance subsidiaries for the fiscal year ended December 31, 2018*." The filing stated that the Company "disagrees with the conclusion of RSM based on the Corporation's assessment of reserve estimates and the related work of the Corporation's independent third party actuaries."

134. Atlas's April 30, 2019 Form 8-K also disclosed that "the Corporation is also in discussions with the Illinois insurance regulators and their third party actuaries with respect to reserve levels, and *there can be no assurance that such regulators will not determine that additional material reserve increases are required."*

135. In response to this news, the Company's stock price fell $0.34 per share to close at $1.28 on April 30, 2019. AFH's stock price continued to slide the next trading day, falling an additional $0.29 per share (26%) to close at $0.99 on May 1, 2019.

## H. Relevant Post-Class Period Events Reveal the True Extent and Fallout of AFH's Ongoing Reserve Deficiencies

### 1. The Illinois Regulatory Order

136. On July 10, 2019, Defendants disclosed that the Circuit Court of Cook County entered an Agreed Order of Rehabilitation with respect to American Country and American Service, pursuant to a verified complaint filed by the Director of the Illinois Department of Insurance. *See* Ex. C.

137. On August 9, 2019, Defendants disclosed that in addition to the Company's 2018 10-K and Q1 2019 10-Q, the Company was unable to timely file its Q2 2019 Form 10-Q. Defendants also clarified their July 10, 2019 disclosure, noting that the Circuit Court of Cook County's Agreed Order of Rehabilitation as to American Country and American Service was a result of their "disagreement" with RSM over the Company's reserving. Specifically, Defendants

stated:

> As previously disclosed, the registrant terminated its auditor on April 29, 2019; two insurance subsidiaries were placed into rehabilitation pursuant to a complaint filed by the Director of the Illinois Department of Insurance ("Director"); and the registrant is in discussions with the Director and his successors in office, insurance regulators, and the registrant's third party actuaries regarding the insurance reserve levels of the registrant's insurance subsidiaries. As a result, reserve levels could be materially increased, which would cause a significant change in results of operations from the corresponding time period for the last fiscal year[.]

138. As indicated in the Illinois Regulatory Order, the directors of American Country and American Service unanimously consented to rehabilitation, and agreed to cede control of business operations to the Director of the Illinois Department of Insurance (the "Director"). Ex. C., p. 4. Thereafter, Gateway was redomesticated in Illinois and also placed into rehabilitation. As described below, the rehabilitation process has not gone smoothly for Defendants. Significantly the three Atlas subsidiaries subject to rehabilitation under the Illinois Regulatory Order are the same three subsidiaries previously under examination by Illinois regulators, as indicated in the May 2017 Missouri Regulatory Order, thus strongly suggesting that the violations and deficiencies identified by Illinois and Missouri, as stated in the Missouri Regulatory Order, were never satisfactorily addressed or resolved by AFH.

## 2. Atlas is Unable to Timely File its 2018 10-K and 2019 10-Qs, and is Delisted from NASDAQ

139. As a result of Defendants' under-reserving practices during the Class Period, which led to their disagreement with RSM and the Illinois Regulatory Order, Defendants were unable to timely file Atlas's forms with the SEC and NASDAQ after dismissing RSM. Indeed, it was not until October 31, 2019, that Defendants were able to engage the services of an independent public accountant, Baker Tilly Virchow Krause, LLP, to replace RSM in order to audit the Company's financial statements for fiscal year ended December 30, 2018.

140. On July 26, 2019, Defendants disclosed that they had received a determination letter from NASDAQ on July 22, 2019 which stated that the Company was not in compliance with listing rules for failure to timely file its 2018 10-K and Q1 2019 10-Q.

141. On August 9, 2019, Defendants disclosed that they were unable to timely file

Atlas's Q2 2019 10-Q, citing the need for additional time to complete the year-end audit process such that Atlas could file its 2018 10-K and Q1 2019 10-Q first.

142.    On September 13, 2019, Defendants filed a Form 8-K, stating that they had received a deficiency notification letter from NASDAQ on September 11, 2019, stating the Company was not in compliance with NASDAQ requirements, including that the Company's Market Value of Publicly Held Shares for the last 30 days was below the minimum requirement of $5,000,000. The Company was granted a 180 day grace period to regain compliance. Further, the Company disclosed that with respect to its failure to timely file periodic reports, "the Company has a hearing scheduled before the Nasdaq Hearings Panel. The Company is also under a grace period for the $1.00 per share bid price requirement, which expires on December 10, 2019."

143.    On November 14, 2019, Atlas disclosed receipt of another NASDAQ delinquency notice for its ongoing failure to timely file its 2018 10-K and 2019 10-Qs.

144.    On November 15, 2019, Atlas disclosed that it still needed additional time to complete its year-end audit process to file its 2018 Form10-K, and as a result, would not be able to timely file its Q3 2019 Form 10-Q either.

145.    On December 16, 2019, the Company announced that NASDAQ was delisting Atlas from the exchange due to the Company's failure to timely file its reports with the SEC.

### 3.    With its Stock Worth Pennies, AFH Finally Reveals the Amount of the 2018 Reserve Increase, and is Forced to Materially "Revise" Previously Reported Net Claims Incurred

146.    Atlas belatedly filed its 2018 Form 10-K on February 12, 2020, announcing another massive reserve increase of $82.7 million.

147.    It appears that despite Defendants' knowledge that their under-reserving practices violated state regulations, Atlas continued its under-reserving practices throughout the Class Period and attempted to spread the necessary reserve increases out over time in an effort to avoid shocking the market. Indeed, when Atlas belatedly filed its 2018 10-K on February 12, 2020, the Company revealed a material revision of its claims liabilities on its balance sheet and its claims incurred on its income statement from its reported results in the Company's March 4, 2019 8-K.

The Company increased these figures by a material amount of $43.43 million. Net claims incurred for 2018 as reported in the March 4, 2019 Form 8-K were $177.2 million; this amount was increased to $220.66 million when the 2018 Form 10-K was finally filed on February 12, 2020. Further, the 2018 8-K reported Atlas's net income as –$80 million and the combined statutory surplus of its insurance subsidiaries as only $14.4 million. The 2018 10-K materially revised the March 4, 2019 8-K's reported net income of –$36.9 million—the loss nearly doubled.

148.     The Company explained the reason for this massive reserve increase as follows:

> Year-end 2018 reserve estimates for the Insurance Subsidiaries were strengthened to the high point of the actuarial range established by the outside independent actuaries for each entity based on December 31, 2018 data, claim settlement activities, and other factors evaluated subsequent to the receipt of the 2018 actuarial opinions . . . . Primarily as a result of regulatory concerns regarding reserve levels, the ASI Pool Companies were placed into rehabilitation in 2019 . . . . Incremental claim outcomes and other factors could result in future adjustments to reserves and reserve estimates.

149.     The late-filed 2018 10-K further disclosed that "[u]nder the supervision of our management, including our Chief Executive Officer [Wollney] and Chief Financial Officer [Romano], we conducted an evaluation of the effectiveness over our internal control over financial reporting" and ultimately, "management concluded that our internal control over financial reporting as of December 31, 2018 was not effective[.]" The reasons cited for this conclusion were that Defendants had failed to timely meet Atlas's filing obligations with the SEC and NASDAQ, noting "the delay in the completion of the audit of the Company's financial statements for the fiscal year ended December 31, 2018 was due to the previously disclosed disagreement with [RSM] with respect to insurance reserves[.]" Defendants stated that their plan for remediation consisted of taking "steps to monitor the progress of all aspects of its financial closing process including more detailed discussions as needed with its independent registered public accounting firm regarding insurance reserve calculations."

150.     On May 11, 2020, Defendants disclosed that in connection with the Illinois Regulatory Order, the Director would sell all of Gateway's insurance licenses and stock.

151.     On May 15, 2020, the Company disclosed that it was unable to timely file its 2019 10-K because it "was in discussions with the Director [of the Illinois Department of Insurance],

insurance regulators, and [Atlas's] auditor regarding year-end results related to certain of [Atlas's] insurance subsidiaries[.]"

152.   On June 15, 2020, the Company disclosed that it had received another NASDAQ delinquency notice for failure to timely file its 2019 10-K, for failure to hold its annual shareholders meeting.

153.   Shareholder equity has been devastated, with Atlas's stock price hovering around $0.37 per share from its Class Period high of $21.35 per share.

## VI.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

154.   On February 22, 2017, Defendants issued an 8-K form informing the public that the Company has strengthened its loss reserves.  Specifically, the exhibit to the form stated: "The Company performed a comprehensive review of its reserves as a result of changing loss payment trends identified through year-end actuarial work, and ultimately decided to strengthen reserves at this time."  Defendant Wollney was quoted as follows:

> While ***Atlas prides itself on disciplined and better-than-industry underwriting and conservative reserving***, we did not anticipate the level of loss development in Michigan increasing dramatically over the past year. ***Our team is confident that we have addressed the issues at the heart of this problem, have taken appropriate steps***, and will learn from it as part of our ongoing commitment to continuous improvement, which has always been a priority at Atlas. ***With respect to pre-acquisition related claims at Global Liberty, the transaction was structured to mitigate potential development. We have isolated any remaining exposure with a clear plan in place for remaining claims, and continue to feel very good about the strategic benefits and expected future profitability of this business. While the impact of our reserve strengthening is significant, we believe it is isolated and that our overall book of business is sound, as will be demonstrated going forward.***
>
> \*     \*     \*
>
> Mr. Wollney continued, "As a specialist, we put a priority on addressing changes in our market in a nimble way. To this end, in recent years Atlas enhanced and initiated numerous underwriting and claim related processes designed to leverage our expertise in the specialty light commercial auto sector, including the elevated use of predictive analytics. We have proactively compressed settlement time, particularly with respect to larger claims, providing earlier visibility into potentially changing claim trends. It is important to acknowledge our entire claims team's excellent work, including our Michigan adjusters who are diligently addressing the challenges in that market. Observations from the year-end 2016 reserve analysis that led to the conclusion that reserve strengthening for older years appears

appropriate also confirm our belief that the changes made in our claim process will yield an overall better result in our ultimate loss costs going forward. The Company is committed to learn from the factors surrounding our reserve strengthening to ensure we can react to changes in our industry and niche as quickly as possible in the future."

