## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PHILIP FRYMAN, *et al.*,

        Plaintiffs,

v.

ATLAS FINANCIAL HOLDINGS, INC.,
SCOTT D. WOLLNEY, and PAUL A.
ROMANO,

        Defendants.

No. 18-cv-01640
Judge Franklin U. Valderrama

## MEMORANDUM OPINION AND ORDER

Philip Fryman and Aram Hovasapyan (collectively, Plaintiffs) bring this securities fraud class action against Atlas Financial Holdings, Inc. (Atlas), Scott D. Wollney (Wollney), and Paul A. Romano (Romano) (collectively, Defendants) on behalf of persons and entities that purchased or acquired Atlas securities between February 22, 2017 and April 30, 2019. R. 97, Fourth Amended Complaint (FAC).[1] Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act) and Rule 10b–5 promulgated thereunder (Count I) and that Wollney and Romano violated Section 20(a) of the Exchange Act (Count II). *Id.* Before the Court is Defendants' motion to dismiss the FAC. R. 99, Mot. Dismiss.

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

For the reasons that follow, Defendants' motion to dismiss is granted in part and denied in part.[2]

**Background**[3]

### I. The Parties

Plaintiffs are purchasers of Atlas securities between February 22, 2017 and April 30, 2019 (the Class Period). FAC ¶¶ 44, 45.

Atlas is a financial services holding company, whose core business is the underwriting of commercial automobile insurance policies for the light commercial automobile sector, which includes taxi cabs, non-emergency paratransit, limousine, livery, and business automobiles. FAC ¶ 50. Atlas holds itself out as a specialty insurance company that has "extensive experience and expertise with respect to underwriting and claims management . . . ." *Id.* ¶ 51 (internal quotation marks and citation omitted). Atlas' business is conducted through insurance subsidiaries, which during the relevant period consisted of: (1) American Country Insurance Company (American Country); (2) American Service Insurance Company, Inc. (American Service); (3) Gateway Insurance Company (Gateway); and (4) Global Liberty Insurance Company of New York (Global Liberty). *Id.* ¶ 2.

---

[2] This Opinion addresses numerous issues raised in no fewer than eight briefs, three of which were oversized. Consequently, the span of issues covered, as well as the complexity of the case, merits a comprehensive opinion.

[3] The Court accepts as true all of the well-pleaded facts in the FAC and draws all reasonable inferences in favor of Plaintiffs. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."); *see also Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

Wollney was Atlas' Chief Executive Officer and Romano its Chief Financial Officer at all relevant times. FAC ¶¶ 47, 48.

## II. Loss Reserves

Atlas, like other insurance companies, establishes loss reserves to ensure that Atlas has sufficient liquid capital to pay claims that are submitted from its insured customers. FAC ¶ 63. Loss reserves are a measure of financial health for an insurance company, as the reserves represent expected future losses that an insurance company will be required to pay out for claims on the insurance policies the company has issued and underwritten. *Id.* In fact, reserves serve as an integral financial metric because every dollar added to loss reserves comes at the expense of net income; an insurance company's value is largely assessed by the amount of capital it holds in excess of reserves, known as capital surplus. *Id.* ¶¶ 65–67.

Insurance companies are required to hold reserves sufficient to cover losses owing to both: (1) known claims on insurance policies that they have provided to customers (case reserves); and (2) presently unknown claims on those policies, which are incurred but not reported losses (IBNR). FAC ¶ 6.

## III. Atlas' 2017 Reserve Increase

On February 22, 2017, Atlas issued a press release announcing a substantial increase in its loss reserves (later revealed to be in the amount of $32.6 million, resulting in a 2016 net income of only $2.646 million). FAC ¶¶ 10, 91. In the press release, Defendants gave a primary and secondary reason for the increase in reserves. *Id.* ¶ 91. The primary reason provided was that there was an unanticipated increase of claims in the light commercial auto industry within the Michigan market. *Id.* The

secondary reason for the reserve increase, according to Defendants, was the pre-acquisition claims of Global Liberty, which Atlas acquired during a March 2015 transaction. *Id.* ¶¶ 56, 91.

Defendants, however, made reassuring comments regarding the 2017 reserve increase in the press release, including Wollney's comments:

> [o]ur team is confident that we have addressed the issues at the heart of this problem, have taken appropriate steps, and will learn from it . . . . We have isolated any remaining exposure with a clear plan in place for remaining claims . . . . While the impact of our reserve strengthening is significant, we believe it is isolated and that our overall book of business is sound, as will be demonstrated going forward.

FAC ¶ 91. Defendants further represented that "the Company believes that this reserve strengthening for past periods coupled with the use of advanced risk modeling has Atlas positioned correctly in 2017." *Id.*

During a public conference call on March 14, 2017 with investors and analysts, Defendants offered further reassurances about the isolated nature of the reserve increase, including Wollney's statement that, "[w]e feel very strongly that we've isolated the issue and that we were open with investors as to both the cause and the short-term impact it had on our operating results." FAC ¶ 92. Wollney likewise reassured investors that "the reserve charges that Atlas took surrounding our Michigan book of business is something that we believe has been isolated." *Id.* ¶ 95.

## IV.    Missouri Regulatory Action

On May 11, 2017, the Missouri Department of Insurance issued a report and order following its examination of Gateway, one of Atlas' subsidiaries. FAC ¶ 96. The Missouri Regulatory Order (the Missouri Report) documented violations relating to

the under-reserving of Gateway, American Country, and American Service during the January 1, 2012 through December 31, 2015 timeframe. *Id.*; FAC Exh. A. The Missouri Report provided, in important part: "[Gateway] should ensure that Loss and Loss Adjustment Expense Reserves are sufficient and adequately supported. This resulted partly because [Gateway] established reserves below what its own appointed actuary had recommended. The reserves recommended by the appointed actuary were found to be deficient as well and were not adequately supported." *Id.*

The Missouri Report found that Gateway's overall reserves were deficient by approximately $6 million and that the reserve deficiency attributable to Atlas was $30.1 million. FAC ¶ 97. Finally, the Missouri Report ordered the reserve deficiencies to be rectified, ordered rectification of Gateway's reserve methodology, and stated "management's current reserve memo does not address IBNR, and thus does not fulfill the requirements of Statement of Statutory Accounting Principle 55 (SSAP)." *Id.* ¶ 98.

The Missouri Report found significant reserve deficiencies despite the fact that "[Gateway] strengthened reserves during 2016 due, largely to continued development on existing claims." FAC ¶ 98. According to the Missouri Report, "[c]hanges to the reserving process implemented by [Gateway] during the year had not achieved the results anticipated by [Gateway]." *Id.*

**V.     Individual Defendants' Sale of Atlas' Stock**

Between November 8, 2017 and December 21, 2017, Wollney made a series of stock sales, in which he sold 36,668 shares of Atlas stock, and realized $721,880.00. FAC ¶ 214. Prior to this series of sales, Wollney had never sold Atlas stock. *Id.* During

5

the same timeframe, Romano executed a similar series of stock sales, in which he sold 26,668 out of his 102,154 shares of Atlas stock (over 26% of his holdings) and realized $525,675.00. *Id.* ¶ 215. Romano, like Wollney, had not sold any Atlas stock before this series of sales. *Id.*

## VI. Atlas' 2018 Reserve Increase

On March 1, 2018, after the market closed, Atlas issued a press release announcing that the company expected to report a net loss of approximately $3.20 per share for fiscal year 2017. FAC ¶¶ 19, 101. The press release additionally announced that Atlas increased its reserve by $75.4 million for claims relating to accident years prior to 2016. *Id.* ¶ 102. By the next day, Atlas' stock price fell $7.70 per share, over 40%, to near $11.10 per share. *Id.* ¶ 103. Defendants continued to reassure investors that Atlas' reserve increase was based on isolated issues that would soon be resolved, and that Atlas' business model was viable. *Id.* ¶ 110. On March 16, 2018, Atlas disclosed that it was unable to timely file its 2017 Form 10-K, stating that it needed "additional time for the registrant and its auditor . . . to complete the year-end process." *Id.* ¶ 111.

## VII. New York Regulatory Action

On March 29, 2018, the New York Department of Financial Services released its report (the New York Report) on its examination of Global Liberty, another Atlas subsidiary, concluding that Global Liberty's inadequate reserves were not in regulatory compliance during the timeframe of January 1, 2013 through December 31, 2016. FAC ¶ 112; FAC Exh. B. The New York Report stated, in addition, that Global Liberty's reserves failed to comply with SSAP 55 (which governs accounting

for unpaid claims, losses, and loss adjustment expenses), were deficient by $10.885 million, and that Global Liberty had recognized $9.674 million of that deficiency in its 2017 annual statement (leaving a reserve deficiency of $1.2 million). FAC ¶¶ 73, 112; FAC Exh. B. The New York Report recommended "that [Global Liberty] address the ongoing reserve inadequacies and increase its carried reserves to an appropriate level . . . . Further, it is recommended that [Global Liberty's] future actuarial report underlying the statement of actuarial opinion provides sufficient details of documentation and footnotes to clearly explain the calculations so that an independent reviewer can evaluate the work." *Id.* ¶ 112.

## VIII. June 15, 2018 A.M. Best Downgrade

On June 15, 2018, A.M. Best, an insurance rating company, announced that it was downgrading the credit rating of Atlas and Atlas' subsidiaries. FAC ¶ 28. According to A.M. Best, the downgrade resulted from, among other things, the balance sheet strength of certain subsidiaries being "very weak," as well as the "significant reserve strengthening charge taken in the fourth quarter of 2017," which "caused operating losses." *Id.*

## IX. Atlas' 2019 Reserve Increase

On March 4, 2019, Defendants announced a third increase to reserves. FAC ¶ 125. Defendant Wollney stated:

> Actuarial work conducted in connection with year-end indicated a need to increase reserve estimates for unpaid losses due primarily to bodily injury claims from accident years 2016 and prior. These claims are showing higher severity and have been open for longer periods than we had estimated. . . . While our use of predictive analytics in underwriting and claims is having a positive impact on claim closures, we are still addressing historic challenges . . . . However, we believe that claim closure data for more recent

accident years demonstrates the fundamental efficacy of our predictive model-driven processes.

*Id.* By the next day, Atlas' stock price fell to $2.66. *Id.* ¶ 129. On March 18, 2019, Defendants filed a notice of late filing Form 12b-25, disclosing that Atlas was unable to timely file its 2018 Form 10-K: "The registrant requires additional time for the registrant and its auditor to complete the year-end audit process. Accordingly, the registrant is unable to file such report within the prescribed time period without unreasonable effort or expense." *Id.* ¶ 130. On April 9, 2019, Defendants disclosed receipt of a NASDAQ delinquency notice for Atlas' failure to timely file its 2018 Form 10-K. *Id.* ¶ 132.

## X. Defendants' Dismissal of Atlas' Independent Public Accountant

On April 30, 2019, Defendants filed a Form 8-K, disclosing that Atlas had dismissed its independent public accountant, RSM US, LLP (RSM) on April 29, 2019. FAC ¶ 133. In the 8-K, Defendants explained "on April 26, 2019, RSM informed the Corporation in writing that, based on its audit work to such date, it had concluded that the December 31, 2018 insurance reserves in certain of the Corporation's insurance subsidiaries were understated, and that such understatement constituted a material misstatement of the Corporation's financial condition as reflected in the statutory financial statements of such insurance subsidiaries for the fiscal year ended December 31, 2018." *Id.* Following this disclosure, on May 1, 2019, Atlas' stock price fell to $0.99. *Id.* ¶ 135.

8

## XI. Illinois Rehabilitation Order

On July 10, 2019, Defendants disclosed that the Circuit Court of Cook County entered an Agreed Order of Rehabilitation (the Illinois Rehabilitation Order) with respect to American Country and American Service, pursuant to a complaint filed by the Director of the Illinois Department of Insurance. FAC ¶ 136; FAC Exh. C. The Illinois Rehabilitation Order stated that the directors of American Country and American Service consented to rehabilitation and agreed to cede control of business operations to the Director of the Illinois Department of Insurance. FAC ¶ 138; FAC Exh. C. Gateway was subsequently redomesticated in Illinois and placed into rehabilitation. *Id.*

## XII. Late Filing of 2018-Form 10-K

On February 12, 2020, after being delisted from NASDAQ in December 2019, Atlas filed its 2018 Form 10-K, announcing another reserve increase, this time in the amount of $82.7 million. FAC ¶¶ 145–46. Atlas' 10-K results for 2018 were materially different from the results in Atlas' March 4, 2019 8-K for fiscal year 2018. *Id.* ¶ 147. Atlas' claims liabilities on its balance sheet, for example, were increased by $43.43 million: Atlas' net claims incurred, according to the March 4, 2019 Form 8-K, were $177.2 million, whereas the February 12, 2020 10-K reported a net claims amount of $220.66 million. *Id.* The late-filed 2018 10-K also reported a loss figure that was nearly double the amount disclosed in the March 4, 2019 8-K. *Id.*

## XIII. Procedural History

Plaintiffs initiated this action on March 5, 2018. R. 1. Plaintiffs have amended their complaint three times. R. 35, 48, 61. On May 26, 2020, Judge Rowland dismissed

the Third Amended Complaint without prejudice. R. 92.[4] Plaintiffs subsequently filed the FAC. R. 97. The FAC alleges violations of Section 10(b) of the Exchange Act against all Defendants and violations of Section 20(a) of the Exchange Act against Wollney and Romano. FAC. Defendants then moved to dismiss the FAC. Mot. Dismiss.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

Fraud allegations are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake,"

---

[4]The Court refers to Judge Rowland's opinion by its published citation, *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020), for the remainder of this Opinion.

while "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Seventh Circuit has interpreted this rule to mean that a fraud complaint must include "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

A plaintiff alleging securities fraud must additionally satisfy the requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4. Thus, a securities action plaintiff must "specify each statement alleged to have been misleading, the reasons why the statement is misleading, and, if an allegation regarding a statement or omission is made on information and belief, it must state with particularity all facts on which that belief is formed." *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 707 F. Supp. 2d 774, 781 (N.D. Ill. 2010) (citing 15 U.S.C. § 78u–4(b)(1)). "The PSLRA raise[d] the pleading standard for securities fraud claims beyond the requirements of even Rule 9(b)." *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *3 (N.D. Ill. Aug. 11, 2021) (internal quotation marks omitted). With respect to a defendant's scienter, "*i.e.*, the defendant's intention to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (internal citation omitted), the PSLRA requires a securities fraud plaintiff to "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

## Analysis

### I. Defendants' Requests for Judicial Notice [101, 106]

Before turning to Defendants' motion to dismiss, the Court briefly addresses Defendants' requests for judicial notice, which were filed concurrently with Defendants' motion to dismiss, R. 101, and Defendants' reply in support of their motion to dismiss, R. 106.[5]

Generally, a court may not consider extrinsic evidence when reviewing a motion to dismiss without converting it to a motion for summary judgment. *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020) (citing *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018)). However, a court "may consider documents attached to a defendant's motion to dismiss, where those documents are 'referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 773 (N.D. Ill. 2011) (quoting *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

#### A. Exhibit HH

Concurrently with the filing of their motion to dismiss, Defendants requested that the Court take judicial notice of Exhibit HH, which Defendants describe as "a true and correct copy of a Form 8-K in the form in which was filed by AFH with the

---

[5]Judge Rowland took judicial notice of twenty-four exhibits submitted in support of Defendants' motion to dismiss the Third Amended Complaint. *Fryman*, 462 F. Supp. at 894–95. Defendants contend that those exhibits are offered again here, *see* R. 100, Memo. Dismiss at 3 n.1, and Plaintiffs do not respond to, or oppose, that notion. The Court therefore considers those exhibits as well.