155.     This statement was materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) AFH's reserving was not "conservative;" (2) despite the reserve increase announced on February 22, 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by at least three state insurance regulators at the time the assurances about reserve adequacy were made.

156.     On March 13, 2017, the Company issued a press release entitled "Atlas Financial Holdings Announces 2016 Fourth Quarter Financial Results."  In this press release, Defendant Wollney was quoted as stating:

> As outlined in our preliminary announcement, we identified a level of loss development in Michigan that led to an increase in reserves at the end of 2016 for older accident years. This impacted our financial performance for the quarter and the year, but *we are confident that the proactive actions we took to address this exposure were appropriate and sufficient* to position Atlas for future profitability at our expected levels in the coming year and beyond.

157.     This statement was materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the actions AFH took to increase reserves were not "appropriate and sufficient"; (2) despite the reserve increase announced on February 22, 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by at least three state insurance regulators at the time the assurances about reserve adequacy were made.

158.    On March 13, 2017, the Company filed its annual report on Form 10-K for the period ending on December 31, 2016. The Company reported net income of $2,646,000. The Company further noted combined statutory capital and surplus of its insurance subsidiaries was $113.9 million. The Company further stated: "During the year ended December 31, 2016, case reserves increased by 5.4% compared to December 31, 2015, while IBNR reserves increased by 12.0%. The increase in case reserves resulted from management's review of outstanding unpaid personal injury protection claims, particularly in the state of Michigan."

159.    The foregoing statements about AFH's financial results and reserve levels were materially misleading because even the material reserve strengthening announced for FY 2016 was materially understated and insufficient, thus overstating net income. As reflected in the Missouri Regulatory Order, AFH's reserves were understated by approximately $30.1 million, which deficiency was not made up in the FY 2016 reserve increase, and Defendants set AFH's reserve levels below the level its actuary recommended, which itself was insufficient.

160.    Atlas's 2016 Form 10-K further stated that: "Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting . . . . ***Based on such evaluation, we have concluded that the Company's internal control over financial reporting is effective as of December 31, 2016.***"

161.    The above quoted statement regarding internal controls was false and misleading because it misrepresented the true state of AFH's internal controls over financial reporting and failed to disclose that the Company, in fact, lacked adequate internal controls to appropriate set reserve levels, as a result, the Company's insurance presented an undisclosed increased risk of loss. The failure to maintain adequate internal controls further rendered AFH's financial reporting materially misleading during the Class period because the lack of controls enabled Defendants to record insufficient reserves, thereby inflating net income and capital surplus.

162.     During a public conference call on March 14, 2017 held to discuss the Company's

Q4 2016 and FY 2016 financial results, Defendants provided further information about the events

leading to the substantial increase to the Company's loss reserves. Specifically, Defendant

Wollney stated:

> For the next few minutes, I'll briefly address the recent reserve strengthening that we've preannounced last month and about which I've spoken with many of you subsequent to that release. ***We feel very strongly that we've isolated the issue and that we were open with investors as to both the cause and the short-term impact it had on our operating results.***
>
> ***As a result of the proactive measures we took and are taking, we believe that Atlas is well positioned going forward….***
>
> ***For the 2016 fourth quarter and year-end, Atlas performed a comprehensive review of its reserves. As a result of changing loss payment trends identified through year-end actuarial work, we ultimately decided that it was appropriate to strengthen reserves at this time.*** The impact on net income after tax and preferred share adjustments related to acquisitions was approximately $17 million. ***The primary cause of the reserve strengthening was related to increased severity in light commercial auto within the Michigan market for business written in prior accident years.***
>
> ***Certain unrelated pre-acquisition claims at Global Liberty were also identified as requiring reserve strengthening. The bulk of the net impact on our balance sheet related to Michigan***, so I'll provide more detail in that regard. On slide 3, we outline a few of the causal elements at the heart of the issue. On slide 4, we further explain the analysis around our book, the origination of the challenge, how we proactively address the issue and, ultimately, how Atlas is positioned going forward. As we've referenced before, Michigan had been underperforming for a number of years relative to the rest of our book. As a result, our exposure to the Michigan market was reduced significantly through a combination of rate increases, reduced policy count and, most recently, by refocusing claim efforts based on developments in the past year in particular.
>
>         \* \* \*
>
> ***While the relative underperformance was not a surprise as evidenced by our significant actuarially supported rate increases in the past three years, the dramatic increase in paid severity in one year was a reason we felt it was important to strengthen reserves based on our 2016 year-end actuarial work.***
>
> ***By the end of 2017, we expect Michigan to be less than 1% of our overall book of business. This doesn't necessarily mean that we're exiting the state [ph] to net worth return. We just understand that, as a nimble operator, we must focus on properly deploying our capital in states where we can achieve our underwriting goals.***

There are a number of states where we currently don't write due to environments that we believe will not support underwriting profit at this time for various reasons. There are also other states that were historically challenged, but has improved. ***In both cases, our expertise coupled with an ability and willingness to adjust our exposure based on these changes is something that distinguishes us from a larger generalist.***

163.    These statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the issues driving the necessary reserve increases were not "isolated"; (2) despite the reserve increase announced on February 22, 2017 and quantified on March 17, 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by at least three state insurance regulators at the time the assurances about reserve adequacy were made.

164.    Also during the March 14, 2017 conference call, Defendant Wollney assured investors that the reserve increases were "appropriately conservative":

> ***And so, we do believe that the reserve strengthening is appropriately conservative, reflecting both the disproportionate amount of reserves that claims in Michigan used up through the end of 2016 as well as the expected future payment for the run-off of remaining claims, again, with the expectation that what we saw in 2016 would not improve from a reserve standpoint.*** But operationally we're doing everything we can do to achieve the best possible outcome. So, we are optimistic that those things will have a positive impact and that would ultimately be a good factor for us.

165.    These statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the reserve strengthening was neither "appropriate" nor "conservative"; (2) despite the reserve increase announced on February 22, 2017 and quantified on March 17, 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to

disclose that they were under investigation for under-reserving by at least three state insurance regulators at the time the assurances about reserve adequacy were made.

166. On May 8, 2017, Atlas issued a press release announcing its financial results for Q1 2017 and filed its Q1 2017 Quarterly Report on Form 10-Q with the SEC, which was signed by Defendant Romano. Therein, AFH reported that the Company's net income for the quarter was $4.9 million, the Company's insurance subsidiaries had a combined statutory surplus of $117.6 million, and the amount of the Company's total reserves was $128 million.

167. The foregoing statements about AFH's financial results and reserve levels were materially misleading because even the material reserve strengthening announced for FY 2016 was materially understated and insufficient, thus overstating net income, and that additional reserve increases were required. As reflected in the Missouri Regulatory Order, AFH's reserves were understated by approximately $30.1 million, which deficiency was not made up in the FY 2016 reserve increase, and Defendants set AFH's reserve levels below the level its actuary recommended, which itself was insufficient.

168. On May 9, 2017, during a public conference call with investors and analysts to discuss the Company's Q1 2017 financial results, Defendant Wollney stated:

> As we discussed in the fourth quarter, *the reserve charges that Atlas took surrounding our Michigan book of business is something that we believe has been isolated* . . . . We clearly take responsibility for the challenges faced in Michigan and are on track to see the percentage of our overall book of business in Michigan drop to below 1% this year. While Michigan claims will continue to runoff over time; as of March 31, 2017, open claim inventory related to the state has been reduced by 8.5% compared to year-end 2016 with 575 pending claims open at this time… This statement was materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because it failed to disclose that the loss reserves that the Company maintained were inadequate and would have to be raised substantially driven in a large part by the claims in Michigan.

169. On the same conference call, Defendant Wollney highlighted Defendants' close monitoring of claims in the following exchange with an analyst:

> **<Q - Tom Shimp>**: Okay. Great. Thank you. I had one more question if I may, in regards to the Michigan market and the issues we saw in the last quarter, how confident are you that we're not going to see that throughout the remainder of the year?

**<A - Scott D. Wollney>**: Well as we stated on the prior call, we focused on that issue, we strengthen reserves with the expectation that the remaining runoff of claims related to the periods the prior year periods where we had a significant amount of exposure in that state would trend similar to kind of the higher paid severity results we saw in 2016. And so, we are expecting that to be a challenging environment for the totality of the runoff of those claims. *So, it is something we're going to be monitoring very closely. I don't think we were surprised by anything in the first quarter, although obviously not a lot of time has passed since our last call.*

*So, I think the good news is we haven't seen anything different than we would have expected and obviously, it's something that we're keeping a very close eye on. It's encouraging that the overall inventory is coming down. As I mentioned, total Michigan related claims were down about 8.5% in just 90 days following the end of the year. And so, we do have a dedicated team of people who are focusing specifically on that book of business and obviously, we want to learn everything we can from what we sort of described as the new normal in that environment to get the best possible result going forward, but we are going to be very careful and manage that book very closely. . . .*

170.    These statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) despite the reserve increase announced on February 22, 2017 and quantified on March 17, 2017, AFH's loss reserves were still materially understated; (2) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (3) AFH was continuing to see claims payments in excess of case reserves for older claims; and (4) it was materially misleading to say they "haven't seen anything different" and that the situation was "encouraging," while concealing that AFH was under investigation for under-reserving by at least three state insurance regulators during the Class Period.