SEC on June 18, 2018, which is quoted from and is incorporated by reference at paragraphs 29 and 117–18 of the complaint." R. 101, Op. Req. Judicial Not. ¶ 4. Plaintiffs do not contest the Court's consideration of Exhibit HH, and judicial notice of the exhibit is proper because the 2018 Form 8-K is referred to in the FAC and central to Plaintiffs' claim that Atlas' financial statements were materially misleading. *See Facebook*, 819 F. Supp. 2d at 773. So, the Court takes judicial notice of Exhibit HH.

### B. Exhibits II and JJ

Along with their reply in support of dismissal, Defendants filed a request for the Court to take judicial notice of Exhibits II and JJ. R. 106, Reply Req. Judicial Not. Exhibits II and JJ are website printouts from the New York Department of Financial Services and the Missouri Department of Insurance. *Id.* ¶¶ 4, 5.[6] Plaintiffs oppose the Court's consideration of Exhibits II and JJ, as well as Defendants' correlating arguments in support of dismissal that rely on those exhibits. R. 107, Mot. Strike at 1.[7] Plaintiffs argue that the Court should strike the exhibits and corresponding

---

[6]Defendants describe Exhibit II as "a true and correct printout of a web page from the website of the New York Department of Financial Services, which contains links to the examination reports of property insurance companies issued by the Department . . . which is quoted from and incorporated by reference, including at paragraphs 24–27, 80, 112–14, and 248–50 of the complaint." Reply Req. Judicial Not. ¶ 4. Defendants similarly describe Exhibit JJ as a printout of a web page from the Missouri Department of Insurance's website, which contains links to an examination report, which is quoted from and incorporated by reference in the FAC. *Id.* ¶ 5.

[7]The Court construed Plaintiffs' motion to strike extraneous materials submitted in support of defendants' motion to dismiss, R. 107, as a sur-response to Defendants' motion to dismiss, thereby denying Plaintiffs' motion as moot. R. 108, 116. The Court nevertheless considers Plaintiffs' arguments in the motion to strike in connection with Defendants' request for judicial notice.

arguments because they were raised for the first time on reply, and because the exhibits are not the proper subject of judicial notice. *Id.* The Court considers Plaintiffs' waiver and judicial notice arguments in turn.

### 1. Waiver

Plaintiffs posit that Defendants could have submitted Exhibits II and JJ with their opening motion to dismiss, and that because they did not, Plaintiffs were denied the opportunity to respond to them. Mot. Strike at 3.

"[I]t is well-settled that arguments first made in the reply brief are waived." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 629–30 (7th Cir. 2007) (citing *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441 (7th Cir. 1992)). "The reason for this rule of waiver is that a reply brief containing new theories deprives the respondent of an opportunity to brief those new issues." *Satkar Hosp. Inc. v. Cook Cty. Bd. of Review*, 819 F. Supp. 2d 727, 739 (N.D. Ill. 2011) (quoting *Wright v. United States*, 139 F.3d 551, 552 (7th Cir. 1998)). Courts in this Circuit have accordingly stricken arguments made for the first time on reply. *See, e.g.*, *UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.*, 289 F. Supp. 3d 852, 863 (N.D. Ill. 2018).

Here, the Court finds that, although the exhibits themselves were presented to the Court for the first time on reply, Defendants' correlating argument—that the Missouri and New York regulatory reports were publicly available—was made in Defendants' opening brief. *See* R. 100, Memo. Dismiss at 26–27. As a result, Plaintiffs had the opportunity to—and did in fact—respond to Defendants' argument that the regulatory reports were publicly available. *See* R. 104, Resp. Dismiss at 24–25. As

Defendants contend, they did not waive arguments made in their opening dismissal motion by filing the supporting exhibits on reply. *See* R. 109, Resp. Strike at 3. Plaintiffs, moreover, have offered no authority for the proposition that the Court must strike exhibits (as opposed to arguments) offered for the first time on reply. The Court resultingly declines to strike Exhibits II and JJ on the basis of waiver.

### 2. Propriety of Judicial Notice

Plaintiffs next argue that judicial notice is not proper for Exhibits II and JJ. Mot. Strike at 4.

Under Rule 201(b) of the Federal Rules of Evidence, a court can take judicial notice of an adjudicative fact "not subject to reasonable dispute" because it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The Seventh Circuit has held that a court not only can, but "shall" take judicial notice of information on official government websites that is not subject to reasonable dispute. *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (collecting cases).

Here, Exhibits II and JJ are website printouts listing links showing that the Missouri and New York regulatory reports referenced in the FAC were available on the governments' websites. Because Exhibits II and JJ are printouts of government websites, the Court can take judicial notice of them. *See Denius*, 330 F.3d at 926 (holding district court abused its discretion in withdrawing judicial notice of information from National Personnel Records Center's official website); *Outley v. City*

*of Chicago*, 407 F. Supp. 3d 752, 767 (N.D. Ill. 2019); *Ambrosetti v. Oregon Cath. Press*, 458 F. Supp. 3d 1013, 1017 (N.D. Ind. 2020) (collecting cases).

Plaintiffs do not deny that the printouts are from government websites, and Plaintiffs likewise do not address whether courts can take judicial notice of such public documents. Instead, Plaintiffs posit that the Court should not rely on the truth of facts asserted within judicially noticed documents to resolve factual disputes at the pleadings stage. Mot. Strike at 4 (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1084 (7th Cir. 1997)). In *Lease Resolution*, a district court took judicial notice of a private settlement document and relied on facts asserted within that document to dismiss a count of the plaintiff's complaint. 128 F.3d at 1084. The Seventh Circuit held that the district court erred in "relying on a private settlement document for the truth of the facts asserted therein without previously establishing why it is a source 'whose accuracy cannot reasonably be questioned.'" *Id.* (citing Fed. R. Evid. 201(b)(2)). Here, the government website printouts are not private documents, and as Defendants aver, *see* Resp. Strike at 4, the veracity of the information on the government website printouts is not subject to reasonable dispute. There is, moreover, nothing in the record to indicate that the accuracy of Exhibits II and JJ can be reasonably questioned. As a result, pursuant to Federal Rule of Evidence 201 and case law in this Circuit indicating that a court can take judicial notice of public record information obtained from an official government website, *see, e.g.*, *Ambrosetti*, 458 F. Supp. 3d at 1017, the Court takes judicial notice of Exhibits II and JJ.

Notwithstanding this determination, as discussed further below, the Court does not rely on the truth asserted in either of the exhibits to resolve factual disputes in this case, nor does the Court rely on either exhibit in coming to its ruling on Defendants' motion.

## II. Defendants' Motion to Dismiss [99]

Defendants move to dismiss the FAC in its entirety on two grounds. First, Defendants argue that Plaintiffs have not sufficiently pled at least three elements of Section 10(b) and Rule 10b–5 liability. Memo. Dismiss at 13. Second, Defendants contend that because Plaintiffs have not met the requirements for Section 10(b) and Rule 10b–5 liability, control person liability under Section 20(a) of the Exchange Act is not available to Plaintiffs *Id.* at 33.

One more preliminary matter warrants mention before delving into the substance of Plaintiffs' Rule 10b–5 allegations. On Defendants' previous motion to dismiss, Judge Rowland dismissed Plaintiffs' Third Amended Complaint without prejudice. *Fryman*, 462 F. Supp. 3d at 905. Judge Rowland's holding thus (at least indirectly) suggested it was possible that Plaintiffs could plead a set of facts that would state a securities fraud claim. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519-20 (7th Cir. 2015) (emphasis in original) ("Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend."). At the same time, Judge Rowland cautioned Plaintiffs that any amendment to the complaint would be subject to close scrutiny and ordered Plaintiffs to be

17

mindful of all of the issues addressed in her opinion when filing any further amendment to the complaint. *Id.* The case was subsequently transferred to this Court. R. 103. Upon close review of the FAC and the present motion to dismiss, although a close call, the Court finds that Plaintiffs have alleged enough to state a securities fraud claim.

### A. Section 10(b) and Rule 10b–5 Liability

Section 10(b) of the Securities Exchange Act of 1934 provides that it shall be unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5, which implements Section 10(b), makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5.

To state a securities fraud claim under Section 10(b) and Rule 10b–5, a private plaintiff must allege that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of

18

securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (citation omitted).

Defendants urge the Court to dismiss the 10b–5 count, arguing that Plaintiffs do not satisfy "at least the first, third, and sixth of these requirements." Memo. Dismiss at 13. The Court addresses the first, third, and sixth 10b–5 requirements, beginning with the requirement that "the defendant made a false statement or omission." *Tricontinental*, 475 F.3d at 842.

### 1. False Statement or Omission

Under the PSLRA's heightened pleading standard, a private securities plaintiff alleging that a defendant made a false or misleading statement or omission must specify each statement or omission alleged to have been misleading and the reason or reasons why the statement or omission is misleading. *Tellabs*,, 551 U.S. at 321 (2007). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet the standard set by the PSLRA." *Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1173 (N.D. Ill. 2019) (internal quotation marks and citations omitted).

Defendants assert that all of the public statements challenged in the FAC are statements of opinion or belief rather than fact, meaning that the Court should apply the framework set forth by the Supreme Court in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Memo. Dismiss at 14. Plaintiffs disagree on two bases. First, Plaintiffs dispute that *Omnicare* applies to

19

Plaintiffs' 10b–5 allegations, when *Omnicare* "examined disclosure obligations under § 11 of the Securities Act . . . ." Resp. Dismiss at 14. Second, Plaintiffs contend that, even if *Omnicare* applies to Plaintiffs' 10b–5 allegations, Defendants' statements about reserves are still actionable under *Omnicare. Id.*

In *Omnicare*, the Supreme Court held that for purposes of Section 11 of the Securities Act of 1933, a sincere statement of pure opinion is not an untrue statement of material fact, simply because the stated opinion proves to be incorrect. 575 U.S. at 186. In reaching that holding, the Court first discussed when an opinion itself constitutes a factual misstatement. 575 U.S. at 182. The Court stated that an opinion is "a belief, a view, or a sentiment which the mind forms of persons or things," whereas "[a] fact is a thing done or existing or an actual happening." *Id.* at 183 (internal quotation marks and citations omitted). In support, the Supreme Court reasoned that, most importantly, "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id.* (citation omitted). The Court found that because a statement of opinion admits the possibility of error, such a statement does not become an actionable "untrue statement of material fact" just because the opinion turns out to be erroneous. *Id.* at 184. That said, the Supreme Court found that an opinion could still become actionable under Section 11 in one of two ways: (1) if the speaker did not hold the belief professed; or (2) if the opinion statement contained supporting facts which were untrue. *Id.* at 185. The Court next addressed "when an opinion may be rendered misleading by the omission of discrete factual representations." *Id.* at 182. The Court

held that "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11's omissions clause creates liability." *Id.* at 189.

Plaintiffs are correct that the Seventh Circuit has not addressed whether the *Omnicare* framework applies to claims under Section 10(b). *See* Resp. Dismiss at 14. Apparently, the Seventh Circuit has not addressed the *Omnicare* decision at all. *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 648 (N.D. Ill. 2020). Be that as it may, other Courts of Appeals have applied the *Omnicare* holdings to Rule 10b–5 claims, *see City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 610 (9th Cir. 2017); *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 n.7 (11th Cir. 2019), as have district courts in this Circuit. *See W. Palm Beach*, 495 F. Supp. at 648; *Fryman*, 462 F. Supp. 3d at 896; *Hedick*, 2021 WL 3566602, at *9.

Plaintiffs offer no explanation as to why the Court should not apply *Omnicare* to their 10b–5 claim, nor do they cite any authority calling for a different result. *See* Resp. Dismiss at 14. The Court consequently finds that *Omnicare* applies to any opinion statements alleged in the FAC.

As discussed further below, Plaintiffs aver that they have sufficiently pled that at least four categories of Defendants' statements were materially misleading: (1) Atlas' Class Period financial results; (2) Defendants' statements about the cause

of reserve increases and related assurances of reserve adequacy; (3) Defendants'
internal control statements; and (4) Atlas' "cautionary statements."[8] Resp. Dismiss
at 11–19.

### a. Atlas' Class Period Financial Results

Plaintiffs allege that Atlas' financials, including net income, reserves, and
surplus, were materially misleading because of Atlas' materially understated
reserves. Resp. Dismiss at 11. In support, Plaintiffs point to various allegations in
the FAC regarding Atlas' financial reporting during the Class Period. *Id.* at 11 n.9.
For instance, Plaintiffs direct the Court to the following allegations in the FAC
concerning Atlas' reporting of Fiscal Year 2016:

> On March 13, 2017, [Atlas] filed its annual report on Form 10-K for the period
> ending on December 31, 2016. [Atlas] reported net income of $2,646,000.
> [Atlas] further noted combined statutory capital and surplus of its insurance
> subsidiaries was $113.9 million. [Atlas] further stated: "During the year ended
> December 31, 2016, case reserves increased by 5.4% compared to December 31,
> 2015, while IBNR reserves increased by 12.0%. The increase in case reserves
> resulted from management's review of outstanding unpaid personal injury
> protection claims, particularly in the state of Michigan." The foregoing
> statements about [Atlas'] financial results and reserve levels were materially
> misleading because even the material reserve strengthening announced for FY
> 2016 was materially understated and insufficient, thus overstating net income.
> As reflected in the Missouri Regulatory Order, [Atlas'] reserves were
> understated by approximately $30.1 million, which deficiency was not made
> up in the FY 2016 reserve increase, and Defendants set [Atlas'] reserve levels
> below the level its actuary recommended, which itself was insufficient.