171.    On August 7, 2017, Atlas issued a press release announcing its financial results for Q2 2017 and filed its Q2 2017 Quarterly Report on Form 10-Q with the SEC, which was signed by Defendant Romano.  Therein, AFH reported that the Company's net income for the quarter was $5.5 million, the Company's insurance subsidiaries had a combined statutory surplus of $124.6 million, and the amount of the Company's total reserves was $119 million.

172.    The foregoing statements about AFH's financial results and reserve levels were

materially misleading because reserves were materially understated and insufficient, thus overstating net income, and that additional reserve increases were required. As reflected in the Missouri Regulatory Order, AFH's reserves were understated by approximately $30.1 million, which deficiency was not made up in the FY 2016 reserve increase, and Defendants set AFH's reserve levels below the level its actuary recommended, which itself was insufficient.

173. On August 8, 2017, Defendants held a public conference call with investors and analysts to discuss the Company's financial results for Q2 2017. During the conference call, Defendant Wollney stated:

> Yes, so we don't typically provide specific reserve levels on a state-by-state basis in dollar terms. ***But I can tell you that the reserve levels that we established at year-end 2016 for Michigan do appear to be holding up consistent with the expectations we had***. Paid severity in Michigan seems to be flattening out, again just based on the sort of early information we have in the first half of this year.
>
> As I touched on, the inventory claim count has dropped 16% since the end of 2016. We currently have about 450 claims open for Michigan in terms of the third-party bodily injury and PIP claims, and we are seeing that inventory declining. ***So claim closure rate is definitely exceeding the rate of inbound claims, which is slowing dramatically***.
>
> Last year, I think, we saw the biggest amount of claims settlement that we've seen historically and probably will see based on the fact that there was a three-year statute related to Michigan PIP and a lot of the exposure in that state for us was created in 2013, in terms of claims made against 2012 and 2013 accident years. And so now that that three-year statute has run on the years where we had the biggest in-force exposure, ***that is also going to result in fewer claims coming in, especially bigger, older claims. So, we do have a team of people who are focused specifically on running off those older Michigan claims and we feel confident that they're doing the right job***…..

174. These statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company"; (2) despite the reserve increase announced on February 22, 2017 and quantified on March 17, 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results,

including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by at least three state insurance regulators during the Class Period.

175.     Additionally, during the August 8, 2017 conference call, an analyst asked about Michigan.  In response, Defendant Wollney misleadingly indicated that in the past six months AFH was not seeing anything different than what Defendants had expected:

> <Q - Matthew J. Carletti>: Hi. Thanks. Good morning. Scott, I just had a quick one. I wanted to circle back on Michigan and maybe a little more qualitative, just versus kind of your expectations at year-end, fast forward to six months where we are today, I think it's safe to say things aren't worse than you expected, because we haven't seen anything adverse, but whether it's claim counts or just the underlying loss trends, are they kind of in line with what you had hoped for or are they better, but because things are still so green, you're not going to reflect that in the numbers yet, you're just kind of wait and see?

> <A - Scott D. Wollney>: Yes. I think it's – I mean, it's definitely the latter where six months while it's encouraging that we are not seeing anything different than we expected, which is a good fact. I think it's – it would be premature for us to do something positive as a result of that. So we are encouraged based on what we're seeing. When we look at settlement – average settlements amounts in all the different severity band, so claims that are between zero and [ph] $25,000 between $25,000 and $50,000 and greater than $50,000 (01:02:41).

> ***In 2017, we are seeing paid severities go down in all three segments by a little bit. And so again it's encouraging, because the actuarial analysis within year-end, the assumptions we made was that we did not build any optimistic assumption that will go down.*** So, again, it is encouraging, but it's really too early, I think, to come to any conclusion on that. Obviously, if we saw something negative, we might have been more proactive in doing something about that. But – so other than being encouraged by the limited amount of additional information we have, I'd probably wouldn't go beyond that in terms of coming to any conclusions about Michigan.

176.     These statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company"; (2) despite the reserve increase announced on February 22, 2017 and quantified on March 17, 2017,

AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by state insurance regulators at the time the assurances about reserve adequacy were made.

177.    On November 6, 2017, Atlas issued a press release announcing its financial results for Q3 2017 and on November 7, 2017, filed its Q3 2017 Quarterly Report on Form 10-Q with the SEC, which was signed by Defendant Romano. Therein, AFH reported that the Company's net income for the quarter was $5.1 million, the Company's insurance subsidiaries had a combined statutory surplus of $131.3 million, and the amount of the Company's total reserves was $114.5 million.

178.    The foregoing statements about AFH's financial results and reserve levels were materially misleading because reserves were materially understated and insufficient, thus overstating net income, and that additional reserve increases were required.  As reflected in the Missouri Regulatory Order, AFH's reserves were understated by approximately $30.1 million, which deficiency was not made up in the FY 2016 reserve increase, and Defendants set AFH's reserve levels below the level its actuary recommended, which itself was insufficient.

179.    On March 1, 2018, Defendants held a public conference call with investors and analysts to discuss the Company's preliminary financial results for Q4 2017 and FY 2017 2017, and the Company's announcement that reserves would be increased yet again contrary to their prior reassurances.  Therein, Defendant Wollney addressed the reserve increase:

> Here are the facts. Last year we identified that claims expense in Michigan were significantly outpacing other states and took a significant charge. ***To-date the disproportional amount of claims we've paid in Michigan exceeds $38 million. We also recognize that claims of Global Liberty related to prior years' business continued being settled for more than case reserves, while New York business at Global is moving in the right direction, particularly non-New York business from 2016 and earlier years developed worse than expected.***
>
> ***In addition to these two specific issues, while we have reasons to believe that our niche is less exposed to volatility than other areas of commercial auto insurance, based on year-end actuarial work, there appears to be an overall increase in both***

*paid severity and future expected unpaid amounts across our book of business primarily for accident years 2015 and prior.*

*While we did see positive trends relating to more recent accident years and our predictive model driven business, based on year-end work, we are again moving to our outside independent actuary select point resulting in a significant reserve increase for remaining claims, especially those older accident years prior to our use of predictive analytics.* The end result is that after the effective reserve strengthening, as well as an approximate $0.55 per share DTA write down resulting from the Tax Cut and Jobs Act (sic) [Tax Cuts and Jobs Act], book value per share as of December 31, 2017 is expected to be between $7.25 and $8, and statutory surplus across Atlas's four insurance company subsidiaries will be between $85 million and $90 million.

180.    On the same March 1, 2018 earnings call, Defendant Wollney also stated that AFH had done the "appropriately conservative" thing by increasing loss reserves for FY 2017:

[W]e have a lot of confidence going forward that, that [predictive] model based approach is going to be more accurate than having to rely on traditional methods, especially given all the changes we've made in the business.

*But again, at this point, it wasn't enough to try to reserve less than the select point and the appropriately conservative thing was to go to the select point and try to share the facts with our stakeholders as transparently as we can.*

181.    The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company"; (2) despite the reserve increases announced for 2016 and 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by state insurance regulators at the time the assurances about reserve adequacy were made.

182.    On that same conference call, in response to an analyst's question about how the Company's quarterly reserve process unfolded throughout the year, Defendant Wollney attempted to claim that the reserve increase caught Defendants off-guard but simultaneously admitted that

Defendants had been aware that older non-modeled claims were paying out in excess of the case reserves throughout 2017:

> <Q - Matthew J. Carletti>: Couple of questions. I guess first, Scott, could you walk us through a bit of how the – even it sounds like this year that was a little bit of a more in-depth process, but on a more regular basis, how did the quarterly reserve processes take place as compared to, say, what I presume is a more in-depth Q4 process? Because it seems like this definitely came out, caught you guys by surprise that I'm just [indiscernible] (00:21:19) that by kind of the interactions that we've had on prior calls and things like that. Just really with the idea of how it seems like this is rather pervasive in the older years, and how it kind of went under the radar for presumably at least three quarters?

> <A - Scott D. Wollney>: Yeah. *No, it did catch us by surprise candidly. I mean, we obviously pay close attention to our claim activity as the analytics that we provided in the deck I think illustrate, we are looking very closely at claim settlement times, at claim settlement amounts. And really in calendar year 2017 there were two things going on simultaneously. There was the runoff of the older claims where we were paying above that factor based case reserves and that's what the IBNR we put up at the end of last year should have been there to cover.*

> And at the same time, we were intentionally paying bigger claims faster as they were identified by our predictive modeling. *And so, when you look at those things in aggregate, the payments for the older claims were using up IBNR, the claims being paid against the predictive model based case. We're releasing redundancy into IBNR and on a quarterly basis, it – as the older claims became the minority and the newer claims became the majority, it looked like those things would essentially offset one another.* And then, so we knew that the claim payments were accelerating that was by design for the claims predicted to be larger and again we've got the specifics in terms of those closure rates on page 9.