FAC ¶¶ 158–59; *see also id.* ¶¶ 166–67 (Q1 2017 results); *id.* ¶¶ 171–72 (Q2 2017
results); *id.* ¶¶ 177–78 (Q3 2017 results); *id.* ¶¶179, 187–88 (4Q and FY 2017 results);

---

[8]The Court addresses Plaintiffs' fourth category of statements ("cautionary statements")
together with their second (Defendants' cause of reserve increases statements and related
assurances).

*id.* ¶¶ 193–94 (Q1 2018 results); *id.* ¶¶ 195–96 (Q2 2018 results); *id.* ¶¶199–200 (Q3 2018 result); *id.* ¶¶ 204–205 (4Q and FY 2018 results). Put simply, Plaintiffs allege that the financial results reported in the Class Period, themselves were materially misleading because Atlas' reserves were materially understated, which caused the reported net income to be overstated.

"Whether a statement is 'misleading' depends on the perspective of a reasonable investor . . . ." *Omnicare*, 575 U.S. at 186–87 (citation omitted). In assessing whether a statement[9] was misleading, a court must "consider the context in which the statement was made and determine whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 474 (N.D. Ill. 2021) (internal quotation marks and citation omitted). Even statements that are "literally true can still be actionable under § 10(b) as misleading if they are susceptible to another interpretation by a reasonable investor." *Id.* (internal quotation marks and citation omitted).

Courts in this Circuit have found plaintiffs to successfully plead materially misleading financial statements in similar circumstances. In *Akorn*, Rule 10b–5 plaintiffs stated a claim for securities fraud by alleging that a pharmaceutical

---

[9]The parties provide no guidance on whether the reported financial results constitute statements of fact or statements of opinion subject to the *Omnicare* framework. The Court views the financial results identified by Plaintiffs—net income, reserves, and surplus—to fall into the former category. While insurance reserves are, by their nature, conjectural, *see Stephens v. Nat'l Distillers & Chem. Corp.*, 6 F.3d 63, 65 (2d Cir. 1993), *certified question answered*, 912 S.W.2d 30 (Ky. 1995), *as modified on denial of reh'g* (Jan. 18, 1996), the reporting of those reserves in a 10-K is nevertheless a statement of present fact about what the company has reserved at that time.

corporation, its CEO, and CFO had overstated the company's financial results by "non-trivial margins: revenue by 8.4% and net income by 194.7%." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017). Likewise, in *First Merchants*, the court found that the plaintiffs sufficiently alleged the "what," "why," and "how" of their securities fraud case by pleading that "the financial statements . . . misrepresented [the company's] true earnings by understating the allowance for loan losses and by failing to follow published procedures for repossession of collateral and to make appropriate adjustments to the allowance for credit losses." *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *3 (N.D. Ill. Nov. 4, 1998). The plaintiffs in *First Merchants* further alleged that the company's true earnings and net worth were misstated in the financial statements, and that the financial statements violated GAAP and Generally Accepted Auditing Standards (GAAP). *Id.* And in *Whitehall*, the plaintiffs sufficiently stated a securities fraud claim by alleging that "[a]s a result of [the company's] failure to properly record vendor allowances . . . [the company] understated its expenses, overstated its income and overstated its inventory during the Class Period." *Greater PA Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, 2005 WL 61480, at *6 (N.D. Ill. Jan. 10, 2005).

So too here, Plaintiffs have stated a claim that Atlas' financial statements were materially misleading. Plaintiffs have pled that Atlas—like the defendants in *Akorn*—overstated its financial results by "non-trivial margins[.]" 240 F. Supp. 3d at 815. For example, when Atlas belatedly filed its 2018 10-K, it materially revised the 2018 results reported on March 4, 2019, indicating that Atlas' actual net loss was

24

more than double what had originally been reported, that the combined capital surplus was 77% less than what had originally been reported, and that the net claims liabilities was 26% higher than what had originally been reported. FAC ¶¶ 146–47. Plaintiffs have further identified the purported misstatements in the financials—net income, reserves, and surplus—and have alleged "the reasons why the" reported financial results are misleading. *Plumbers*, 707 F. Supp. 2d at 781. That is, the FAC alleges: "The [ ] statements about [Atlas'] financial results and reserve levels were materially misleading because even the material reserve strengthening announced for FY 2016 was materially understated and insufficient, thus overstating net income." FAC ¶ 159. The Court thus finds that Plaintiffs have adequately pled that Atlas' reported financial results of reserves, net income, and surplus during the Class Period were materially misleading.

Defendants insist that Plaintiffs "do not even attempt to allege that defendants disbelieved the sufficiency of Company reserves when those reserves were announced," and that Plaintiffs do not "identify a single fact known to defendants during the putative class period that would call into question—much less contradict—defendants' belief that reserves were adequate." Reply at 6.[10] The FAC shows otherwise, namely, Plaintiffs' allegations that Defendants had contemporaneous

---

[10]Defendants cite to *Fulton Cty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012) in support of their repeated, "fraud-by-hindsight" arguments, in which Defendants contend that Plaintiffs ask the Court to make the impermissible inference that, because it became clear later on that larger reserves were required, Defendants must have known that Atlas' reserves were inadequate all along. *See* Memo. Dismiss at 14. But *Fulton Cty.* is inapposite because there are no allegations in the FAC, nor has the Court taken judicial notice of any facts, indicating that a subprime credit crisis caused the reserve problems at issue in this case.

knowledge of materially adverse information about Atlas' reserve process, which Atlas purportedly concealed from the market. For instance, Plaintiffs allege that in May 2017, as a result of the Missouri Order, Defendants knew that their reserves were materially understated, and that their reserve practices violated SSAP 55. FAC ¶¶ 11–14. As such, Plaintiffs have indeed adequately alleged that Defendants did not believe their reserves were adequate (or that their net income was accurate) on March 13, 2017, when Atlas filed its 10-K for the period ending December 31, 2016. *Id.* ¶ 158.

In the same way, Plaintiffs have alleged that Defendants did not believe the financial results announced on May 7, 2018 in Atlas' first quarter 2018 10-Q (reporting net income of $5.5 million, surplus of $91 million, and reserves of $204.7 million) because the reserves were materially understated, thus overstating net income. *See* FAC ¶¶ 193–94. As the FAC explains, those financial results and reserve levels were misleading because the May 2017 Missouri Order revealed that Atlas' reserves were understated by approximately $30.1 million (a deficiency not made up in the Fiscal Year 2016 reserve increase), and the March 2018 New York Order showed that Atlas "remained under-reserved by at least an additional $1.2 million with respect to Global Liberty." *Id.* ¶ 194. So, contrary to Defendants' position, Plaintiffs have pled that Defendants had contemporaneous knowledge which showed their financial statements to be materially misleading.

In addition, the Court finds that Plaintiffs' allegations of accounting principle violations support Plaintiffs' contention that the financial results are materially misleading. Throughout the FAC, Plaintiffs allege that Atlas' reserve practices

violated SSAP and GAAP. *See, e.g.*, FAC ¶ 81 ("[D]uring the Class Period, Defendants violated GAAP disclosure requirements regarding their basis for methodology and calculating Atlas's loss reserves" by "conceal[ing] major risks and uncertainties presented by their ongoing under-reserving practices, as identified by the Missouri Regulatory Order and the New York Regulatory Report."); *id.* ¶ 246 ("The Missouri Regulatory Order stat[ed] that 'management's current reserve memo does not address IBNR, and thus does not fulfill the requirements of [SSAP] 55.'").

There is a presumption in the case law that financial statements violative of GAAP are misleading: "[f]inancial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate." *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 975 (N.D. Ill. 2006) (citing 17 C.F.R. § 210.4–01(a)(1); *Baron v. Smith*, 380 F.3d 49, 55 (1st Cir. 2004)); *see also S.E.C. v. Sys. Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001) ("A financial statement that recognizes revenue and does not conform to the requirements of GAAP is presumptively a false or misleading statement of material fact under Rule 10b–5."); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 981 (W.D. Wis. 2003) (quoting 17 C.F.R. § 210.4–01(a)(1)) ("Under the regulations of the Securities and Exchange Commission, filings that do not comply with GAAP 'will be presumed to be misleading and inaccurate.'").

*Takara* presents an example of GAAP violation allegations supporting a 10b–5 claim. There, the plaintiffs alleged that the defendants manipulated their financial statements "through improper accounting and recording of accruals, contingent gains

and adjustments in order to make [the company's] earnings appear larger than they actually were." *Takara*, 429 F. Supp. 2d at 974. The plaintiffs claimed that those accounting practices violated SEC rules and GAAP. *Id.* at 975. The court in *Takara*, observing that financial statements filed with the SEC not prepared in compliance with GAAP are presumed to be misleading and inaccurate, concluded that "[g]iven the[] specific allegations of GAAP violations and manipulation of accruals, allowances, contingent gains and adjustments, Plaintiffs have adequately alleged that Defendants' various accounting methods during the Class Period were false or misleading." *Id.* (citations omitted).

The FAC pleads with particularity GAAP and SSAP violations, and the plausibility of those allegations are buttressed by, among other things, the Missouri Report and New York Report. The Court therefore finds that, as in *Takara*, the FAC's allegations regarding GAAP and SSAP violations support Plaintiffs' contention that the reported financial results were materially misleading.

Defendants oppose Plaintiffs' GAAP allegations by highlighting Atlas' public disclosures detailing its methods for estimating loss reserves. Memo. Dismiss at 10–11; Reply at 10. But the fact that Atlas included general language in its 10-Ks about establishing reserves based on "actuarial and statistical projections" that compare "the difference between the reported claims and the estimate of the ultimate paid claims," does not mean that Atlas fulfilled its GAAP obligation to disclose any major risks and uncertainties concerning those estimates. Resp. Dismiss at 22 (citing RJN Exh. D (2016 10-K) at 96; *id.* Exh. W (2017 10-K) at 101); *see* FAC ¶ 78 (citing ASC

944-40-50-4F; ASC 944-40-50-4I). Plaintiffs specifically allege that "Defendants concealed the major risks and uncertainties presented by their ongoing under-reserving practices, as identified by the Missouri Regulatory Order and the New York Regulatory Report." FAC ¶ 81; *see also id.* ¶ 100 ("By concealing the basis and methodology for their estimates of Atlas's loss reserves, including the material risks and uncertainties presented by the state regulators' findings, as required by GAAP, Defendants were able to artificially inflate Atlas's stock price during the Class Period.").

Nor does Atlas' generic 10-K language about reserves render the SSAP 55 violation alleged by Plaintiffs implausible. Plaintiffs allege that Atlas' reserve practice violated SSAP 55, which requires "[t]he liability for claim reserves and claim liabilities . . . [to] be based upon the estimated ultimate cost of settling the claims." FAC ¶ 73 (quoting SSAP 55 ¶ 10). Plaintiffs claim that Defendants violated SSAP 55 by materially under-reserving and failing to adequately account for IBNR. FAC ¶¶ 73, 79, 80. This SSAP violation allegation is supported by Plaintiffs' claims relating to the Missouri Order and the New York Order, and is not remedied by Atlas' boilerplate reserve methodology language.

Defendants' argument as to Plaintiffs' assertion that Atlas failed to disclose the manner in which its estimates of loss reserves diverged from those of actuaries, *see* Memo. Dismiss at 22, fares no better. Defendants attack Plaintiffs' allegation regarding the divergence issue as "unsupported," but this is not summary judgment. Plaintiffs do not have to prove their allegations yet; they just need to plead them

according to the standards of Fed. R. Civ. P. 9(b) and the PSLRA. Plaintiffs have done so because they have explained with particularity their theory of how Defendants violated the GAAP requirement "to disclose the manner in which [Atlas'] estimates of loss reserves diverged from those of internal and external actuaries. Indeed, the Missouri Regulatory Order specifically provided that on a combined basis, Gateway, American Country and American Services' loss reserves were $6 million below what Atlas's own appointed actuary had recommended, and $24 million below the level determined to be necessary. Yet, Defendants never disclosed this information, nor did they disclose the impact it had on their reserving, or their financial statements." FAC ¶ 192. After discovery, Defendants may be able to show that Plaintiffs' GAAP violation allegations are incorrect; but for now, Defendants have not convinced the Court that it should dismiss Plaintiffs' allegations regarding Atlas' reporting of financials during the Class Period.

### b. Defendants' Statements about the Causes of Reserve Increases and Related Assurances of Reserve Adequacy

Plaintiffs next identify Defendants' Class Period statements about the cause of reserve increases and assurances about reserve adequacy as misleading. Resp. Dismiss at 13.

The parties initially disagree about whether these Class Period statements are statements of opinion or fact. Plaintiffs contend that because Defendants' reserve explanations were purportedly based on then-existing facts, they are not subject to the *Omnicare* rubric for opinions. Resp. Dismiss at 14. Defendants counter that

because setting reserves requires anticipating future losses, statements about reserves are generally a matter of opinion or belief. Memo. Dismiss at 1.

Turning to the purportedly misleading reserve statements identified by Plaintiffs, *see* Resp. Dismiss at 14 (citing FAC ¶¶ 162, 173), the Court finds these statements to be opinion statements subject to *Omnicare*. For instance, Wollney's March 14, 2017 assurance that "[w]e feel very strongly that we've isolated the issue [to Michigan and pre-acquisition Global Liberty claims]," FAC ¶ 162, is couched in opinion language; a strong feeling is still a feeling and not a fact. Along those same lines, the Court reads Wollney's August 8, 2017 statement that the Michigan ASI pool reserves for year-end 2016 "appear to be holding up consistent with the expectations we had," *id.* ¶ 173, as Defendants' assessment on how the Michigan ASI pool reserves were faring with respect to the company's expectations. Consequently, the aforementioned March 14, 2017 statement and August 8, 2017 are opinion statements subject to *Omnicare*.

Defendants are correct that, pursuant to *Omnicare*, there is no liability for a sincere statement of opinion or belief that merely turns out to be wrong, *see* Memo. Dismiss at 14 (citation omitted). *Omnicare* nevertheless provides that an opinion statement can still be actionable as misleading in three ways: (1) the speaker did not hold the belief professed; (2) the opinion statement contained supporting facts which were untrue; or (3) the statement omits material facts about the company's inquiry into or knowledge regarding a statement of opinion when "those facts conflict with

what a reasonable investor would take from the statement itself[.]" 575 U.S. at 185, 189.