> We were not paying more to close those claims earlier, which is what we illustrate on page 10. So again, it wasn't an issue where we saw average paid severity is going up significantly on a calendar year basis. *And because those older claims really relied pretty heavily on the IBNR being correct, until we did the full year actuarial work, we weren't comfortable coming to a conclusion that on an overall net basis, there was a significant need, but we did do a couple of things differently this year obviously than we've done in the past. We did this intensive file review that was possible because at this point claims from 2015 and prior are now at least a year old because almost all the claims for a given accident year get reported within a year.*

183. These statements were materially false and/or misleading and/or lacked a reasonable basis, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects, because they failed to disclose that the loss reserves that the Company

maintained were materially inadequate. As evidenced by the $30.1 million reserve deficiency identified in the Missouri Regulatory Order, Defendants were not "surprised" by the need to increase reserves. Further, Defendants falsely blamed the need for the reserve increase on the "specific" issues of Michigan claims, and older non-modelled and pre-acquisition Global Liberty claims, and falsely reassured investors that further reserve increases would not be necessary as a result of their claim-by-claim review.

184. During the March 1, 2018 conference call, Defendant Wollney reassured investors that the decision to increase reserves was due to management's comprehensive claim-by-claim review, and that as a result of that thorough review, further reserve increases would not be necessary. Specifically, Defendant Wollney stated: "At year-end 2017, *experienced members of our claims team also conducted a file by file claim review of non-modeled claims, as well as all remaining Michigan claims to reinforce our decision-making. The results of that review will serve as a benchmark against which sufficiency can be measured as these older claims run off*."

185. Further, Defendant Wollney indicated that "Joe Shugrue[5] and his team of experienced adjusters with 10 years to 20 years or more years of experience at the end of the year looked at each and every one of those claims and evaluated their expected outcomes: "We have a lot of confidence. All of those claims at this point are at least a year old and the amount that the audit—the internal audit assessed would be necessary is less than the IBNR we put for those years."

186. The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company"; (2) despite the reserve increases announced for 2016 and 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital

---

[5] As noted below, Joe Shugrue was one of several key AFH executives who engaged in highly unusual and suspicious sales of AFH stock between November and December 2017.

surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by at least three state insurance regulators during the Class Period.

187. On April 3, 2018, Defendants filed Atlas's 2017 Form 10-K for the year ended December 31, 2017, which stated that the Company's net income was -$38.8 million and that the Company's insurance subsidiaries had a combined statutory capital and surplus of $87.8 million. The 2017 10-K further stated that "The provision for unpaid claims and claims adjustment expenses increased by 52.3% to $211.6 million . . . case reserves increased by 20.4% . . . while IBNR reserves increased by 71.4%. The increase in case reserves resulted from the increase in current accident year claims due to business growth offset by a decrease in claims in older accident years due to the acceleration of claim payments for those years. Based on year end 2017 actuarial work Atlas determined that a significant IBNR increase was necessary to ensure levels are sufficient to extinguish the remaining claims, especially for older accident years."

188. The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million with respect to American Country, American Service, and Gateway, and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company", and the New York Regulatory Order indicates that reserves were deficient by at least another $1.2 million with respect to Global Liberty; (2) despite the reserve increases announced for 2016 and 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by at least three state insurance regulators during the Class Period.

189.     Atlas's 2017 10-K further stated, "Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting . . . . Based on such evaluation, we have concluded that the Company's internal control over financial reporting is effective as of December 31, 2017."

190.     The above quoted statement regarding internal controls was false and misleading because it misrepresented the true state of AFH's internal controls over financial reporting and failed to disclose that the Company, in fact, lacked adequate internal controls to appropriate set reserve levels, as a result, the Company's insurance presented an undisclosed increased risk of loss.  The failure to maintain adequate internal controls further rendered AFH's financial reporting materially misleading during the Class period because the lack of controls enabled Defendants to record insufficient reserves, thereby inflating net income and capital surplus.

191.     Atlas's 2017 10-K failed to provide GAAP-compliant disclosures regarding Defendants' basis and methodology for estimating Atlas's loss reserves.  Defendants were on notice by the Missouri Regulatory Order and the New York Regulatory Report that the basis and methodology they employed to estimate reserves was non-compliant, yet they continued obfuscating the truth to portray a misleadingly positive outlook to investors.  Indeed, the Missouri Regulatory Order stated, "The reserves recommended by the appointed actuary were found to be deficient as well and were not adequately reported.  Management's current 'reserve memo' does not address IBNR, and thus does not fulfill the requirements of [SSAP] 55.  Should the Company wish to materially deviate from the appointed actuary's central estimate in the future, it should ensure that supporting detail complies with SSAP 55."  Ex. A, p. 15.  The New York Regulatory Report similarly "recommended that the Company's future actuarial report underlying the statement of actuarial opinion provides sufficient details of documentation and footnotes to clearly explain the calculations so that an independent reviewer can evaluate the work."  Ex. B, p. 18.

192.     Defendants concealed the major risks and uncertainties presented by their ongoing under-reserving practices, as identified by state regulators in Missouri, Illinois, and New York.

Moreover, Defendants failed to disclose the manner in which their estimates of loss reserves diverged from those of internal and external actuaries. Indeed, the Missouri Regulatory Order specifically provided that on a combined basis, Gateway, American Country and American Services' loss reserves were $6 million below what Atlas's own appointed actuary had recommended, and $24 million below the level determined to be necessary. Ex. A, p. 15. Yet, Defendants never disclosed this information, nor did they disclose the impact it had on their reserving, or their financial statements. By concealing the basis and methodology for their estimates of Atlas's loss reserves, including the material risks and uncertainties presented by the state regulators' findings, Defendants were able to artificially inflate Atlas's stock price during the Class Period.

193.    On May 7, 2018, Atlas filed its Q1 2018 10-Q with the SEC, signed by Wollney and Romano. The Q1 2018 10-Q reported that Atlas's net income was $5.5 million, that the Company's insurance subsidiaries had a combined statutory surplus of $91 million, and that the amount of the Company's total reserves was $204.7 million.

194.    The foregoing statements about AFH's financial results and reserve levels were materially misleading because reserves were materially understated and insufficient, thus overstating net income, and that additional reserve increases were required. As reflected in the Missouri Regulatory Order, AFH's reserves were understated by approximately $30.1 million, which deficiency was not made up in the FY 2016 reserve increase, and Defendants set AFH's reserve levels below the level its actuary recommended, which itself was insufficient. Moreover, the March 2018 New York Regulatory Order indicates that AFH remained under-reserved by at least an additional $1.2 million with respect to Global Liberty.

195.    On August 6, 2018, Atlas filed its Q2 2018 10-Q with the SEC, signed by Wollney and Romano. The Q2 2018 10-Q reported that Atlas's net income was $5.6 million, that the Company's insurance subsidiaries had a combined statutory surplus of $89.2 million, and that the amount of the Company's total reserves was $187.2 million.

196.    The foregoing statements about AFH's financial results and reserve levels were

materially misleading because reserves were materially understated and insufficient, thus overstating net income, and that additional reserve increases were required. As reflected in the Missouri Regulatory Order, AFH's reserves were understated by approximately $30.1 million, which deficiency was not made up in the FY 2016 reserve increase, and Defendants set AFH's reserve levels below the level its actuary recommended, which itself was insufficient. Moreover, the March 2018 New York Regulatory Order indicates that AFH remained under-reserved by at least an additional $1.2 million with respect to Global Liberty.

197. On this same call, Defendant Wollney again assured investors that the Company's reserving was appropriate, noting that "Claims that were too old to be modeled when our current protocol was introduced carry a factor reserve . . . . As part of our year-end 2017 work, experienced members of our claims team conducted a detailed review of these well-developed claim files and created a database to benchmark expectations regarding ultimate loss costs earlier this year." Defendant Wollney further reassured investors about the Company's "conservative" approach to reserving, stating:

> [W]e have taken a position that we elected a carried loss ratio that was slightly higher than what our outside actuaries believe last year's fully developed loss ratio will be, and so when we feel like the actual loss information reinforces that, especially at the end of the year, we are going to be more likely to want to take credit for that, where ***right now we want to maintain as conservative of an approach as we think is appropriate.***

198. The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million with respect to American Country, American Service, and Gateway, and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company", and the New York Regulatory Order indicates that reserves were deficient by at least another $1.2 million with respect to Global Liberty; (2) despite the reserve increases announced for 2016 and 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims

payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by at least three state insurance regulators during the Class Period.

199.     On November 6, 2018, Defendants filed Atlas's Q3 2018 10-Q, signed by Wollney and Romano.  The Q3 2018 10-Q reported Atlas's net income of $5.6 million, the Company's insurance subsidiaries combined statutory surplus of $109.8 million, and the total amount of the Company's reserves as $187 million.

200.     The foregoing statements about AFH's financial results and reserve levels were materially misleading because reserves were materially understated and insufficient, thus overstating net income, and that additional reserve increases were required.  As reflected in the Missouri Regulatory Order, AFH's reserves were understated by approximately $30.1 million, which deficiency was not made up in the FY 2016 reserve increase, and Defendants set AFH's reserve levels below the level its actuary recommended, which itself was insufficient.  Moreover, the March 2018 New York Regulatory Order indicates that AFH remained under-reserved by at least an additional $1.2 million with respect to Global Liberty.

201.     On a November 6, 2018 earnings call, Defendants were asked how their conversation with their actuaries was "different now at this point in the year compared to where it was last year or two years ago."  Defendant Wollney responded:

> *So I think the key difference is, we've been focusing much more on the underlying data and the changes in the business to make sure that as we go into the year-end actuarial review, we avoid surprises* … We felt like that was an issue at year-end '17.  *And we want to make sure that we do not have any surprises related to misinterpretation this year.*  So we've been talking with and working with a number of resources to make sure that we've got a very good handle and that our actuaries have a very good handle on the impact of the underlying changes in the business.

202.     Wollney went on to explain that based on their data, case reserves were expected to be "*sufficient in aggregate*," and that their analysis tracking older-modeled claims was also expected to be "reflective of the expected ultimate on those claims."