The FAC adequately alleges that, in light of Defendants' contemporaneous knowledge surrounding the reserve deficiencies and violation of accounting principles—as documented in the Missouri Report and the New York Report—Defendants did not actually believe that the reserve increases were caused by isolated incidents, such as the unanticipated increase of claims in the light commercial auto industry within the Michigan market or the pre-acquisition claims of Global Liberty, FAC ¶¶ 56, 91, nor that the reserve increases were adequate to remedy the material understatement identified by the state regulators, *see id.* ¶ 38. Thus, the opinion statements concerning the cause or adequacy of Atlas' reserves could still be misleading under *Omnicare* because the Defendants did not "hold the belief[s] [] professed[.]" 575 U.S. at 186.

Alternatively, Plaintiffs have sufficiently pled that Defendants' failure to disclose the significant problems identified by the regulatory bodies constituted a material omission, rendering the reserve statements misleading. The facts surrounding the Missouri and New York investigations (that Atlas was materially under-reserving in violation of SSAP 55 for failing to address IBNR), "conflict with what a reasonable investor would take from" Atlas' representations that the reserves were necessitated by isolated issues, and that the newly implemented reserves were adequate to address those issues. *Omnicare*, 575 U.S. at 189.

Defendants argue that Plaintiffs have not alleged contemporaneous facts contradicting Defendants' statements concerning reserve adequacy, for seven primary reasons. Reply at 6. First, Defendants cite numerous cases for the rather unremarkable proposition that it is not factually sufficient for Plaintiffs to allege that, because large reserves were required at the end of the class period, Atlas' reserves were inadequate all along. Memo. Dismiss at 16. Defendants are correct that even a massive increase to loan loss reserves does not, on its own, mean that the previous reserve levels were inadequate. *See, e.g.*, *United States v. Morris*, 80 F.3d 1151, 1165 (7th Cir. 1996) ("It is true . . . that the government cannot establish fraud in the offering circular merely by pointing to the bank's announcement a short time later that an additional $9.4 million in reserves would be required."); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 361 (S.D.N.Y. 2011) (internal quotation marks and citation omitted) ("[T]he fact of a 'massive increase' to loan loss reserves 'is not, in itself, an indicator that the previous reserve levels were inadequate.'"). However, Plaintiffs are not alleging here, and the Court is not concluding, that falsity is met due to the size of the reserve increases alone, so Defendants' argument falls short.

Second, Defendants argue that the FAC contradicts any plausible inference that Defendants knew Atlas' insurance reserves were understated because Wollney stated that the decision to increase reserves was based on year-end actuarial work and caught Defendants by surprise. Memo. Dismiss at 16. However, alongside Wollney's statements are Plaintiffs' allegations indicating that Defendants knew their reserves were understated, and that they were therefore not actually surprised

by the continual need for massive reserve increases. *See, e.g.*, FAC ¶¶ 9–27. Defendants are thus wrong that "[t]here are no allegations of contemporaneous facts that conflict with [Wollney's] statements." Memo. Dismiss at 17. *See also infra* Section II.A.2.d.

Third, Defendants maintain that "pre-class period regulatory findings do not conflict with statements concerning reserves in later years." Reply at 7; *see also* Memo. Dismiss at 18–19. However, the findings of the Missouri Report and New York Report were not limited to times before the Class Period. The March 2017 Missouri Report stated that the company's *current* reserve memo violated SSAP 55 because it failed to address IBNR. FAC ¶ 246. The New York Report correspondingly stated that Atlas' subsidiary's reserve inadequacies were *ongoing* as of March 2018 and recommended that the company increase its carried reserves to an appropriate level. *Id.* ¶ 24.[11] The Court accordingly finds that the Missouri Report and New York Report support Plaintiffs' allegations of falsity.

Fourth, Defendants assert that "an after-the-fact difference of opinion about actuarial estimates between the Company and its independent accounting firm is insufficient to call earlier statements into question." Reply at 8; *see also* Memo. Dismiss at 19–20. But the termination of RSM, as discussed further below, goes beyond a mere difference of professional opinion. *See infra* Section II.A.2.c. On June

---

[11]As discussed below in the Court's scienter discussion, the Court does not find Atlas' reserve increase of $32.6 million as of December 31, 2016 to mean that Atlas had cured the reserve issues identified in the Missouri Report. The Court disagrees with Defendants that Plaintiffs' allegations show that Atlas was just attempting to cure the insufficiencies identified in the regulatory reports. *See infra* Section II.A.2.a.

15, 2018, Defendants announced the firing of RSM after RSM concluded that Atlas' reserves were so understated the understatement constituted a material misstatement of Atlas' financial condition. FAC ¶ 119. That allegation supports the misleading nature of Defendants' statements because RSM's conclusion, along with the regulatory reports, provided clear red flags to Defendants that their reserves were materially understated, and instead of revising their reserves, Atlas terminated RSM.[12]

Fifth, Defendants argue that the Illinois Rehabilitation Order, entered into by two of Atlas' subsidiaries after the Class Period, does not support Plaintiffs' claims of falsity. Reply at 9. This argument is a non-starter. Although the Illinois Rehabilitation Order was entered into in 2019, the order resulted from the material under-reserving in Atlas' subsidiaries, taking place during the Class Period—the same under-reserving investigated by Missouri and New York. *See* FAC ¶¶ 11–14, 37, 136–38. Thus, the Illinois Rehabilitation Order reinforces Plaintiffs' allegations that Atlas had a severe reserve problem, through its subsidiaries, during the Class Period. That severe reserve problem, as alleged by Plaintiffs, supports Plaintiffs' theory that Defendants knew Atlas was materially under-reserved, making Defendants' statements to the contrary misleading.

Defendants disagree, insisting that the Illinois Rehabilitation Order does not use the word "reserves." *See* Reply at 9. Even if that were the case, Plaintiffs have

---

[12]Contrary to Defendants' suggestion, *see* Memo. Dismiss at 20 (citing *Tongue*, 816 F.3d at 212), Plaintiffs are not merely asserting that the termination of RSM was suspicious because RSM's feedback "tended to cut against their projections," 816 F.3d at 212, so Defendants' citation to *Tongue* is not persuasive.

adequately alleged a connection between the Illinois Rehabilitation Order and Atlas' reserve deficiencies. Plaintiffs allege that on August 9, 2019, Defendants stated that "two insurance subsidiaries were placed into rehabilitation pursuant to a complaint filed by the Director of the Illinois Department of Insurance," and that Atlas was "in discussions with the Director and his successors in office, insurance regulators, and the registrant's third party actuaries regarding the insurance reserve levels of the registrant's insurance subsidiaries." FAC ¶ 137. As such, Plaintiffs have alleged that Defendants' own representation linked the reserve issue to the Illinois Rehabilitation order, so Defendants' argument to the contrary is unconvincing.

Sixth, Defendants emphasize Atlas' external disclosures, which warned about the uncertainties of reserves. Memo. Dismiss at 17; Reply at 9. Defendants point out that Atlas' external disclosures repeatedly warned that: (1) reserve setting reflects the uncertainties and significant judgmental factors inherent in estimating future results; (2) provisions of unpaid claims may be inadequate requiring future reserve increases; (3) Atlas is involved in regulatory examinations in the ordinary course of its business; and (4) regulators could require Atlas to increase its reserves. Memo. Dismiss at 10–11; Reply at 9. While Defendants repeatedly state that Plaintiffs ignore this cautionary language, Defendants do not cite to any authority or explain how Atlas' generic cautionary language cancels out specific allegations of misleading statements at the pleading stage. At best, Defendants are asking the Court to weigh the impact of the cautionary language against the purported misstatements, and the Court declines to do so at this stage.

Lastly, Defendants contend that Plaintiffs are basing their falsity claims on the ground that Defendants had real-time access to and actively monitored unspecified key data regarding trends in their insurance pool. Memo. Dismiss at 17 (citing *Pierrelouis*, 414 F. Supp. 3d at 1174–75; *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 559 (S.D.N.Y. 2010)). While the FAC contains allegations regarding Defendants' access to and active monitoring of reserve data, *see* FAC ¶¶ 233–40, Plaintiffs are not attempting to plead fraud "by pleading that [D]efendants *merely* had access to data that *may have* shown that their statements to investors were misleading when made," so this case is unlike *Pierrelouis*. 414 F. Supp. 3d at 1174 (emphases added). The Court also declines to require Plaintiffs to have knowledge of contemporaneous internal Atlas documents before discovery, so Defendants' citation to *In re SLM Corp.*, 740 F. Supp. 2d at 559, misses the mark as well. Defendants' real-time data argument, like their other six arguments, fails to rebut Plaintiffs' plausible allegations of contemporaneous facts known by Defendants, which support falsity.

### c. Defendants' Internal Control Statements

Plaintiffs additionally submit that Defendants' statements regarding the effectiveness of Atlas' internal controls are materially misleading. In support, Plaintiffs direct the Court to: (1) the Missouri Report and New York Report findings; (2) Atlas' admission that it lacked effective internal controls over financial reporting as of December 31, 2018; and (3) Atlas' belated filing of its 2018 10-K, which materially revised the results previously reported on March 4, 2019. Resp. Dismiss at 17.

As a threshold matter, the Court finds that Defendants' statements about the effectiveness of Atlas' internal controls—for instance, Defendants' certification that Atlas' "internal control over financial reporting is effective as of December 31, 2016," FAC ¶ 160—are statements of opinion. *See Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *10 (S.D.N.Y. Mar. 28, 2017). And Plaintiffs appear to concede as much. *See* Resp. Dismiss at 17. The Court therefore applies the *Omnicare* framework to Defendants' statements concerning the effectiveness of Atlas' internal controls and asks whether Plaintiffs have alleged: (1) that Defendants did not believe Atlas' internal controls were effective; (2) that the facts supporting Defendants' opinion on internal controls were untrue; or (3) whether Defendants omitted material facts about Defendants' inquiry into its internal controls that a reasonable investor would find conflicting with Defendants' opinion that its internal controls were effective. 575 U.S. at 186, 189.

Plaintiffs assert the third option, arguing that Defendants had actual knowledge of, and omitted material facts that contradicted their internal control attestations—namely the Missouri Report and New York Report's findings that Atlas' subsidiaries had material reserve deficiencies, that Atlas' process failed to ensure sufficient reserves, and that Atlas failed to comply with SSAP 55. Resp. Dismiss at 17. In support, Plaintiffs direct the Court to *Heinz*. R. 112, Mot. Supp. Auth. at 2. In *Heinz*, the plaintiffs similarly argued that the defendant's certification that its internal controls were effective and provided reasonable assurances regarding the reliability of the defendant's financial reports was misleading. 2021 WL 3566602, at

*7. The defendants argued that the amended complaint failed to state a claim because it "lacked allegations that these statements inaccurately reflect the conclusions reached by the CEO and CFO at that time or incorrectly portrayed the process used to reach those conclusion[s]." *Id.* (internal quotation marks and citation omitted). The court disagreed, noting that "the amended complaint alleges that the material weaknesses in Kraft Heinz's financial controls caused specific deficiencies that led to overstatements in the financial reporting, despite its public statements to the contrary during the class period and despite knowing that the SEC was investigating Kraft Heinz's accounting practices." *Id.* The court found those allegations sufficient to satisfy the falsity requirement at the Rule 12(b)(6) stage. *Id.*

The Court finds this case analogous to *Heinz*. Plaintiffs similarly allege that Atlas "lacked adequate internal controls to appropriate[ly] set reserve levels," and that "[t]he failure to maintain adequate internal controls further rendered [Atlas'] financial reporting materially misleading during the Class [P]eriod because the lack of controls enabled Defendants to record insufficient reserves, thereby inflating net income and capital surplus." FAC ¶ 161. On top of that, Plaintiffs allege that Defendants made the statements about Atlas' internal controls despite knowing that at least two state regulatory bodies had determined that Atlas' subsidiaries had violated SSAP 55, had materially under-reserved, and that the subsidiaries needed to remediate the reserve deficiencies. *See, e.g.*, *id.* ¶ 250. In addition, the New York Report concluded specifically that Atlas had an internal control problem with respect to its IT controls and/or processes. *Id.* ¶ 249. The Court therefore finds, like the court

39

in *Heinz*, that Plaintiffs have adequately pled falsity with respect to Defendants' statements about its internal controls.

Defendants counter that *Heinz* is distinguishable because the challenged statements here concern future insurance reserves, because there was no financial restatement or impairment charge, because there are no allegations attributed to former employees or other confidential sources, and because the failure of internal controls here was purportedly limited to the timeliness of Atlas' 10-K for the year ended December 31, 2018. R. 113, Resp. Mot. Supp. Auth. at 2–3. Defendants' arguments about *Heinz* can be boiled down to an assertion that the evidence in *Heinz* was stronger than the evidence here, but that is not a proper determination for the Court to make on a motion to dismiss. Defendants point to nothing significant about *Heinz* or the allegations in this case which dissuade the Court from applying the *Heinz* reasoning. Defendants urge the Court to rely on the Seventh Circuit's recent decision, *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592 (7th Cir. 2021), instead of *Heinz*. *Id.* at 3. But the Court finds *Zebra Techs* far afield from this case. In *Zebra Techs*, the plaintiffs attempted to support a Section 10(b) material misstatement claim with allegations involving a profit-margin projection which "missed the actual profit margin by just over one percentage point," as well as a vaguely optimistic statement that integration was "progressing as planned." 8 F.4th at 595. Here, Plaintiffs' allegations do not concern "near miss" projections. *Id.* For instance, Atlas' belatedly filed 2018 10-K showed that Atlas' previously reported net loss was off by $43.1 million (the actual net loss was more than double what was

initially reported), Atlas' combined capital surplus was off by $47 million (dropping 77% from the initially reported figure), and Atlas' net claims liabilities was off by $43.4 million (increasing the initially reported figure by over 26%). *See* Resp. Dismiss at 17 (citing FAC ¶¶146–47). The Court therefore finds that this case is like *Heinz*, not *Zebra Techs*.

Another basis supporting falsity is Atlas' February 12, 2020 admission that Atlas' management had "concluded that our internal control over financial reporting as of December 31, 2018 was not effective." FAC ¶ 149. Defendants insist that Atlas' conclusion only pertained to Atlas' failure to "timely meet its filing obligations with the SEC and NASDAQ," and not to Atlas' reserve-setting practices. Memo. Dismiss at 20. But Plaintiffs have alleged that in explaining the conclusion that Atlas' internal controls were not effective, Defendants stated that "the delay in the completion of the audit of the Company's financial statements for the fiscal year ended December 31, 2018 was due to the previously disclosed disagreement with RSM with respect to insurance reserves." FAC ¶ 149. Plaintiffs further allege that Defendants revealed that their plan for internal control remediation consisted of taking "steps to monitor the progress of all aspects of its financial closing process including more detailed discussions as needed with its independent registered public accounting firm regarding insurance reserve calculations." *Id*. The Court finds that Plaintiffs have thus connected, at least well enough at the pleading stage, that Defendants' February 12, 2020 admission that its internal controls were not effective over financial

reporting as of December 31, 2018 supports the falsity of Defendants' opinion statements about its internal controls.