203.     The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations,

and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million with respect to American Country, American Service, and Gateway, and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company", and the New York Regulatory Order indicates that reserves were deficient by at least another $1.2 million with respect to Global Liberty; (2) despite the reserve increases announced for 2016 and 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; (4) AFH was continuing to see claims payments in excess of case reserves for older claims; and (5) Defendants failed to disclose that they were under investigation for under-reserving by at least three state insurance regulators during the Class Period.

204.    On March 4, 2019, Defendants announced Atlas's preliminary financial results for FY 2018.  Defendants reported net claims incurred as $177.2 million, net income of -$36.9 million and total reserves of $218.3 million.  Defendants unexpectedly – and contrary to their previous representations – disclosed yet another round of "surprises" by issuing a press release announcing a *third* increase to reserve estimates.  Defendant Wollney stated:

> ***Actuarial work conducted in connection with year-end indicated a need to increase reserve estimates for unpaid losses due primarily to bodily injury claims from accident years 2016 and prior.  These claims are showing higher severity and have been open for longer periods than we had estimated***. . . . While our use of predictive analytics in underwriting and claims is having a positive impact on claim closures, we are still addressing historic challenges . . . However, we believe that claim closure data for more recent accident years demonstrates the fundamental efficacy of our predictive model-driven processes.

205.    The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million with respect to American Country, American Service, and Gateway, and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company", and the New York Regulatory Order indicates that reserves were deficient by at least another $1.2 million with respect

to Global Liberty; (2) despite the reserve increases announced for 2016 and 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; and (4) AFH was continuing to see claims payments in excess of case reserves for older claims.

206. Still, during the March 4, 2019 conference call to discuss preliminary FY 2018 results, Defendants continued to misleadingly reassure investors as to the appropriateness and adequacy of the Company's reserves. For example, Defendant Wollney insisted that "we expect the process changes implemented in the past to have a favorable impact on our results over time, and the additional steps the company will be taking with the objective of maximizing shareholder value." He further stated:

> While operating results during the past year demonstrate continuing improvement, it is taking longer than we would've hoped for these positive activities to be reflected in actuarial estimates. As was the case last year, *we believe that the incremental <u>reserve strengthening</u> taken as of December 31, 2018, is an <u>appropriate</u> step based on the available information to account for future liabilities*.
>
> *We've been providing data throughout the year to deliver transparency and believe claim closure data from our recent accident years demonstrates the fundamental efficacy of our processes*.

207. The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million with respect to American Country, American Service, and Gateway, and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company", and the New York Regulatory Order indicates that reserves were deficient by at least another $1.2 million with respect to Global Liberty; (2) despite the reserve increases announced for 2016 and 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; and (4) AFH was continuing to see claims payments in excess of case reserves for older claims.

208.     Further, on that same call, Defendant Wollney reassured investors about the nature of the conversations Defendants were having with state regulators:

> SAMUEL HOFFMAN: Okay. Next question is with regulators. Do you -- as a result of this year's results, do you need to have additional discussions with the insurance departments of any state? And what are the potential implications there?
>
> SCOTT DAVID WOLLNEY: So we have confidentially advised the insurance regulators of the decision to strengthen reserves, and obviously, have filed our statutory statements so they're aware of our financial -- what the financial result was. We've had a lot of dialogue with our domestic regulators to make sure they understand what we've been doing with analytics, both in terms of our overall discussions with them and also in connection with some rate filings that we've made that's specifically tied to the use of analytics on the underwriting side. So we think they're very up to speed in terms of what we're doing, and so we'll continue that dialogue. But I don't see any significant impact on our business or business plans because of discussions with regulators.

209.     The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts about AFH's business, operations, and prospects, because (1) the Missouri Regulatory Order determined reserves to be understated by approximately $30.1 million with respect to American Country, American Service, and Gateway, and observed that "[c]hanges to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company", and the New York Regulatory Order indicates that reserves were deficient by at least another $1.2 million with respect to Global Liberty; (2) despite the reserve increases announced for 2016 and 2017, AFH's loss reserves were still materially understated; (3) as a result, AFH's financial results, including net income and capital surplus, were materially overstated; and (4) AFH was continuing to see claims payments in excess of case reserves for older claims.

## VII.     ADDITIONAL SCIENTER ALLEGATIONS

210.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Atlas Financial, their control over, and/or receipt and/or modification of Atlas Financial's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Atlas Financial, participated in the fraudulent scheme alleged herein.

211. Additionally, the Defendants' knowledge and/or recklessness regarding the materially false and/or misleading statements and omissions described herein, is further established by the following facts which establish a strong inference that Defendants acted with scienter.

A. **The Individual Defendants And Other Key Atlas Financial Executives And Directors Began Dumping Atlas Financial Stock In A Highly Unusual And Coordinated Fashion Between November 8, 2017 and December 21, 2017**

212. During the Class Period Defendants Wollney and Romano, as well as three other high ranking AFH executives (including Joseph Shugrue, Bruce Wayne Giles, and Leslie DiMaggio) took advantage of AFH's artificially inflated stock price and sold shares while AFH's stock price was near its Class Period high and shortly before AFH disclosed substantial increases to its loss reserves.

213. Each of these individuals' sales of AFH was highly unusual and suspicious because: (1) each individual deviated from their prior trading in AFH's stock since 2015; (2) occurred between November 8 and December 21, 2017, while AFH's stock was near its Class Period high; (3) occurred near the end of 2017 around the time AFH was conducting a claim-by-claim review of its non-modeled claims, which was being conducted by Joseph Shugrue; (4) each individuals' transaction occurred in a synchronized and coordinated fashion with their transactions occurring over the same period of time and on similar dates; and (5) resulted in each individual obtaining substantially higher proceeds than had each individual waited until after the March 1, 2018, announcement that AFH was drastically increasing its reserves or thereafter.

214. During the Class Period, between November 8, 2017 and December 21, 2017,

Defendant Wollney sold 36,668 shares of AFH stock and realized $721,880 from these sales. On November 8, 2017, Wollney sold 12,443 shares at $20.10 per share. On November 10, 2017, Wollney sold 7,556 shares at $19.12 per share. On November 13, 2017, Wollney sold 284 shares at $19.12 per share. On November 29, 2017, Wollney sold 6,068 shares at $21.39 per share. On November 30, 2017, Wollney sold 2,660 shares at $20.12 per share. On December 12, 2017, Wollney sold 881 shares at $19.06 per share. On December 16, 2017, Wollney sold 869 shares at $19.28 per share. On December 14, 20117, Wollney sold 1,055 shares at $19.06 per share. On December 20, 2017, Wollney sold 1,145 shares at $18.75 per share. On December 21, 2017, Wollney sold 3,707 shares at $18.75 per share. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

215. During the Class Period, between November 8, 2017 and December 21, 2017, Defendant Romano sold 26,668 out of his 102,154 shares of AFH stock—over 26% of his holdings—and realized $525,675 from these sales. On November 8, 2017, Romano sold 9,477 shares at $20.10 per share. On November 10, 2017, Romano sold 5,538 shares at $19.12 per share. On November 13, 2017, Romano sold 193 shares at $19.12 per share. On November 29, 2017, Romano sold 4,442 shares at $20.39 per share. On November 30, 2017, Romano sold 1,942 shares at $20.12 per share. On December 12, 2017, Romano sold 649 shares at $19.06 per share. On December 13, 2017, Romano sold 653 shares at $19.28 per share. On December 14, 2017, Romano sold 783 shares at $19.06 per share. On December 20, 2017, Romano sold 852 shares at $18.75 per share. On December 21, 2017, Romano sold 2,139 shares at $18.75 per share. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

216. During the Class Period, Joseph Raymond Shugrue was AFH's Vice President for Claims (after the Class Period, Shugrue was promoted to Atlas's Chief Operating Officer). During the Class Period, between November 8, 2017 and December 21, 2017, Shugrue sold 23,334 shares of AFH stock—approximately 24% of his holdings—and realized $456,173 from these sales. On November 8, 2017, Shugrue sold 7,776 shares at $20.10 per share. On November 10, 2017, Shugrue sold 4,840 shares at $19.12 per share. On November 13, 2017, Shugrue sold 181 shares

at $19.12 per share. On November 17, 2017, Shugrue sold 299 shares at $19.00 per share. On November 29, 2017, Shugrue sold 3,827 shares at $20.39 per share. On November 30, 2017, Shugrue sold 1,676 shares at $20.12 per share. On December 12, 2017, Shugrue sold 555 shares at $19.06 per share. On December 13, 2017, Shugrue sold 533 shares at $19.28 per share. On December 14, 2017, Shugrue sold 657 shares at $19.06 per share. On December 20, 2017, Shugrue sold 707 shares at $18.75 per share. On December 21, 2017, Shugrue sold 2,283 shares at $18.75 per share. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

217.    Bruce Wayne Giles is AFH's Vice President for Product Development and Underwriting. During the Class Period, between November 8, 2017 and December 21, 2017, Giles sold 23,334 shares of AFH stock—approximately 25% of his holdings—and realized $459,172 from these sales. On November 8, 2017, Giles sold 7,776 shares at $20.10 per share. On November 10, 2017, Giles sold 4,840 shares at $19.12 per share. On November 13, 2017, Giles sold 181 shares at $19.12 per share. On November 17, 2017, Giles sold 293 shares at $19.00 per share. On November 29, 2017, Giles sold 3,827 shares at $20.39 per share. On November 30, 2017, Giles sold 1,676 shares at $20.12 per share. On December 12, 2017, Giles sold 555 shares at $19.06 per share. On December 13, 2017, Giles sold 533 shares at $19.28 per share. On December 14, 2017, Giles sold 657 shares at $19.06 per share. On December 20, 2017, Giles sold 707 shares at $18.75 per share. On December 21, 2017, Giles sold 2,289 shares at $18.75 per share. These sales were unusual in that prior to the Class Period he had not sold any AFH stock.