In the same vein, Defendants argue that Plaintiffs' allegations regarding Atlas' post-Class Period disclosure on its internal controls is "yet another example of fraud by hindsight." Memo. Dismiss at 11 (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007)). But Plaintiffs' internal controls argument is not like the one rejected in *Higginbotham*, as this is not a case where "[h]indsight is the only basis of the proposed inference" of fraud. 495 F.3d at 759. As explained throughout this Opinion, Plaintiffs have alleged that Defendants had contemporaneous knowledge that Atlas' reserves were materially under-reserved.

Defendants make much of the fact that Atlas never made a financial restatement for any of the audited financial statements that incorporated the opinion statements about reserves and internal controls. *See* Memo. Dismiss at 20–21; Reply at 9, 11 n.11, 13, 15 n.15. Yet, Defendants do not cite any authority supporting the proposition that statements about reserves or internal controls cannot be misleading without a formal restatement. While a restatement of financials is further evidence of materiality" in a Rule 10b–5 falsity claim, *Akorn*, 240 F. Supp. 3d at 815–16 (collecting cases), that does not mean that a restatement is *required* to show falsity. Here, while Atlas never formally restated its financials, it did delay filing its 2018 10-K for many months due to its disagreement with RSM about the adequacy of its reserves. FAC ¶ 149. The belated filing in February 2020, moreover, as discussed above, showed material revisions to the 2018 results that had previously been

reported in Atlas 2018 8-K filed on March 4, 2019, including: more than double the previously reported net loss; a combined capital surplus 77% lower than what had previously been reported, and net claims liabilities 26% higher than what had previously been reported. *Id.* ¶¶ 146–47. Although not a formal restatement, the Court still finds the delayed, significant revisions to bolster Plaintiffs' falsity claims.

### d. Inactionable Puffery

In a last-ditch effort to knock out the purported misleading statements, Defendants argue that "many of the statements challenged in the complaint amount to 'generalizations' regarding 'integrity,' 'risk management,' and 'fiscal discipline' are 'no more than puffery which does not give rise to securities violations." Memo. Dismiss at 22 (citation omitted). Such generalized "puffery" statements, assert Defendants, are insufficient to support claims of fraud. *Id.* at 23 (citing *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 940 (N.D. Ill. 2015)).

It is true that courts have held as immaterial as a matter of law, and therefore, not actionable, "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.*" In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (internal quotation marks and citation omitted).

However, it is also the case, as Plaintiffs point out, *see* Resp. Dismiss at 19–20, that some courts decline to decide if statements constitute puffery when reviewing a Rule 12(b)(6) motion to dismiss. *See United States Sec. & Exch. Comm'n v. Ustian*,

229 F. Supp. 3d 739, 772 (N.D. Ill. 2017) (declining to dismiss claims in Rule 12(b)(6) posture based on defendant's puffery arguments because "the context in which these statements were made is significant, and the context can add concreteness to otherwise vague, inactionable statements"); *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004) (court would not hold at motion-to-dismiss stage that statements in press release concerning "realized progress" "solid" "sales and earnings" constituted puffery). The Court is therefore hesitant to weigh in on the potential "puffery" of Defendants' statements at this point.

Regardless, the Court disagrees that the statements identified by Defendants in a footnote are mere puffery. *See* Memo. Dismiss at 23 n.6. For instance, Defendants characterize Wollney's February 22, 2017 representation that "[o]ur team is confident that we have addressed the issues at the heart of this problem, have taken appropriate steps . . . ." as puffery. *Id.* (citing FAC ¶ 154). While the phraseology isolated by Defendants certainly contains ephemeral language, such as "confident" and "appropriate," when the statement is provided in context of Wollney's full statement, it is clear that Wollney's comments were not "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Van Noppen*, 136 F. Supp. 3d at 940. Context matters. That is, if one reads before and after the snippet selected by Defendants, one can see that Wollney made specific statements about: Atlas' efforts to remediate a reserving issue, Atlas' surprise at the level of loss development in Michigan, and

Atlas' isolation of remaining exposure with respect to pre-acquisition related claims at Global Liberty. FAC ¶ 154. Those specific statements show that Wollney's comments, when assessed in context, are not puffery because they are not vague or unimportant to a reasonable investor, who would want to know if future reserve increases would be needed which could diminish Atlas' net income. The Court thus finds Defendants' puffery contention unpersuasive.

### e. Actionable Violation of Item 303 of Regulation S–K

In addition to their material misstatements allegations, discussed above, Plaintiffs allege securities fraud under Rule 10b–5 via Defendants' purported violation of Item 303 of Regulation S–K. *See* FAC ¶¶ 83–90; Resp. Dismiss at 19.

Item 303 of Regulation S–K provides that registration statements and annual 10-K reports must reveal: "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Gallagher v. Abbott Lab'ys*, 269 F.3d 806, 810 (7th Cir. 2001) (quoting 17 C.F.R. § 229.303). The Second Circuit has held that Item 303's affirmative duty to disclose can serve as the basis for a securities fraud claim under Section 10(b). *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (Item 303 may serve as basis for duty to disclose for Section 10(b) claim if materiality element is likewise satisfied). However, the Seventh Circuit has not decided whether an Item 303 violation can rise to fraud under the Exchange Act. *See Macovski*, 553 F. Supp. 3d at 485. The parties do not address this issue in briefing, nor do they acknowledge the circuit split on this issue.

45

*See id.* (collecting cases). Instead, the parties assume that an Item 303 violation could support a 10b–5 fraud claim in the Seventh Circuit. The Court follows the parties' lead.

The Second Circuit has clarified that "a violation of Item 303's disclosure requirements can only sustain a claim under Section 10(b) and Rule 10b–5 if the allegedly omitted information satisfies *Basic*'s test for materiality." *Stratte-McClure*, 776 F.3d at 103 (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). In *Basic*, the Supreme Court held that materiality in a Rule 10b–5 case of an allegedly required forward-looking disclosure is determined by "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." 485 U.S. at 238. So, under the Second Circuit's test, "a plaintiff must first allege that the defendant failed to comply with Item 303 in a 10-Q or other filing. Such a showing establishes that the defendant had a duty to disclose." *Stratte-McClure*, 776 F.3d at 103. If the Item 303 showing is satisfied, "[a] plaintiff must then allege that the omitted information was material under *Basic*'s probability/magnitude test." *Id.*

Here, Defendants challenge only the first part of the *Stratte-McClure* test, whether Plaintiff has adequately alleged that Defendants failed to comply with Item 303. Defendants argue that Item 303 only requires a company to disclose *known* trends, and that Plaintiffs do not allege what specific information was known to Defendants indicating its reserve amounts were inadequate. Memo. Dismiss at 21. The Court agrees with Plaintiffs, however, that they have alleged facts that show

Defendants' contemporaneous knowledge of Atlas' ongoing reserve deficiencies, including: "(1) the Missouri Order's determination that Atlas was under-reserved and had inadequate methodology, (2) the New York Report's determination that Atlas was under-reserved and had inadequate methodology, and (3) the fact that Defendants chose to set reserves below the value recommended even by Atlas's own actuarial recommendations, which was itself too low." Resp. at 19.

In light of Plaintiffs' allegations showing that Atlas' ongoing deficiency was a systemic failure and trend known to Defendants during the Class Period, it is plausible that Item 303 required disclosure. As Plaintiffs allege, "the inadequacy of Atlas's reserves, its flawed methodology for estimating reserves, and the trend of ever-increasing claim severity, were known trends or uncertainties likely to have a material unfavorable impact on Atlas's net income or statutory surplus." FAC ¶ 90. Taking Plaintiffs' plausible allegations as true, as the Court must, *see Tellabs*, 551 U.S. at 322, the Court finds that the disclosure of Atlas' material reserve problems could have been required by Item 303, as Plaintiffs have alleged that the reserve problem was a "known trend" which could be reasonably expected to have a "material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Gallagher*, 269 F.3d at 810. The Court therefore finds that Defendants have not adequately convinced the Court that Plaintiffs' Item 303 claim should be dismissed. *See Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021) (burden is on moving party in Rule 12(b)(6) motion to prove that no legally cognizable claim for relief exists).

Now that the Court determines that Plaintiffs have adequately pled the first requirement of a 10b–5 securities fraud claim, the Court moves on to the next requirement attacked by Defendants, scienter. *See Tricontinental*, 475 F.3d at 842.

## 2.    Scienter

Defendants assert that Plaintiffs have not alleged facts supporting the required "strong inference" for scienter because Plaintiffs have not alleged conscious wrongdoing, and because Plaintiffs' motive allegations are insufficient. Memo. Dismiss at 23–28.

To meet the scienter element of their 10b–5 claim, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In other words, "Plaintiffs must state with particularity facts giving rise to a strong inference that the Defendants either knew the statement was false or [were] reckless in disregarding a substantial risk that it was false." *W. Palm Beach*, 495 F. Supp. 3d at 658 (internal quotation marks and citation omitted).

In *Tellabs*, the seminal case on the scienter element of § 10(b) litigation, the Supreme Court provided a framework for analyzing the sufficiency of a complaint in the face of a Rule 12(b)(6) motion to dismiss. 551 U.S. 308. First, the court must accept all factual allegations in the complaint as true. *Tellabs*, 551 U.S. at 323 (citation omitted). Second, the court considers the complaint holistically to determine if all facts taken together will give rise to a strong inference of scienter, instead of scrutinizing each allegation individually. *Id.* at 310, 326. Third, the court must take

into account all "plausible opposing inferences" of scienter. *Id.* at 310, 323. Thus, for a complaint alleging fraud under § 10(b) to survive, it must allege a strong inference of scienter that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. In other words, where two contrary inferences of scienter are equally probable, the tie goes to the plaintiff. It is within this framework that the Court analyzes the FAC.

Plaintiffs direct the Court to five categories of allegations in the FAC, which they claim give rise to a strong inference of scienter: (1) the magnitude and ongoing nature of Atlas' material reserve deficiencies; (2) the New York and Missouri regulatory orders; (3) Defendants' dismissal of two independent public accountants during the Class Period; (4) Atlas' year-end 2017 detailed reserve review and subsequent representations of it; and (5) Defendants' unusual and suspicious stock sales during the Class Period. Resp. Dismiss at 21–31. The Court evaluates each basis for scienter, keeping in mind that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326 (citations omitted). The Court accordingly asks: "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.*

### a. Magnitude and Ongoing Nature of Atlas' Material Reserve Deficiencies

For their first basis of scienter, Plaintiffs "allege recklessness based on Defendants' ongoing and systemic failure to ensure sufficient reserves." Resp. Dismiss at 21 (citing *In re Spiegel Inc. Sec. Litig.*, 382 F. Supp. 2d at 1020–21).

Plaintiffs further aver that the magnitude of Atlas' under-statement of reserves during the Class Period bolsters scienter. *Id.* (citing *Frank v. Dana Corp.*, 646 F.3d 954, 960–62 (6th Cir. 2011); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255-56 (N.D. Ill. 1997)). In a nutshell, Plaintiffs argue that because Defendants continued to get their reserves wrong, and by such a large degree, there is a strong inference that Defendants acted with reckless disregard.

Recklessness, for purposes of scienter, "is 'an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *United States Sec. & Exch. Comm'n v. Winemaster*, 529 F. Supp. 880, 910 (N.D. Ill. 2021) (quoting *McConville v. SEC*, 465 F.3d 780, 788 (7th Cir. 2006)). Plaintiffs point to *Rehm*, another 10b–5 case, where the court found that "defendants ha[ving] to record a massive year-end increase of $5 million in credit loss reserves and slash its reported yearly earnings from $3.530 million to $325,000 weigh[ed] heavily in favor of a finding of reckless disregard." Resp. Dismiss at 21 (quoting *Rehm*, 954 F. Supp. at 1255–56). While the court acknowledged that "the mere fact that a company's financial reporting was inaccurate does not establish scienter," the court reasoned that "the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors." *Id.* at 1256 (citations omitted). The court in *Rehm* determined that "[t]he more serious the error, the less believable are defendants['] protests that they were completely unaware of

[the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." *Id.*

Here, the Court finds that Plaintiffs' allegations about Atlas' failure to maintain adequate reserves and the magnitude of the reserve increases support an inference of recklessness. Plaintiffs sufficiently allege "an extreme departure from the standards of ordinary care," *Winemaster*, 529 F. Supp. at 910, by pleading: the Generally Accepted Accounting Principles (GAAP) applicable to the reserve process, Defendants' violation of the GAAP rules, and the regulatory orders identifying regulatory violations related to the significant under-reserving. FAC ¶¶ 13, 63–80, 98, 112. In addition, Plaintiffs have pled facts indicating that the danger of misleading buyers or sellers was either known to Defendants, or so obvious that Defendants must have been aware. Namely, the magnitude of the repeated reserve increases, when coupled with the fact that the Missouri and New York regulatory orders found that Atlas' subsidiaries had ongoing reserve deficiencies, made the danger of misleading its investors with reassuring statements about the adequacy of its reserves obvious. As in *Rehm*, Defendants' massive year-end increases of $32.6 million for Fiscal Year (FY) 2016, $75.4 million for FY 2017, and $82.7 million for FY 2018, with net income dwindling from $2.6 million in 2016 to a $38.8 million loss for 2017, weighs in favor of a finding of reckless disregard. *See Rehm*, 954 F. Supp. at 1255–56.

Defendants insist that reliance on *Rehm* is inapt because it pre-dates *Tellabs*, in which the Supreme Court held than an inference of fraud must be "at least as

compelling as any opposing inference of nonfraudulent intent." R. 105, Reply at 12 (internal quotation marks omitted) (quoting *Tellabs*, 551 U.S. at 314). However, *Rehm* is still good law, and the Court finds that the inference of fraud here *is* at least as compelling as the opposing inference of nonfraudulent intent. That is, the Court finds that it is just as compelling that the reporting of massive reserve increases with assurances that the reserve issues were isolated was misleading to investors, as it is compelling that Atlas simply misestimated the needed reserves by millions of dollars, year after year.