218.    During the Class Period, Leslie DiMaggio was AFH's Vice President for Operations and IT. During the Class Period, between November 8, 2017 and December 21, 2017, DiMaggio sold 23,334 shares of AFH stock—approximately 24% of her holdings— and realized $459,172 from these sales. On November 8, 2017, DiMaggio sold 7,776 shares at $20.10 per share. On November 10, 2017, DiMaggio sold 4,840 shares at $19.12 per share. On November 13, 2017, DiMaggio sold 181 shares at $19.12 per share. On November 17, 2017, DiMaggio sold 293 shares at $19.00 per share. On November 29, 2017, DiMaggio sold 3,827 shares at $20.39

per share. On November 30, 2017 DiMaggio sold 1,676 shares at $20.12 per share. On December 12, 2017, DiMaggio sold 555 shares at $19.06 per share. On December 13, 2017, DiMaggio sold 533 shares at $19.28 per share. On December 14, 2017, DiMaggio sold 657 shares at $19.06 per share. On December 20, 2017, DiMaggio sold 707 shares at $18.75 per share. On December 21, 2017, DiMaggio sold 2,289 shares at $18.75 per share. These sales were unusual in that prior to the Class Period she had not sold any AFH stock.

219. The Individual Defendants and Leslie DiMaggio were further motivated to inflate the price of AFH stock because, as of March 27, 2017, Scott Wollney had 58,098 Ordinary Shares, Paul Romano had 14,488 Ordinary Shares and Leslie DiMaggio had 14,488 Ordinary Shares pledged as security for personal loans.

220. As of April 13, 2018, the number of shares Wollney had pledged as security for personal loans dramatically increased to 146,917 shares. As of March 31, 2019, the number of shares Wollney had pledged as security for personal loans increased further, to 180,724.

## B. Defendants' Manipulation Of AFH's Reserves Involved The Company's Core Operations

221. Setting of loss reserves are indisputably part of Atlas Financial's core operations. Atlas Financial is in the business of providing specialized auto insurance. Setting of loss reserves is an essential part of an insurance business. Without a knowledgeable setting of loss reserves, an insurance company cannot properly function in a business environment in that setting an appropriate loss reserve is essential in the underwriting of insurance policies.

222. Setting of loss reserves in, among other states, Michigan represented a crucial part of Atlas Financial's operations. Company executives, including the Individual Defendants, repeatedly emphasized the loss reserves in Michigan as representing an important aspect of the Company operations, and stated that they played an important role in Atlas Financial's profitability and income.

223. As alleged herein, Atlas Financial carefully tracked the status of its loss reserves. The data concerning actual or possible claims was maintained by Defendants and was easily

available to them.  Defendants further had (and promoted having) extensive experience in the commercial auto insurance industry and were aware of the importance of setting appropriate loss reserves.  Indeed, Defendants understood that, as part of Atlas Financial's core operations, the setting of appropriate loss reserves were necessary for the Company's status as a going concern, let alone as a profitable enterprise.

224.    The Individual Defendants admitted that they, as Atlas's management, were responsible for monitoring claims and determining whether reserves needed to be increased.  For example, in the Company's 2016 10-K filed on March 13, 2017, Defendants stated that: "The increase in case reserves resulted from *management's review* of outstanding unpaid personal injury protection claims, particularly in the state of Michigan."

225.    Moreover, the Individual Defendants signed and submitted certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") for the Company's Class Period financial statements, attesting that they reviewed these forms and that these reports did not contain any false statements of material fact of material omissions, and that they fairly presented in all material respects the financial condition of the Company.  During the Class Period, Defendant Wollney and Defendant Romano both signed certifications pursuant to SOX attached as exhibits to the following SEC filings: 2016 10-K, Q1 2017 10-Q, Q2 2017 10-Q, Q3 2017 10-Q, 2017 10-K, Q1 2018 10-Q, Q2 2018 10-Q, Q3 2018 10-Q, 2018 10-K, Q1 2019 10-Q, Q2 2019 10-Q, Q3 2019 10-Q.

226.    In each SOX Certification referenced in this Amended Complaint, the Individual Defendants certified that:

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements ….

227.    The Individual Defendants further confirmed their responsibility for Atlas's financial oversight by stating in Atlas's 2017 10-K, that "[o]ur management is responsible for establishing and maintaining adequate internal control over financial reporting . . . . Under the supervision and with the participation of our management, including our chief executive officer [Defendant Wollney] and chief financial officer [Defendant Romano], we conducted an evaluation of our internal control over financial reporting . . . . [and] concluded that the Company's internal control over financial reporting is effective[.]"  Defendants further confirmed this in Atlas's belatedly filed 2018 10-K, stating that "[u]nder the supervision of our management, including our Chief Executive Officer [Wollney] and Chief Financial Officer [Romano], we conducted an evaluation of the effectiveness over our internal control over financial reporting" and had concluded that Atlas "lacked effective internal control over financial reporting as of December 31, 2018."  The reasons cited for this conclusion were that Defendants had failed to timely meet their filing obligations with the SEC and NASDAQ, noting "the delay in the completion of the audit of the Company's financial statements for the fiscal year ended December 31, 2018 was due to the previously disclosed disagreement with [RSM] with respect to insurance reserves[.]"  Defendants stated that their plan for remediation consisted of taking "steps to monitor the progress of all aspects of its financial closing process including more detailed discussions as needed with its independent registered public accounting firm regarding insurance reserve calculations."

## C.    Defendants Were Experienced Executives At A "Specialty" Insurance Company

228.    Each of the Individual Defendants is a highly experienced corporate executive with particular experience in the specialty insurance industry.

229.    Defendant Wollney is President, Chief Executive Officer & Director at Atlas Financial Holdings, Inc. and President & Chief Executive Officer at American Service Insurance Co., Inc.  He is on the Board of Directors at 1347 Property Insurance Holdings, Inc.  Mr. Wollney

was previously employed as President & Chief Executive Officer by Kingsway America, Inc. and Lincoln General Insurance Co., and President by Avalon Risk Management, Inc. Mr. Wollney was a Co-Founder of Avalon subsidiary over 10 years ago and has over 18 years' experience in transportation related and surety insurance. He has been a Director of Atlas Financial Holdings, Inc. since December 31, 2010 and 1347 Property Insurance Holdings, Inc. since March 30, 2015. He is a sub-committee member in the U.S. Customs and Border Protection Trade Support Network and received the Transportation Intermediaries Industry Advancement Award. Mr. Wollney holds an MBA with a dual concentration in Finance and Strategy from Northwestern University's, Kellogg School of Management in 2000 and a Bachelor of Arts degree from the University of Illinois in 1991.

230. Defendant Romano has served as Vice President and Chief Financial Officer of Atlas Financial since December 2010. From March 2010 until that time, he served as Vice President and Treasurer of Kingsway America Inc., prior to which he was the Vice President, Data Management of Lincoln General Insurance Company from October 2008 to March 2009. From 2002 through 2008, he held various Vice President and Director positions with American Country Insurance Company and its affiliates. Mr. Romano holds a Certified Public Accountant designation in the State of Illinois. He received a Master of Business Administration degree from the Northwestern University Kellogg Graduate School of Management in 1996 and a Bachelor of Science, Accounting, from the University of Illinois in 1984.

231. The Individual Defendants' educational and professional experience demonstrate that they are well-versed in the business of specialized auto insurance. By virtue of this experience, the Individual Defendants understood the importance of setting appropriate levels of loss reserves in the insurance industry. They also understood the importance of setting appropriate levels of loss reserves to Atlas Financial's business, as well as to the Company's stock price.

232. Further, Defendants confirmed that they monitored and adhered to relevant accounting principles and disclosure requirements. Indeed, Atlas's 2015 10-K stated: "In May 2015, the FASB issued guidance requiring additional disclosures about short-duration insurance

contracts. The new disclosures, which are required for annual periods beginning after December 31, 2015 and for interim periods beginning after December 31, 2016, are intended to provide additional information about insurance liabilities including the nature, amount, timing, and uncertainty of future cash flows related to those liabilities." Thus, Defendants knowingly or at minimum, recklessly violated GAAP's disclosure requirements throughout the Class Period.

**D.** **Defendants Were Admittedly Aware Of Negative Undisclosed Trends And Claim To Have Been Closely Monitoring The Negative Information That Was Withheld From Investors**

233. The Individual Defendants repeatedly highlighted their real-time access to key data regarding the trends in their insurance risk pool, including data necessary to properly set loss reserves. Indeed, the Individual Defendants not only had access to, but in fact actively monitored this information.

234. For example, during a May 9, 2017 earnings call, Defendant Wollney stated: In the case of the evolution of our target niche, we believe that Atlas has the most comprehensive perspective on the market risk and has been moving incrementally to translate that knowledge into underwriting profit by leveraging both our heritage as well as our commitment to technology and analytics.

235. Wollney emphasized Defendants' proficiency with data analysis and touted it as one of the Company's strengths:

*We have a high level of visibility to evaluate and implement rate changes where appropriate and have been doing so.* Data from The Council of Insurance Agents and Brokers as shown on slide 7 illustrates the broader commercial auto rate retrenchment, which supports rate increases in general and particularly in the smaller account and light commercial auto markets, in which Atlas specializes....