Defendants more generally argue that Plaintiffs are pleading fraud by hindsight, and that "[e]ven a massive increase of reserves does not mean previous reserve levels were inadequate." Reply at 12–13 (citing *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 361; *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 412 (S.D.N.Y. 2010)). True, a subsequent increase of reserves, on its own, does not establish scienter in a Rule 10b–5 action. For instance, in *Wachovia*, the Rule 10b–5 plaintiffs alleged that, based on the timing and magnitude of reserve increases, the previous loan loss reserves were understated, and that the defendant corporation "was well aware of, or recklessly indifferent to, the fact that their loan reserves were significantly understated in light of the deteriorating real estate market." 753 F. Supp. 2d at 361. The court in *Wachovia* found that "the fact of a massive increase to loan loss reserves is not, in itself, an indicator that the previous reserve levels were inadequate." *Id.* (internal quotation marks and citations omitted). The court observed that the plaintiffs' "generalized allegations fail to specify what caused the

[d]efendants to know that the loan loss reserves were insufficient." *Id.* (citation omitted). The court declined to base an inference of reckless disregard on the loan loss reserve allegations because "[i]n the absence of particularized allegations that [the defendant company] was experiencing or internally predicting losses exceeding their set reserves, the subsequent disclosures provide no basis to conclude that Defendants recklessly misstated previous reserve levels." *Id.* at 362.

In this case, however, contrary to Defendants' contention, *see* Reply at 13, Plaintiffs have alleged that Defendants knew and hid information demonstrating that the reserves were understated. Specifically, Plaintiffs allege that Defendants knew and concealed that Atlas' subsidiaries were under investigation for under-reserving by insurance regulators from Missouri, Illinois, New York. FAC ¶ 9. For example, the FAC alleges, "the Missouri Regulatory Order specifically provided that on a combined basis, Gateway, American Country and American Services' loss reserves were $6 million below what Atlas's own appointed actuary had recommended, and $24 million below the level determined to be necessary. . . . Yet, Defendants never disclosed this information, nor did they disclose the impact it had on their reserving, or their financial statements." *Id.* ¶ 81. Furthermore, Plaintiffs allege that Defendants concealed the basis and methodology for their estimates of Atlas' loss reserves, including the material risks and uncertainties presented by the state regulators' findings, as required by GAAP. *Id.* ¶ 100. Thus, the Court finds that Plaintiffs' argument as to scienter is supported by allegations beyond merely a massive reserve increase.

### b. The New York and Missouri Regulatory Orders

Plaintiffs next direct the Court to the New York and Missouri regulatory orders in support of scienter, stating, "[t]hat Defendants continued to fail to cure, and in fact concealed, Atlas's material reserve deficiencies and lack of adequate methodology after both the Missouri Order and the New York Report, supports scienter." Resp. Dismiss at 22–23.

Generally, government investigations "can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter." *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d at 820 (internal quotation marks and citation omitted); *see also Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021) (internal quotation marks and citations omitted) ("[T]he fact that the SEC and RTI's internal audit committee initiated an investigation into RTI's revenue recognition practices and internal controls provides additional support for finding that scienter has been adequately pleaded.").

In this case, Plaintiffs allege not only investigations by regulatory bodies, but also conclusions by those regulatory bodies that Defendants were under-reserving in violation of SSAP No. 55.[13] The New York report, for example, found that Defendants had a reserve inadequacy as of December 31, 2016, and that Atlas was under-

---

[13]This is why the Court finds unpersuasive Defendants' argument that pending government investigations, without more, do not trigger a generalized duty to disclose. Memo. Dismiss at 27. Plaintiffs are not alleging a generalized duty to disclose; they are alleging that Defendants made false or misleading statements while in possession of information, including information learned from state regulatory orders, which Defendants knew would make the statements misleading. Because Plaintiffs are not alleging a generalized duty to disclose, Defendants' citation to *Gallagher*, 269 F.3d at 808, is off target.

reserving in violation of SSAP No. 55. FAC ¶¶ 24–25, 80. The Missouri report similarly concluded that Atlas' subsidiaries were under-reserved in violation of SSAP No. 55. *Id.* ¶¶ 14, 79. The reports "certainly put [Atlas] on notice"[14] that its reserve amounts were insufficient, thus supporting an inference of scienter, which is "strengthened by [Atlas'] failure to disclose" the reports' conclusions. *Fryman*, 462 F. Supp. 3d at 903.

Defendants argue that the Missouri and New York regulatory reports do not support a strong inference of scienter because they discuss financials from before the Class Period. Reply at 14. The Court disagrees. Admittedly, the Missouri and New York regulatory reports covered time frames before the Class Period, but the reports also indicated that the regulatory bodies reviewed data after those time frames and gave present directions regarding Atlas' current reserve practices. For instance, the New York report stated:

> Transactions occurring subsequent to this period were reviewed where deemed appropriate by the examiner. . . . It is recommended that [Global Liberty] address the ongoing reserve inadequacies and increase its carried reserves to an appropriate level. . . . Further, it is recommended that [Global Liberty's] future actuarial report underlying the statement of actuarial opinion provides sufficient details of documentation and footnotes to clearly explain the calculations so that an independent reviewer can evaluate the work.

---

[14]For this reason, the Court disagrees with Defendants' contention that the FAC "does not plead contemporaneous facts known or available to defendants that conflicted with the challenged public statements." Memo. Dismiss at 24. In addition to the FAC's allegations regarding the Missouri Report, several other allegations indicate that Defendants contemporaneously had reason to know that Defendants' statements were misleading, including the allegations about the New York Report, *see* FAC ¶¶ 24–26, 80, and the allegations regarding the dismissal of RSM, *see id.* ¶¶ 35, 133.

FAC ¶ 24 (quoting FAC Exh. B). The Missouri Report, issued in March 2017, similarly addressed contemporaneous reserve issues. *See* FAC ¶ 246 ("[M]anagement's current 'reserve memo' does not address IBNR, and thus does not fulfill the requirements of [SSAP] 55.") (quoting FAC Exh. A). The Court therefore does not find that the time frame covered in the regulatory reports renders them less cogent in terms of scienter.

Defendants maintain that the far more compelling inference is that Defendants were attempting to cure previous insufficiencies by increasing reserves. Reply at 14 (citing *Fryman*, 462 F. Supp. 3d at 899). But, Defendants have not shown that this inference is more cogent or compelling than Plaintiffs' suggested inference of fraud. Defendants claim that the pre-class period regulatory findings were addressed at the beginning of the class period because Atlas increased reserves at the start of the Class Period by more than what regulators had suggested. *Id.* (citing FAC ¶ 58). But as Defendants repeatedly assert, the regulatory reports only pertained to certain Atlas subsidiaries, so the fact that Atlas as a whole increased its reserves by an amount greater than the reports recommended does not mean that Atlas resolved all of the problems identified by the regulatory bodies with respect to the subsidiaries. In fact, Plaintiffs allege that the reports state the opposite. *See* FAC ¶¶ 14, 25.

Even if Defendants were attempting to fix the material deficiencies identified in the regulatory reports (while concealing that they were doing so), the scienter inference would not necessarily be defeated. *See Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 845 (N.D. Ind. 2018) (citing *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("[F]ailing to succeed at fraud does not

obviate the fact that there may have been fraudulent intent."). In any event, Defendants have not convinced the Court that Atlas' overall increase of reserves at the beginning of the Class Period means that Defendants were attempting to cure the deficiencies identified in the Missouri and New York reports. Perhaps discovery will vindicate Defendants' inference, but at the motion to dismiss stage, it is enough that Plaintiffs' scienter inference is at least as cogent as Defendants' opposing inference. *See Tellabs*, 551 U.S. at 324.

Defendants argue that because the regulatory findings were publicly available to investors, there can be no plausible inference of fraud. *See* Memo. Dismiss at 26–27 (citing *Higginbotham*, 495 F.3d at 758–59); Reply at 15 (citing *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008)). In *Pfizer*, the plaintiffs alleged that the defendants made public statements that contradicted information they possessed about a developmental drug's efficacy and safety. 538 F. Supp. 2d at 637. The court found that, because the contradictory information was publicly available when the allegedly misleading statements were made, the inference that the defendants intended to defraud the market was weakened. *Id.* According to the *Pfizer* court, "[n]umerous courts have suggested or assumed that the contradictory information must have been non-public in order to raise a strong inference of intent." *Id.* (citing *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 452–53 (S.D.N.Y. 2005); *Higginbotham*, 495 F.3d at 758–59). While the strength of a scienter inference may be reduced by the public nature of contradictory information in the Second Circuit, *see GeoPharma*, 399 F. Supp. 2d at 452 ("Cases in this Circuit assume that

the contradictory information in question must be non-public."), the Court is not convinced that the same is true in the Seventh Circuit.

In *Higginbotham*, a binding Seventh Circuit opinion also relied on by Defendants, the defendant, Baxter International (Baxter), announced in 2004 that it would restate the company's preceding three years of income to correct errors created by fraud at its subsidiary in Brazil. 495 F.3d at 755. The managers at Baxter's Brazilian subsidiary had exaggerated growth by reporting sales as having been made earlier than their actual dates and also failed to create appropriate reserves for bad debts. *Id.* Not surprisingly, the price of Baxter stock fell following the announcement. *Id.* at 755–56. Plaintiffs, shareholders of Baxter, filed multiple suits against Baxter under § 10(b), which were dismissed by the district court. *Id.* at 756. The Seventh Circuit affirmed dismissal of the complaints, finding that the plaintiffs failed to allege Baxter's knowledge or reckless indifference. *Id.* at 758. On the issue of notice, the plaintiffs alleged that prior to the announcement, Brazil's government accused Baxter's subsidiary of participating in antitrust conduct. *Id.* According to the plaintiffs, this should have alerted Baxter to the fraud before the 10-Q report. *Id.*

The Seventh Circuit rejected this proposition on at least three grounds. First, the court explained that "[a]ccusations differ from proof; business executives are not charged with 'knowing' the truth of whatever any public official anywhere in the world may assert." *Higginbotham*, 495 F.3d at 758. Second, "antitrust offenses have no apparent link to fraud. Cartels improve the profitability of the participants; proof that managers in Brazil were working hard to generate profits (if illegal ones) would

not imply that they were also reporting nonexistent sales." *Id.* at 758–59. Third, the court stated that "the charge of antitrust conspiracy was public knowledge. If it were enough to demonstrate fraud, then plaintiffs and other investors could have drawn that inference themselves, and the price of Baxter's stock would have declined immediately. The securities laws do not require firms to 'disclose' information that is already in the public domain." *Id.* at 759 (citing *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989)).

The Court finds that *Higginbotham* does not eliminate a finding of scienter here. True, under *Higginbotham*, security firms are not required to disclose information already in the public domain. That unremarkable proposition, however, does little to advance Defendants' position. Here, unlike in *Higginbotham*, the regulatory reports contained not mere accusations, but conclusions based on the regulatory bodies' investigations into Defendants' accounting practices, which directly related to and contradicted Defendants' public reassurances that Atlas' loss reserves were adequate. 495 F.3d at 758–59. *Higginbotham* further involved antitrust concerns which have no link to this case. The Court therefore declines, at this stage of the litigation, to dismiss or discount Plaintiffs' scienter allegations merely because the regulatory reports were public documents.

Finally, Defendants' contention that their reserves were based on advice by their independent actuaries, *see* Memo. Dismiss at 22, does not negate an inference of scienter. Plaintiffs allege that the Missouri order states that Atlas did not follow its actuary's recommendations, and that Atlas instead materially deviated from the

actuary's advice. FAC ¶ 12. Plaintiffs further plead that both the Missouri Report and the New York Report stated that Atlas' reserve methodology was inadequate, unsupported, and violative of SSAP 55. *Id.* ¶¶ 12, 14, 24, 79–80. Consequently, the Court does not find Defendants' purported reliance on the advice of independent actuaries to make their non-fraudulent inference more compelling or cogent than Plaintiffs' fraudulent inference, particularly when Plaintiffs have also pled that another independent advisor, RSM, gave Defendants advice consistent with the Missouri and New York findings, and was fired for doing so. *Id.* ¶¶ 35, 133. This leads the Court to Plaintiffs' next set of allegations supporting scienter.

### c. Defendants' Dismissal of Two Independent Accountants During Class Period

Plaintiffs' third source supporting scienter is Defendants' dismissal of two independent accountants during the Class Period, BDO USA, LLP (BDO) and RSM. Beginning with BDO, Plaintiffs allege:

> On June 18, 2018, Defendants filed a Form 8-K with the SEC, signed by Defendant Romano, disclosing that the Company had "dismissed" its independent public accountant, [BDO], on June 15, 2018. Defendants did not provide a reason for the dismissal of BDO, but claimed that they had had no prior disagreements with BDO specifically with respect to fiscal years ended December 31, 2016 and 2017, and the subsequent interim period through June 25, 2018.

FAC ¶ 117. Plaintiffs argue that although Atlas did not specify why it dismissed BDO in June 2018, "there is a strong inference that BDO's dismissal was related to Atlas' deficient reserves and related FY 2017 financial reporting." Resp. Dismiss at 26.

The Court, however, finds that Plaintiffs have come up short here. The fact that BDO was dismissed three months after Atlas announced its 4Q and FY 2017

financial results, at a time after the Missouri and New York reports were issued, does not mean that the termination of BDO is indicative of fraudulent intent. Plaintiffs acknowledge that Atlas disclosed its termination of BDO and explained that there were no disagreements between Atlas and BDO on the company's recent financials. FAC ¶ 117. Plaintiffs do not make any other allegations that paint the termination of BDO in a suspicious light. As a result, Plaintiffs' scienter inference based on Defendants' termination of BDO is not as cogent or compelling as the opposing non-fraudulent inference, namely, that Defendants simply decided to hire somebody else.

Plaintiffs' allegations with respect to Defendants' firing of RSM, by contrast, have more scienter traction. Plaintiffs allege that Defendants fired RSM on April 29, 2019, just three days after RSM informed Atlas that it had determined that Atlas' reserves were materially understated, and that its FY 2018 financial results were materially misleading as a result. FAC ¶¶ 35, 117–18. This allegation, considered holistically, supports an inference of scienter. Defendants fired an independent accountant who not only disagreed with Defendants' financial reporting, but also stated that Atlas' reserves were materially understated (consistent with the Missouri and New York reports), and that because of the under-reserving, the FY 2018 financial results were materially misleading. Put simply, firing an independent accounting firm just three days after it has looked at your books and opined that you have materially misstated your financials, is fishy.