\* \* \*

*We are continuing to closely monitor loss development throughout our book of business and feel that many of the investments made in recent years in the areas of predictive analytics and increased use of advanced telematics will continue to refine our ability to identify potential loss scenarios more rapidly and also optimize pricing.*

236. On the same conference call, Defendant Wollney highlighted Defendants' close monitoring of claims in the following exchange with an analyst:

**<Q - Tom Shimp>**: Okay. Great. Thank you. I had one more question if I may, in regards to the Michigan market and the issues we saw in the last quarter, how confident are you that we're not going to see that throughout the remainder of the year?

**<A - Scott D. Wollney>**: Well as we stated on the prior call, we focused on that issue, we strengthen reserves with the expectation that the remaining runoff of claims related to the periods the prior year periods where we had a significant amount of exposure in that state would trend similar to kind of the higher paid severity results we saw in 2016. And so, we are expecting that to be a challenging environment for the totality of the runoff of those claims. ***So, it is something we're going to be monitoring very closely. I don't think we were surprised by anything in the first quarter, although obviously not a lot of time has passed since our last call.***

***So, I think the good news is we haven't seen anything different than we would have expected and obviously, it's something that we're keeping a very close eye on.*** It's encouraging that the overall inventory is coming down. As I mentioned, total Michigan related claims were down about 8.5% in just 90 days following the end of the year. ***And so, we do have a dedicated team of people who are focusing specifically on that book of business and obviously, we want to learn everything we can from what we sort of described as the new normal in that environment to get the best possible result going forward, but we are going to be very careful and manage that book very closely. . . .***

237.    Similarly, during an August 8, 2017 earnings call, Defendant Wollney touted the

Company's focus on data analytics:

[W]e are expecting to write to the same target loss ratio, despite the fact that you're going to see changes in frequency and severity. ***So it's definitely something we're watching very closely.*** The fact that we are now using the machine-learning based predictive analytics in our pricing models as well as our claims reserving process, ***it's going to help us monitor those changes in severity and frequencies much more closely than we could have without those tool***s. And it's definitely something that will be part of our regular pricing analysis as well. But it's a great question and those are definitely changes that that ***we have to keep an eye on*** and make sure we're pricing to. . . .

238.    Likewise, on a November 7, 2017, earnings call, Defendant Wollney emphasized

the Company's agility with real-time data analysis:

Atlas was built through a series of acquisitions which allowed us to assemble a unique combination of data, brand strength and expertise. We utilize machine learning-based predictive analytics to amplify the value of these assets which our team ***continuously refreshes*** increasingly with the additional benefit of in-vehicle and other emerging technologies.

*The usage of data and analytics to innovate has been at the core of Atlas's business model since our formation.* When we initially conducted the analysis of the two subsidiaries that initially made up the Atlas platform, we found that through decades of data, like commercial auto and our target niche has historically outperformed both commercial auto and property and casualty at large and that the data that was inside of these companies was of immense value as it could be further leveraged through analytics. . . .

Our strategy is to exploit this situation by incorporating sophisticated technologies, to leverage specific data which is not readily available, to create a differentiated comparative advantage relative to the smaller insurers against which we generally compete, it should also widen the value of the competitive modes I mentioned.

239.    On an August 7, 2018 earnings call, Defendant Wollney stated:

We continue to be pleased with our results in 2018. *Our earnings per share are on track to achieve the level to which we previously guided … The significant investment we've made in predictive analytics is helping to optimize the value we're able to deliver as a specialist.*

***

In addition to an overall increase in average rate levels, *our use of predictive analytics is helping to shift our overall business written to a larger percentage of accounts expected to generate below average losses*[.]

***

*In particular, you can see that overall inventories have declined and more challenging areas, like Michigan, continue to represent a lesser amount of our exposure.*

***

*Predictive model based case reserves represent the majority of our pending third-party liability claims for accident year 2017 and prior to this point. Our expectation is that overall claims in this category will close at or slightly below the case reserves predicted by our models over time. These models are refreshed regularly to refine predictive ability as well as to capture underlying loss trend information.*

***

*[W]e continue to close claims faster than in the past and for lower calendar year paid severity amounts.* Ultimately, the goal of introducing analytics in our claims process was to accomplish this, and we're pleased to see data supporting this expectation.

240.    On a November 6, 2018 earnings call, Defendant Wollney reiterated assurances that older claims not covered by predictive modeling were being closely monitored, and were

stable (*i.e.*, that additional increases in loss reserves were not necessary):

> Year-to-date 2018, 486 older claims, which were not scored by the predictive model, were closed with an aggregate paid amount of $14.3 million compared to an expected benchmark range of $9.2 million to $20.7 million. . . . ***We're encouraged by closures in the middle of the anticipated range and are continuing to monitor the balance of this inventory[.]***

241.    Under these circumstances, Defendants were aware or were reckless in not being aware that the trends, especially in Michigan, would require an increase in loss reserves for the policies in that state.

### E.    Regulatory Investigations During the Class Period Further Demonstrate Defendants' Scienter

242.    At the time Atlas announced its first reserve increase of the Class Period on February 22, 2017, it was already on notice that all of its insurance subsidiaries were under scrutiny by state regulators.

243.    Just three months into the Class Period, on May 11, 2017, the Missouri Department of Insurance completed its report and order concluding an investigation into reserves at Gateway, which it conducted in conjunction with examiners from the State of Illinois.  *See* Ex. A.  The Missouri Regulatory Order examined the period January 1, 2012 through December 31, 2015, and stated that "[t]he examination also evaluated material transactions or events occurring subsequent to December 31, 2015." Ex. A, p.1.  The examination focused on insurance pools of Gateway and two other AFH subsidiaries, American Service and American Country.  *Id*. at pp. 6-7.

244.    The Missouri Regulatory Order identified regulatory violations related to significant under-reserving at Gateway.  For example, in its "Summary of Recommendations," the Missouri Department of Insurance admonished that:

> The Company should ensure that Loss and Loss Adjustment Expense Reserves are sufficient and adequately supported. ***This resulted partly because the Company established reserves below what its own appointed actuary had recommended. The reserves recommended by the appointed actuary were found to be deficient as well and were not adequately supported.*** Ex. A, p. 15.

245.    The Missouri Regulatory Order concluded that the reserves of the pooled business were deficient on a combined basis by approximately $30.1 million. Ex A, p. 15.  It further detailed

that reserves on the examined insurance pools were $6 million below the opining actuary's recommendation, and the actual recommendation was itself $24 million below the level determined to be necessary.  *Id.*  Reasoning that "Gateway's share of the pooled business is 20%," the order concluded that its overall reserves were deficient by approximately $6 million." However, because the other two entities in the pools were AFH subsidiaries, the entire $30.1 million reserve deficiency inured to AFH.  In addition, the Missouri Department of Insurance noted that Gateway's $6 million reserve deficiency "reduces [its] surplus of $18.8 million by almost one-third."  Ex. A, p. 2.

246.    The Missouri Regulatory Order ordered the reserve deficiencies to be rectified and further ordered rectification of Gateway's reserve methodology, stating that "[m]anagement's current 'reserve memo' does not address IBNR, and thus does not fulfill the requirements of Statement of Statutory Accounting Principles 55 (SSAP)."  Ex. A, p. 15.  The Missouri Regulatory Order made clear that the reserve deficiency had not yet been made up by the date of the report, stating "The Company strengthened reserves during 2016 due, largely to continued development on existing claims.  Changes to the reserving process implemented by the Company during the year had not yet achieved the results anticipated by the Company."  *Id.*  Defendants disclosed neither the Missouri Regulatory Order nor the additional material $30.1 million reserve deficiency identified therein.

247.    Despite the Missouri Regulatory Order, which provided Defendants with actual knowledge that the reserves of Gateway, American Country and American Service were significantly deficient, and that the Company's changes to its reserving process during 2016 had failed to achieve their desired results, Defendants falsely and repeatedly reassured investors that the Company's reserves were adequate and would not need to be increased again when indeed, they were not adequate and would need to be increased further.  Moreover, Defendants falsely and repeatedly blamed the "isolated" and soon to be resolved issues of Michigan claims, and older claims (pre-acquisition Global Liberty claims and non-modelled claims) as the reason reserves were increased throughout the Class Period and concealed the need to increase reserves to cure

their prior under-reserving. Defendants were on notice as a result of the Missouri Regulatory Order that their reserving practices were not in regulatory compliance, yet Defendants nonetheless continued these under-reserving practices.

248. On March 29, 2018, just weeks after Atlas announced its second reserve increase of the Class Period, the New York State Department of Financial Services concluded its report on examination of Atlas subsidiary, Global Liberty, noting Global Liberty's reserves were materially understated and not in regulatory compliance during the timeframe of January 1, 2013 through December 31, 2016. *See* Ex. B (New York Regulatory Report), p. 18. Specifically, the report stated:

> *It is recommended that the Company address the ongoing reserve inadequacies and increase its carried reserves to an appropriate level …. Further, it is recommended that the Company's future actuarial report underlying the statement of actuarial opinion provides sufficient details of documentation and footnotes to clearly explain the calculations so that an independent reviewer can evaluate the work.*

The report indicated that Global Liberty's reserves were deficient by $10.885 million, and that the Company had recognized $9.674 million of that deficiency in its 2017 annual statement. *See* Ex. B, p. 18. Thus, AFH's reserves remained deficient by approximately $1.2 million relating to Global Liberty and the New York Regulatory Report, even after the Company's 2017 reserve strengthening.