The fact that Defendants publicly disclosed the termination of RSM, as well as their reason for doing so, does not, to this Court, scrub out the scienter inference. As

Plaintiffs point out, Item 4.01 of Form 8-K mandates filing an 8-K within four days of an auditor's dismissal. *See* Resp. Dismiss at 28. Consequently, that Defendants promptly disclosed their dismissal of RSM (in response to an 8-K form requirement) does not make the fraudulent inference less cogent or compelling; it is still suspicious that Defendants fired RSM three days after RSM told Defendants exactly what the Missouri and New York reports had already made Defendants aware of—that they were under-reserving—and additionally that that under-reserving "constituted a material misstatement of the Corporation's financial condition as reflected in the . . . financial statements of such insurance subsidiaries for the fiscal year ended December 31, 2018." FAC ¶ 35.

Defendants attempt to frame their termination of RSM as a mere difference in judgment. Memo. Dismiss at 25. It is true that a mere difference in accountants' judgment regarding financial statements cannot establish scienter. *Id.* (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012)). But as Judge Rowland observed, "the disagreement between RSM and [Atlas] goes beyond this." *Fryman*, 462 F. Supp. 3d at 903.[15] RSM and Atlas did not merely disagree about how certain GAAP provisions should be interpreted. *See Kuriakose*, 897 F. Supp. 2d at 181 (divergent conclusions reached by different accountants regarding GAAP

---

[15]Judge Rowland ultimately concluded that the inference of scienter stemming from Atlas' termination of RSM was reduced by the fact that Atlas disclosed the termination. *Fryman*, 462 F. Supp. 3d at 903. As discussed above, the Court does not find the disclosure to make the nonfraudulent inference more plausible than the fraudulent inference, particularly when the allegation regarding RSM's termination is considered holistically with the other scienter allegations.

provisions not sufficient to support inference that defendant materially misstated its financials). Rather, Atlas fired RSM three days after RSM informed Atlas in writing that, based on its audit work, RSM had concluded that the December 31, 2018 insurance reserves in certain of Atlas' insurance subsidiaries were understated, and that such understatement constituted a material misstatement of Atlas' financial condition for the fiscal year ended December 31, 2018. FAC ¶¶ 35, 133.

Courts have held the ending of a relationship between a company and its auditor, whether through termination by the company or resignation by the auditor, under similar circumstances, can support an inference of scienter. *E.g.*, *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 983 (N.D. Ill. 2006) (denying motion to dismiss where "complex securities case involve[ed] numerous allegations of corporate misdeeds amid suspicious factual circumstances, including the resignation of [the company's] independent auditor, several undisclosed accounting errors, and multiple short-term changes in accounting methods"); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 127 (S.D.N.Y. 2013) (resignation of CFO, two board members, and independent auditor contributed to strong inference of scienter); *In re Spear & Jackson Securities Litigation*, 399 F. Supp. 2d 1350, 1358 (S.D. Fla. 2005) (listing "auditor resignations" as one of several indicia of scienter courts consider); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (finding strong inference of scienter, in part, based on the plaintiffs' allegation that the defendants terminated their independent auditor and kept improper accounting practices in place).

While the termination of RSM, alone, would not be enough to establish a strong inference of scienter, the Court finds it does when considered holistically with the other scienter allegations. For instance, the Court considers Plaintiffs' allegation that Atlas fired RSM three days after RSM informed Atlas that its under-reserving meant Atlas' financials for Fiscal Year 2018 were materially misstated, FAC ¶ 133, with the allegation that Atlas' late-filed 2018 10-K reported financials materially differed from those reported at the time of RSM's termination, *id.* ¶¶ 145–47, and Plaintiffs' allegation that the Missouri Report and New York Report put Defendants on notice that Atlas' reserves were materially understated, *id.* ¶ 191. So, the Court disagrees with Defendants that Atlas' termination of RSM was a mere difference in business judgment non-indicative of scienter.

### d. Atlas' Year-End 2017 Detailed Reserve Review and Subsequent Representations

Plaintiffs' fourth basis for scienter is Atlas' detailed end-of-year review in 2017 and Defendants' related representations about their surprise concerning the need for increasing reserves. Resp. Dismiss at 28–29. Plaintiffs contend that because the Missouri Report put Defendants on notice that there was a material deficiency in the reserves, the most compelling inference is that "Defendants knew heading into their 4Q 2017 review, and were not caught by surprise that another material reserve increase was necessary." *Id.* at 29. Plaintiffs further argue that Defendants' March 1, 2018 assurance that Atlas' reserves were sufficient in light of Atlas' "file-by-file review" was at least recklessly misleading as to the cause and sufficiency of the 2017 reserve increase, because it is apparent that Atlas never satisfactorily remediated the

deficiencies and problems identified in the Missouri Report. *Id.* (citing *Carpenters Pension Tr. Fund for N. California v. Allstate Corp.*, 2018 WL 1071442, at *5 (N.D. Ill. Feb. 27, 2018); *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 785 (E.D. Va. 2015)).

The Court agrees that Atlas' year-end 2017 detailed reserve review and subsequent representations support an inference of scienter here. The Missouri Report, issued on May 11, 2017, put Defendants on notice that, due to deficiencies in the reserves of Atlas' subsidiaries, there was a reserve deficiency attributable to Atlas in the amount of $30.1 million. FAC ¶¶ 13, 97, 159, 167. While the Missouri Report contained findings regarding a time period prior to the Class Period, the Missouri Report also issued opinions about Atlas' contemporaneous reserve and accounting practices. Specifically, the Missouri Report ordered the reserve deficiencies to be rectified, ordered rectification of Gateway's reserve methodology, and stated "management's current 'reserve memo' does not address IBNR, and thus does not fulfill the requirements of [SSAP] 55." *Id.* ¶ 98 (quoting FAC Exh. A). Thus, when Defendants represented months later on March 1, 2018 that they were surprised by the need for another reserve increase, without disclosing the Missouri Report findings, there is a plausible and cogent inference that Defendants had known they would need to increase the reserves, and that they were not actually surprised by the need for a reserve increase.

Defendants' March 1, 2018 reassurances to investors that the file-by-file review revealed the need for a reserve increase and that the reserve was then

adequate does not help Defendants either. Arguably, Defendants were motivated to act surprised by the need for a reserve increase, despite the Missouri Report, and to assure Atlas' investors that the reserves were rectified because keeping the reserves low overinflated the net income of the company. *See* FAC ¶ 6. Moreover, the New York Report, issued on March 29, 2018, which stated Atlas had "ongoing reserve inadequacies," supports Plaintiffs' inference that the deficiencies identified in the May 2017 Missouri Report had not been rectified as of March 2018, meaning that Defendants either knew that their March 2018 reassurances that the reserves were adequate were false, or at the very least that Defendants were "reckless in disregarding a substantial risk that it was false." *W. Palm Beach*, 495. Supp. 3d at 658 (internal quotation marks and citation omitted).

Defendants argue that an inference of scienter is improper because the FAC alleges that (1) the reserve increase for year-end 2017 was based on year-end actuarial work by independent third-party actuaries,[16] and (2) the reserve increase came as a surprise because independent actuarial estimates were bigger than Atlas' team had assessed when they did their file-by-file review. Reply at 17 (citing FAC ¶¶ 103–04, 108). However, Plaintiffs' inference that Defendants acted with scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of

---

[16]Defendants similarly argue in passing in their opening brief that, because Atlas set its reserves based on advice provided by its independent actuaries, any cogent or compelling inference of scienter is diminished. *See* Memo. Dismiss at 25. The Court finds this argument underdeveloped and therefore, will not consider it. *See Shipley v. Chicago Bd. of Election Commissioners*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived."). Again, it is not the Court's role to make or flesh out the parties' arguments, so the Court need not address this fleeting argument further. *See Vertex*, 374 F. Supp. 3d at 765 (citation omitted).

competing inferences[.]" *Tellabs*, 551 U.S. at 324 (internal quotation marks and citation omitted). Rather, a complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Defendants have not shown that their proposed inference—that the reserve increase was caused by year-end actuarial work by independent third-party actuaries and that Defendants were legitimately surprised by the reserves because Atlas' estimates for reserves were smaller than the independent actuarial estimates—is more cogent or compelling than Plaintiffs' fraudulent inference. Defendants' arguments opposing Plaintiffs' fourth scienter basis, as a result, fall short.[17]

### e. Defendants' Unusual and Suspicious Stock Sales during Class Period

Finally, Plaintiffs direct the Court to their allegations regarding the individual Defendants' stock sales to support the scienter element of their 10b–5 claim. Resp. Dismiss at 29–31.

"Because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pension Tr.*

---

[17]To attack scienter on this basis, Defendants also cite to Judge Rowland's refusal to infer that Atlas' detailed internal "review of claims revealed information about reserve inadequacies," in light of her finding that "plaintiffs ha[d] not adequately pled that defendants' review of claim information revealed contradictory information regarding reserve amounts." Reply at 17 (quoting *Fryman*, 462 F. Supp. 3d at 904). According to Defendants, the FAC does not plead any different facts, so the Court should similarly decline to infer that Atlas' internal review revealed inadequacies. *Id.* However, the FAC does plead additional scienter facts demonstrating contemporaneous contradictory information about reserve amounts, including the allegations of Defendants' knowledge as indicated by findings in the Missouri Report and the New York Report. *See, e.g.*, FAC ¶¶ 242–51.

*Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 940 (7th Cir. 2018) (internal quotation marks and citations omitted). To determine whether an insider stock sale is unusual or suspicious, courts can consider, among other things, the "percentage of the individual defendants' holding, . . . the typical trading volume of [the company's] shares, . . . [and] how [the company's] stock price fluctuated around these sales," and the timing of the sales. *Id.*

When considering those factors here, the Court finds the stock sales by the individual Defendants are sufficiently unusual to support an inference of scienter. In the time period between November 8, 2017 and December 21, 2017, Wollney, Romano, and others sold substantial amounts of their stock, when, prior to the Class Period, none of these individuals had sold any of their Atlas stock. FAC ¶ 17. The timing is questionable because the stock sales took place: (1) when Atlas' stock was near its Class Period high; (2) around 6 months after the Missouri Report; (3) around four months before the March 1, 2018 press release announcing a substantial reserve increase; and (4) during the time Defendants claimed to be performing their file-by-file review of claims to ensure reserve adequacy. *Id.* As Plaintiffs point out, that extensive review included Joseph Shugrue, AFH's then Vice-President for Claims, looking over older, non-modeled claims,[18] which Defendants later referred to in

---

[18]"[C]laims after June 1, 2016 had 'modeled' case reserves that took into account predictive analytics, whereas claims prior to that date were so-called 'non-modeled' claims where the case reserves were not set using predictive analytics." FAC ¶ 69.

explaining Atlas' decision to increase Fiscal Year 2017 reserves.[19] Resp. Dismiss at 30 (citing FAC ¶¶ 182, 184). As a result, Plaintiffs have adequately pled facts showing the timing of the stock sales to be suspicious, as the FAC alleges that the executives knew that they were selling off their stock before announcing massive reserve increases, which could reduce the value of Atlas' stock.

The percentages of stocks sold were also unusual. Wollney, for instance, sold nearly 10% of his holdings and realized $721,880.00 from his stock sales. Resp. Dismiss at 6 (citing FAC ¶ 214). Romano sold over 26% of his holdings, earning $525,675.00. *Id.* (citing FAC ¶ 214). On March 2, 2018, Atlas' stock price fell $7.70 per share, over 40%, to close at $11.10 per share on unusually heavy trading volume. FAC ¶ 22. Wollney and Romano were not alone in their stock sales during this time period; Shugrue, who led the claim review, and other insiders "in the know," *see Higginbotham*, 495 F.3d at 759; *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271–72 (S.D.N.Y. 2009), also made substantial stock sales for the first time. Shugrue sold 24% of his holdings for $456,173.00; Bruce Wayne Giles, Atlas' Vice

---

[19]To oppose scienter, Defendants relatedly contend that Plaintiffs "do not offer any facts in support of their conclusory assertion that defendants 'disregarded' that 'older non-modeled claims were being paid for higher than case reserves.'" Memo. Dismiss at 25 (quoting FAC ¶ 108). The Court finds Plaintiffs' allegation about the disregarding of the impact of older non-modeled claims to be a fair interpretation of Wollney's comments to shareholders on March 1, 2018 because Wollney suggested that "in aggregate, there was sort of an offsetting effect" and that Defendants' expectation had been that the IBNR problem "would be more than offset by the benefit from what was going on the modeled claims . . . ." FAC ¶ 108. Furthermore, while the Court must ensure that "the grounds for the [P]laintiffs' suspicions . . . make the allegations plausible," the Court must also "remain[] sensitive to information asymmetries that may prevent [Plaintiffs] from offering more detail based only on [their] pre-complaint inquiry, which [is] conduct[ed] without the benefit of discovery." *Pierrelouis*, 414 F. Supp. 3d at 1174 (internal quotation marks and citation omitted). The Court therefore finds Defendants' arguments on this point miss the mark.

President for Product Development and Underwriting, sold approximately 25% of his holdings for $459,172.00; Leslie DiMaggio, Atlas' then-Vice President for Operations and IT, sold approximately 24% of her holdings for $459,172.00. FAC ¶ 17. The Court therefore finds the insider stock sales to support an inference of scienter here.

Defendants once again rely on Judge Rowland's opinion, arguing that Judge Rowland concluded that the stock option exercises were not suspicious. Reply at 17. Defendants maintain that the FAC adds nothing to Plaintiffs' "already-rejected allegations" that stock option exercises by certain Atlas officers bolster Plaintiffs' scienter allegations. *Id.* The Court disagrees that the FAC adds nothing to the Third Amended Complaint's allegations regarding the suspicious stock sales. *Compare* R. 61 ¶¶ 106–13 *with* FAC ¶¶ 117, 212–20. The FAC adds allegations detailing the individual sales made over a short time by each insider (as opposed to just a summary of the total stock sales for each individual), as well as the percentage of holdings sold by each individual. More importantly, the FAC adds scienter allegations about Defendants' knowledge in light of the findings in the New York Report and Missouri Report about contemporaneous reserve deficiencies at Atlas, which show that the timing of the stock sales was suspicious. Judge Rowland did not have the benefit of all these allegations when she concluded that the stock option exercises were not suspicious.[20] Taken alone, allegations of stock sales by the individual Defendants

---

[20]For instance, while Judge Rowland took judicial notice of the Missouri Report for a limited purpose, *see Fryman*, 462 F. Supp. 3d at 895, the Third Amended Complaint did not include allegations discussing the Missouri Report, *see* R. 61, so Plaintiffs had not alleged with particularity why the Missouri Report (which primarily dealt with a time period before the Class Period) was pertinent to Defendants' knowledge about reserve deficiencies during the Class Period. The New York Report was not before Judge Rowland at all.

during the Class Period would not satisfy the scienter requirement. However, when the Court considers the FAC stock sales allegations holistically in conjunction with the other scienter allegations demonstrating Defendants' knowledge, the Court finds the insider stock sales to support an inference of scienter here.