249. The New York Regulatory Report on Global Liberty further identified insufficient risk management and internal controls. Specifically, the report stated, "It is recommended that the Company take the necessary steps to address the weaknesses in its IT controls and/or processes in order to improve or strengthen its operation integrity, efficiency and effectiveness." Ex. B, p. 19. Defendants did not disclose the New York Regulatory Report or its impact on Atlas's loss reserves. Instead, despite their actual knowledge that Atlas's internal control over financial reporting was deficient, as noted by the New York Regulatory Report, Defendants falsely claimed that Atlas's internal control over financial reporting was effective, and that the Company's reserving practices and claims-monitoring gave it a competitive edge that would obviate the need for further reserve

increases.

250.    Defendants never disclosed that the Class Period reserve increases were necessitated by their prior under-reserving, or that AFH was ordered to increase reserves by state insurance regulators.  Instead, they misled investors to believe that, year after year, the necessary reserve increases were unexpected and could not have been better predicted.  Further, after each reserve increase, Defendants falsely and repeatedly assured investors that the Company's reserves were adequate when indeed, they were not.  Defendants were on notice as a result of the Missouri Regulatory Order and the New York Regulatory Report  that their under-reserving practices were not in regulatory compliance, yet Defendants nonetheless continued these practices.  Moreover, Defendants concealed from investors the material risks and uncertainties inherent in the conclusions of the state regulators with respect to their reserve estimates.

251.    Ultimately Defendants had to disclose the consequences of their ongoing noncompliance when the Illinois Department of Insurance placed Gateway, American Country, and American Service into rehabilitation and further, when Defendants' late-filed 2018 10-K materially revised Atlas's claims liabilities and claims incurred by $43.43 million.

**F.**    **Defendants Were Motivated To Understate Atlas Financial's Reserves To Avoid Non-Compliance With Atlas Financial's Covenants With Its Lenders**

252.    The Individual Defendants had the motive and opportunity to commit fraud. With respect to opportunity, because of their positions with Atlas Financial, the Individual Defendants controlled the contents of the Company's public statements during the Class Period. Each of the Individual Defendants was provided with, had access to or was in control of the statements alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Given their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the facts specified herein had not been disclosed to, and were being concealed from, the public and that the representations that were being made were false and misleading. As a result, the Individual Defendants were responsible for the accuracy of Atlas Financial's corporate statements and are

therefore responsible and liable for the representations contained therein.

253.    Atlas Financial's 2016 Form 10-K stated:

In February 2017, American Acquisition filed its statutorily required financial
statements for the year ended December 31, 2016, which are used to determine on-
going compliance with the covenants contained in the Loan Agreement. As a result
of the reserve strengthening described in this annual report on Form 10-K and its
effect on American Acquisition's December 31, 2016 financial statements,
American Acquisition is not in compliance with the Loan Agreements' EBITDA
Ratio covenant as of March 13, 2017. American Acquisition has a thirty day period
to cure this covenant non-compliance and the Company and American Acquisition
have been in discussions with the lender regarding a modification to the loan
covenants to more specifically address the effects of reserve modifications and/or
obtaining a waiver with respect to the existing non-compliance.

254.    Defendants, therefore, knew that any additional increase in loss reserves, including
with respect to Michigan claims, would lead to additional breaches of the covenants in the Loan
Agreement.  Defendants were motivated to not disclose to the market and its lender(s) additional
increases in loss reserves as that would endanger the Company's credit.  Accordingly, Defendants
had both motive and opportunity to withhold key information regarding the Company, including
the need to increase loss reserves.

### G.    Defendants Were Motivated To Understate Atlas Financial's Reserves To Issue Securities (Senior Unsecured Notes Issued on April 26, 2017) To Raise Funds To Repay The Amount Outstanding Under Its Loan Agreement With Fifth Third Bank

255.    On or around April 21, 2017, AFH issued approximately $25 million worth of
senior unsecured notes.  According to the offering materials for the issuance, AFH "intends to use
the net proceeds of this offering, together with cash on hand, for the repayment of $19.4 million
in outstanding debt drawn from Atlas' secured credit facilities (which will then be terminated),
repurchases of common stock, supporting organic growth, and potential acquisitions, as well as
for general corporate purposes."

256.    Atlas Financial's Form 10-Q for the period ending March 31, 2017 stated:

As of December 31, 2016, American Acquisition was in compliance with the
covenants of the Loan Agreement. In February 2017, American Acquisition filed
its statutorily required financial statements for the year ended December 31, 2016,

which are used to determine ongoing compliance with the covenants contained in the Loan Agreement. As a result of the reserve strengthening described in Atlas' 2016 Annual Report on Form 10-K and its effect on American Acquisition's December 31, 2016 financial statements, American Acquisition was not in compliance with the Loan Agreements' EBITDA Ratio covenant as of March 13, 2017. ***On April 26, 2017, Atlas issued senior unsecured notes and used a portion of the net proceeds of this offering, together with cash on hand, to repay the entire amount outstanding under the Loan Agreement, which was then terminated.***

257.     In other words, in order to cure the above-referenced non-compliance under the Loan Agreement, due to the strengthening of the loss reserves, AFH issued unsecured notes to terminate that agreement.

258.     Defendants, therefore, had the motive and opportunity to conceal negative information regarding the need for additional strengthening of the loss reserves in order to secure the funds necessary to terminate the Loan Agreement.   If Defendants had disclosed this information, it would have been far more difficult for them, if not impossible, to raise the funds needed to repay the indebtedness under the Loan Agreement or would have resulted in AFH having to offer the notes on substantially less favorable terms than AFH was ultimately able to issue the notes.

## H.     Atlas Financial Acted With Corporate Scienter

259.      Each of the Individual Defendants was a high-ranking management-level employee.  The scienter of each of the Individual Defendants and of all other management-level employees of Atlas Financial, including each high-ranking officer or director, is imputable to Atlas Financial. The knowledge of each of these individuals should therefore be imputed to Atlas Financial for the purposes of assessing corporate scienter.

260.     Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Atlas Financial as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's operations, finances, business practices and loss reserves—all important topics that would

necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## VIII. LOSS CAUSATION

261. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. During the Class Period, Plaintiffs and the Class purchased Atlas Financial's securities at artificially inflated prices and were damaged thereby. The price of AFH's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

262. The truth regarding AFH's financial condition was partially revealed, and/or the concealed risks materialized, on or about: March 1, 2018; March 15, 2018; June 15-18, 2018; March 4, 2019; and April 30, 2019. As alleged above, as direct result of these partial disclosures and/or materialization of risk, the price of AFH's stock declined precipitously, often on heavy trading volume.

## IX. CLASS ACTION ALLEGATIONS

263. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that acquired Atlas Financial's securities between February 22, 2017, and April 30, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

264. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Atlas Financial's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least

hundreds or thousands of members in the proposed Class. Millions of Atlas Financial shares were traded publicly during the Class Period on the NASDAQ. As of November 3, 2017, Atlas Financial had 12,030,703 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Atlas Financial or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

265. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

266. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

267. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Atlas Financial; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

268. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

269.     The market for Atlas Financial's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Atlas Financial's securities traded at artificially inflated prices during the Class Period. On January 5, 2018, the Company's stock price closed at a Class Period high of $21.35 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Atlas Financial's securities and market information relating to Atlas Financial, and have been damaged thereby.

270.     During the Class Period, the artificial inflation of Atlas Financial's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Atlas Financial's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Atlas Financial and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

271.     At all relevant times, the market for Atlas Financial's securities was an efficient market for the following reasons, among others:

(a)     Atlas Financial stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Atlas Financial filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Atlas Financial regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press

releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

> (d)     Atlas Financial was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

272.    As a result of the foregoing, the market for Atlas Financial's securities promptly digested current information regarding Atlas Financial from all publicly available sources and reflected such information in Atlas Financial's stock price. Under these circumstances, all purchasers of Atlas Financial's securities during the Class Period suffered similar injury through their purchase of Atlas Financial's securities at artificially inflated prices and a presumption of reliance applies.

273.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.     NO SAFE HARBOR

274.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Atlas Financial who knew that the statement was false when made.

## XII. CLAIMS

### FIRST CLAIM
**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

275.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

276.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Atlas Financial's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

277.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Atlas Financial's securities in violation of Section 10(b)

of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

278.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Atlas Financial's financial well-being and prospects, as specified herein.

279.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Atlas Financial's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Atlas Financial and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

280.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or

recklessly disregarded was materially false and misleading.

281.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Atlas Financial's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

282.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Atlas Financial's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Atlas Financial's securities during the Class Period at artificially high prices and were damaged thereby.

283.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Atlas Financial was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Atlas Financial securities, or, if they had acquired such securities during the Class Period, they would not have

done so at the artificially inflated prices which they paid.

284.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

285.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

<div align="center">

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

</div>

286.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

287.    Individual Defendants acted as controlling persons of Atlas Financial within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

288.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

289.    As set forth above, Atlas Financial and Individual Defendants each violated Section

10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIV.   **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: June 30, 2020                          Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Kara M. Wolke*
Kevin F. Ruf
Kara M. Wolke
Natalie S. Pang
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kruf@glancylaw.com
        kwolke@glancylaw.com
        npang@glancylaw.com

*Lead Counsel for Lead Plaintiffs
and the Putative Class*

**LAWRENCE KAMIN, LLC**
Mitchell B. Goldberg
John S. Monical
Peter E. Cooper
300 S. Wacker Drive, Suite 500
Chicago, IL 60606
Telephone: (312) 372-1947
Facsimile: (312) 372-2389
Email: mgoldberg@lawrencekaminlaw.com
       jmonical@lawrencekaminlaw.com
       pcooper@lawrencekaminlaw.com

*Liaison Counsel for Lead Plaintiffs and the Class*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Plaintiffs*

## **PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On June 30, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Illinois, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 30, 2020, at Los Angeles, California.


*s/ Kara M. Wolke*
Kara M. Wolke