Defendants further argue that the insiders did not sell enough of their stock to be suspicious, and that "[t]heir significant continuing investment in [Atlas] is directly in conflict with any inference that the alleged stock sales were motivated by fraud." Reply at 18 (citing *Gildan*, 636 F. Supp. 2d at 271). While the court in *Gildan* did find the individual defendants' sales in that case to be "relatively small in volume compared to overall holdings," where the stock sales "amounted to only 22.5% and 4.9% of [the individual defendants'] holdings, respectively," *Gildan*, 636 F. Supp. 2d at 271, the sales in this case are, to begin, at least somewhat more substantial (ranging from 10% to 26%). The *Gildan* court, furthermore, did not set a categorical of the individual defendant's holdings is just one factor for a court to consider when assessing whether stock sales by individual defendants are suspicious. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (citations omitted) ("Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants' selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to

trading plans such as Rule 10b5–1 plans."). Here, when all of those factors are considered, the Court finds that the inference that Wollney, Romano, and three other insiders, who had never sold any stocks before, dumped their stocks after the Missouri Report while the stock price was high and before Atlas announced its substantial reserve increase is at least as cogent and compelling as Defendants' inference that the executives were just engaging in innocent stock exercises.

### f. Corporate Scienter

Plaintiffs also contend that the scienter of each Wollney and Romano (and other corporate executives) is imputable to Atlas, a point with which Defendants disagree. FAC ¶ 259; Resp. Dismiss at 31–32; Reply at 18–19.

A corporation may be liable for statements by its employees, so long as the employees have apparent authority to make them. *Pugh v. Trib. Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (citing *Am. Soc'y. of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982)). "Accordingly, the corporate scienter inquiry must focus on the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Id.* (internal quotation marks and citation omitted). Significantly, "it is possible to draw a strong inference of corporate scienter without naming specific individuals." *In re Chicago Bd. Options Exch. Volatility Index*

*Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 861 n.6 (N.D. Ill. 2020) (internal quotation marks and citation omitted).

Here, Plaintiffs have adequately pled that the individual corporate officials who made the statements at issue in this case, Wollney and Romano, had the requisite state of mind to support corporate scienter. For starters, Wollney (President, Chief Executive Officer & Director) and Romano (Vice President and Chief Financial Officer) had the authority to make the purported misleading statements. FAC ¶¶ 229–30. As alleged in the FAC, Wollney and Romano "possessed the power and authority to control the contents of Atlas Financial's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market." *Id.* ¶ 49.[21] Plaintiffs have further pled that Defendants had knowledge in this case that their under-reserving practices violated state regulations, and that despite that knowledge, Atlas continued to under-reserve throughout the Class Period and issue misleading reassurances about Atlas' reserves to Atlas' investors. *See, e.g.*, *id.* ¶¶ 38, 147. The Court therefore finds that corporate scienter is adequately pled here.[22]

---

[21]This is not to say that scienter is met merely because reserve setting is part of Atlas' core operations, or because Defendants are experienced corporate executives. *See* Memo. Dismiss at 27. While the Court disagrees that Plaintiffs, pre-discovery, must plead to specific internal, "smoking gun" documents showing fraud, *see id.*, the Court agrees that "scienter may not rest on the inference that defendants must have been aware of a misstatement based on their positions within the company." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 713–14 (N.D. Ill. 2005) (internal quotation marks and citation omitted).

[22]In their reply brief, Defendants state, without meaningful elaboration, that Plaintiffs have not pled facts supporting corporate scienter. Reply at 18–19. Defendants have accordingly waived their corporate scienter argument. *See Shipley*, 947 F.3d at 1063.

Bringing it all together, when the allegations in the FAC are accepted as true and taken collectively, the Court finds that a reasonable person would deem the inference of scienter at least as strong as any opposing inference. *Tellabs*, 551 U.S. at 326 (citations omitted). Although not one of Plaintiffs' purported bases would alone suffice, taken together, Plaintiffs' scienter grounds—(1) the magnitude and ongoing nature of Atlas' reserve deficiencies, (2) the Missouri and New York Reports, (3) the dismissal of RSM, (4) Atlas' 2017 year-end review and representations, and (4) Defendants' unusual and suspicious stock sales—show that the inference of fraud is at least as cogent and compelling as Defendants' competing inference.[23] In other words, Plaintiffs have pled facts giving rise to a strong inference that Defendants either knew their statements about Atlas' financials and reserves were false, or were at least reckless in disregarding a substantial risk that the statements were false. *W. Palm Beach*, 495. Supp. 3d at 658. Whether there was actually scienter in this case is a decision for another day; for now, although by no means a slam dunk, Plaintiffs have adequately pled scienter for their 10b–5 claim.

The Court next addresses the final requirement of a 10b–5 securities fraud claim attacked by Defendants, loss causation. *See Tricontinental*, 475 F.3d at 842.

---

[23]Plaintiffs' allegations regarding Atlas' non-compliance with debt covenants, FAC ¶¶ 253–56, are not a basis for the Court's holding that Plaintiffs have adequately pled scienter here. The Court agrees with Defendants that Plaintiffs have not persuasively shown, at this point, that the covenant allegations reveal a motive to defraud where Atlas' non-compliance with those debt covenants was resolved long before the alleged misstatements. Memo. Dismiss at 30. However, the Court is not striking these allegations in the complaint or making a finding that the debt covenants could not support scienter after discovery is conducted.

### 3.    Loss Causation

Defendants argue that Plaintiffs have failed to adequately plead loss causation in this case. To plead loss causation in the Seventh Circuit, "[t]he plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 749 (N.D. Ill. 2006) (citing *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)). Although loss causation is a PSLRA element, it is not subject to the heightened Rule 9(b) pleading standard. *Id.* at 742 (citation omitted). As such, loss causation is subject to the pleading standards of Rule 8(a)(2), which requires only "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As a result, Plaintiffs are not required to plead facts showing economic loss or causation; they must merely "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Ong*, 113 F.3d at 649 (internal quotation marks omitted) (citing *Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 347 (2005)).

The FAC provides the requisite indication of loss and causal connection Plaintiffs have in mind. Specifically, Plaintiffs plead that "[d]uring the Class Period, Plaintiffs and the Class purchased Atlas Financial's securities at artificially inflated prices and were damaged thereby. The price of [Atlas'] securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses." FAC ¶ 261. Plaintiffs additionally allege

that the truth about Atlas' financial condition was partially revealed on or about March 1, 2018, March 15, 2018, June 15–18, 2018, March 4, 2019, and April 30, 2019, and that the direct result of the partial disclosures was the decline in the price of Atlas' stock, often on heavy trading volume. *Id.* ¶ 262. Plaintiffs have thus put Defendants on notice of the economic loss they allege, as well as the causal connection that Plaintiffs have in mind—that Defendants' misrepresentations led to Plaintiffs purchasing Atlas stock at inflated prices, and that the value of that stock began and continued to plummet as the truth about Atlas' reserve deficiencies and the overall health of the company was revealed. Plaintiffs have satisfied the pleading requirements for loss causation.

Defendants launch four primary attacks on the loss causation allegations in the FAC, none of which persuades the Court that the entire case should be dismissed. *See* Memo. Dismiss at 31–33. First, Defendants aver that Plaintiffs have not plausibly alleged that their losses were attributable to a revelation of fraud rather than normal market movements following the disappointing reports on March 1, 2018, and March 4, 2019 regarding Atlas' expected net losses. *Id.* at 31–32. However, Defendants elevate the loss causation pleading standard. Plaintiffs do not have to plead that all of their loss is attributed to the actions of the Defendants, only that Defendants' actions are a plausible cause of Plaintiffs' economic loss. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 618 (7th Cir. 2011) (citations omitted) ("[W]e do not require that a plaintiff plead that all of its loss is necessarily attributed to the actions of the defendant, only that it plead that the defendant is at least one plausible cause of the

economic loss."); *Ray v. Citigroup Glob. Markets, Inc.*, 482 F.3d 991, 994–95 (7th Cir. 2007) (analyzing loss causation requirement and noting that a plaintiff must be able to plead that "the defendant's actions had something to do with the drop in value" of the stock). Plaintiffs have made the requisite pleading by alleging plausibly that Defendants' misstatements about Atlas' reserves and concealment of the state regulatory investigations artificially inflated the stock prices, and that the subsequent announcements of massive reserve increases (which Defendants purposefully spread throughout the Class Period to avoid shocking the market) caused investors to lose money. *See* FAC ¶¶ 147, 261.

Second, Defendants argue that the fact that Atlas maintained its public stance throughout the Class Period that its reserves were adequate means that loss causation is not met. Memo. Dismiss at 32 (citing *Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009)). In *Biovail*, the court held that the plaintiffs' complaint did not adequately plead loss causation because the complaint "did not identify any 'corrective disclosure' that revealed the existence of some prior alleged misrepresentation by Defendants and so caused [the company's] stock price to decline." 615 F. Supp. 2d at 229. By contrast here, Plaintiffs have alleged that there were corrective disclosures. While Defendants may have maintained their position that their reserves were adequate, they nevertheless made statements which partially revealed the truth of their reserve deficiencies, including their disclosure that they fired RSM after RSM told Atlas that its material under-reserving made Atlas' financial statements materially misstated. *See* FAC ¶ 35. As

Plaintiffs allege, Atlas' stock price fell by 24% in response to the RSM news. *Id.* ¶ 36. *Biovail* is thus distinguishable from this case.

Third, Defendants attempt to chip away at loss causation by diminishing Plaintiffs' allegations regarding A.M. Best's ratings downgrade on June 15, 2018. Memo. Dismiss at 32 (citing FAC ¶ 116). Defendants argue that the A.M. Best downgrade merely reflected the adverse information that the market had already absorbed. *Id.* (citations omitted). But, the Court agrees with Plaintiffs that Defendants are in fact contesting the corrective impact of the A.M. Best downgrade. *See* Resp. at 33 n.28. Such a determination is not appropriate for the Court to decide on a motion to dismiss. *See Akorn*, 240 F. Supp. 3d at 821 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)) ("'Loss causation is a fact-based inquiry' that need not be proven until the later stages of litigation"). Even if the June 2018 A.M. Best ratings downgrade could not constitute a corrective disclosure, "Plaintiffs need not point to a single revelation that exposes the entirety of the alleged fraud . . . loss causation may be plead on a theory of partial disclosures." *Heinz*, 2021 WL 3566602, at *16. Defendants' argument knocking off the June 2018 A.M. Best downgrade, even if successful, would not undermine Plaintiffs' other alleged partial disclosures, *see* FAC ¶ 262, so the Court would still consider loss causation satisfied here.

Fourth, Defendants assert that loss causation cannot be alleged for statements made by Defendants after Plaintiffs' last purchases of Atlas common stock. Memo. Dismiss at 33 (citing FAC ¶¶ 171–78). Relatedly, Defendants insist that

the named Plaintiffs, who would have no claim of their own based on the post-purchase statements, do not have standing with regard to statements made after their last stock purchases. *Id.* (citing *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 n.6 (7th Cir. 1992); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 707 (N.D. Ill. 2005)). Here, the Court finds that, although not fatal to Plaintiffs' loss causation allegations generally, Defendants are correct.

In *Roots*, the Seventh Circuit indeed held that loss causation was not satisfied for the alleged post-purchase statements, "because the statements could not have affected the price at which plaintiff actually purchased." 965 F.2d at 1420 (citation omitted). The court in *Roots* further held that, "[h]aving no claim of its own based on the post-purchase statements, [the plaintiff] would not be a proper representative of a class of persons who bought [the company's] stock after defendants' allegedly fraudulent post-[purchase] statements." *Id.* at 1411 n.6. Thus, contrary to Plaintiffs' assertion, *see* Resp. Dismiss at 34, *Roots* does "stand for the broad principle" that loss causation is not adequately alleged for post-purchase statements.

Courts interpreting the *Roots* holding confirm this reading. *See, e.g.*, *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 644 (N.D. Ill. 2015) (quoting *Roots*, 965 F.2d at 1420) ("post-purchase statements cannot form the basis of Rule 10b–5 liability, because the statements could not have affected the price at which plaintiff actually purchased"); *Davis*, 385 F. Supp. 2d at 705 (collecting cases interpreting *Roots*); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 908 (N.D. Ill. 2001) (citing *Roots* and finding that "[s]tatements made after

named plaintiffs purchased their stock cannot form the basis for § 10(b) liability, even if other class members purchased later"). The Court accordingly finds that loss causation has not been pled for any post-Class Period statements.

The Court further finds that Plaintiffs lack standing to pursue any claims based on post-Class Period statements. Plaintiffs claim that such a holding would constitute a premature attack on Rule 23(a)(4) adequacy, improper at the motion to dismiss stage. Resp. Dismiss at 35 (citation omitted). The Court disagrees. Several courts have found standing lacking for post-purchase statements in a motion to dismiss posture. *See, e.g.*, *Navistar*, 114 F. Supp. 3d at 644; *Anderson*, 140 F. Supp. 2d at 908. Alternatively, Plaintiffs request leave to add additional representative plaintiffs. Resp. Dismiss at 35 n.31. Plaintiffs' request is denied; this litigation has been ongoing since 2018, and Plaintiffs are now on their fourth amended complaint. Plaintiffs have had ample time to find the appropriate class members and appropriately plead loss causation for all alleged misstatements.

### B. "Control Person" Liability

Defendants' only argument as to "control person" liability is that because Plaintiffs have not alleged a primary violation, their "control person" claim under Section 20(a) of the Exchange Act should also be dismissed. Memo. Dismiss at 33 (citing *Pugh*, 521 F.3d at 693). However, for the reasons discussed above, the Court finds that Plaintiffs have alleged a primary violation. As such, Defendants' "control person" argument fails.

## Conclusion

For the reasons above, Defendants' motion to dismiss [99] is granted in part and denied in part. It is granted as to any misstatement claims which allege that post-Class Period statements are false or materially misleading, but is denied in all other respects (to make sure the Court's holding is crystal clear, the Court clarifies that it is not dismissing any claims that are supported by or relate to statements made after the Class Period, only misstatement claims alleging that post-Class Period statements, themselves, are misleading). Defendants shall answer the FAC by May 9, 2022.

Dated: April 18, 2022

Franklin U. Valderrama
United States District Judge